## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-cr-203 (JDB)** |
| | : | |
| **ALEXANDER SHEPPARD,** | : | |
| | : | |
| **Defendant.** | : | |

### UNITED STATES' OMNIBUS MOTION IN *LIMINE*

The government hereby moves in *limine* to preclude the following defense arguments and to admit certain evidence during trial in this case. The government will address authentication of multimedia evidence in a separate motion.

Motions in *limine* are "designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Graves v. District of Columbia*, 850 F. Supp. 2d 6, 10 (D.D.C. 2011) (quoting *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1070 (3d Cir. 1990)). The government presents these issues to the Court in an effort to prepare this case for an efficient trial. For each motion herein, the United States asks that the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments when the relevant issues arise during trial. For the Court's awareness, the government also anticipates filing a trial memorandum in which it will discuss additional legal or evidentiary issues that may arise during trial, but on which the government would not be seeking a pretrial ruling.

### I. Motion in *Limine* No. 1: To Limit Unnecessary Discussion of Security-Related Topics

The government moves to preclude the admission of any evidence, through cross-examination or through the defense case-in-chief, or argument by counsel, regarding certain sensitive, security-related topics. Specifically, the government seeks to preclude evidence or argument concerning 1) the exact locations of U.S. Capitol Police ("USCP") security cameras and

2) the protocols of the U.S. Secret Service ("USSS").  As explained below, these two topics have little to no probative value but would compromise significant security interests if needlessly disclosed to the public.  The government does not intend to elicit any of the following topics in its case-in-chief and, for that reason, cross-examination on such topics may simply be beyond the scope of direct examination and impermissible for that reason.  *See* Fed. R. Evid. 611(b).  To the extent that Defendants seek to argue that any of the following topics are relevant and within the scope of the government's examination, the government requests an order under Fed. R. Evid. 403 foreclosing unnecessary cross-examination on these topics.

It is well established that this Court may reasonably limit a criminal defendant's presentation of evidence and cross-examination of witnesses.  *See United States v. Whitmore*, 359 F.3d 609, 615-16 (D.C. Cir. 2004) ("The district court . . . has considerable discretion to place reasonable limits on a criminal defendant's presentation of evidence and cross-examination of government witnesses.").  For one thing, the Court may prohibit cross-examination that goes beyond matters testified to on direct examination. Fed. R. Evid. 611(b). This is particularly so when the information at issue is of a sensitive nature. *See e.g., United States v. Balistreri*, 779 F.2d 1191, 1216-17 (7th Cir. 1985) (upholding district court's decision to prohibit cross-examination of agent about sensitive information about which that agent did not testify on direct examination and which did not pertain to the charges in the case), *overruled on other grounds by Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2016).  The Confrontation Clause only guarantees "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).[1]

---

[1] Even if evidence may be relevant to an affirmative defense, that evidence should not be elicited during cross-examination of government witnesses during the government's case-in-chief. Instead, it would be elicited (if at all) only after a defendant sufficiently establishes that defense through

More specifically, even if marginally relevant, this Court may exclude evidence under Federal Rule of Evidence 403 on the ground that its marginal probative value is significantly outweighed by the national security risks implicated by that evidence's use at trial. The Supreme Court has recognized that trial courts' balancing under Federal Rule of Evidence 403 should account for concerns extrinsic to the litigation, such as "witness' safety." *Olden v. Kentucky*, 488 U.S. 227, 232 (1988). Accordingly, courts have properly balanced the sensitivity of national security-related information against the probative value of such information to the case, excluding the evidence where its relevance is slight. *See, e.g., United States v. Marshall*, 544 F. Supp. 3d 1032, 1042 (D. Mont. 2021); *United States v. Mohammed*, 410 F. Supp. 2d 913, 918 (S.D. Cal. 2005); *cf. United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988) (endorsing balancing test in context of Classified Information Procedures Act).

This Court should take the same step here for the reasons given below. The marginal probative value of the exact positions of USCP cameras, the camera map, and U.S. Secret Service protocols are substantially outweighed by national security concerns, and any probative value can be addressed without compromising the protective functions of government agencies.

### A. Exact Locations of USCP Cameras

The government produced the exact locations of USCP surveillance cameras ("CCTV"), including maps showing each camera's physical location, in discovery pursuant to the Highly Sensitive designation of the Protective Order. The purpose of that disclosure was to permit

---

affirmative evidence presented during their own case-in-chief. *See United States v. Lin*, 101 F.3d 760, 768 (D.C. Cir. 1996) (acknowledging trial court has discretion to limit cross-examination on prejudicial matters without reasonable grounding in fact); *United States v. Sampol*, 636 F.2d 621, 663-64 (D.C. Cir. 1980) (holding that trial court properly limited cross-examination of alleged CIA murder scheme until defense put forth sufficient evidence of the affirmative defense in its case-in-chief).

defendant to make use of such information in order to identify evidence and prepare for trial. However, those locations do not serve to illuminate any fact of consequence that is before the jury. To the extent CCTV footage is introduced, a general description of its location and the footage from the camera itself will make clear what the camera recorded and what it did not. Absent some concrete and specific defense need to probe the camera's location, there is nothing to be gained from evidence of specific camera locations or the map of all CCTV cameras.

On the other hand, the national security implications at stake are significant. The U.S. Capitol Police's surveillance system serves an important and ongoing function in protecting Congress. Furthermore, the maps that show the physical location of cameras have been designated as "Security Information" under 2 U.S.C. § 1979, which generally requires approval of the Capitol Police Board before they may be released. If a map that revealed the location of all Capitol cameras were introduced in this trial, or in any trial, it would become available to the general public and foreign adversaries. Anyone could discern the Capitol Building's camera coverage as of January 6, 2021, including parts of the Capitol where cameras were not then installed.

Accordingly, the security considerations of introducing this evidence clearly outweigh significantly any marginal probative value of the specific locations or map of CCTV cameras.

**B. Secret Service Protocols**

To meet its burden of proof at trial, the government may call a witness from the United States Secret Service to testify that at the time of the Capitol breach, Secret Service agents were on duty to protect former Vice President Mike Pence and his immediate family members, all of whom were present at the Capitol. The witness would further testify about the Capitol breach's effect on the Secret Service's protection of Vice President Pence and his family members. The purpose of this testimony would be to explain—in part—the bases for enhanced security controls

4

at the Capitol on January 6 as well as establish elements of several charges.  First, with respect to Counts Two and Three, that the Vice President was visiting the Capitol building on January 6, 2021, rendering the Capitol building and its grounds a "restricted building or ground" under 18 U.S.C. § 1752(c)(1)(B) (defining such term to include "any posted, cordoned off, or otherwise restricted areas—. . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting").

The very nature of the Secret Service's role in protecting the Vice President and his family implicates sensitive information related to that agency's ability to protect high-ranking members of the Executive Branch and, by extension, national security.  Thus, the government seeks an order limiting the cross-examination of the Secret Service witnesses to questioning about the federally protected function performed by the Secret Service as testified to on direct exam, namely, protecting the Vice President and his family.  The government further requests that such order preclude cross-examination that would elicit information that does not directly relate to whether the Secret Service was performing that function at the Capitol on January 6, 2021.  Specifically, cross-examination should not be permitted to extend to (1) Secret Service protocols related to the locations where protectees or their motorcades are taken at the Capitol or other government buildings when emergencies occur, and (2) details about the nature of Secret Service protective details, such as the number and type of agents the Secret Service assigns to protectees.  These topics have no relevance to any issue at controversy, and even if they did, any relevance would be substantially outweighed by the danger of prejudicing the government's legitimate interest in the safety of senior government officials.  *See* Fed. R. Evid. 403.

Cross-examination of Secret Service witnesses about extraneous matters beyond the scope of direct examination should be excluded as irrelevant or unduly prejudicial.  The Secret Service's

general protocols about relocation for safety are completely irrelevant to the only facts at issue—whether the Vice President was the Capitol that day and whether the breach interfered with his details' function. Fed. R. Evid. 401.  Similarly, evidence of the nature of Secret Service protective details in general is not relevant in this case.  The disorder on January 6 interfered with the Secret Service's duties to protectees in this case insofar as they were required to take action to evade the mob.  The number or type of assigned agents on a protective detail is simply not relevant and could not alter the probability that there was interference with the Secret Service.  None of the other elements to be proven, or available defenses, implicates further testimony from the Secret Service.

Even assuming the evidence to be excluded is marginally relevant, such relevance is substantially outweighed by the danger of confusion of the issues, mini-trials, undue delay, and waste of time.  Broader cross-examination of Secret Service witnesses could compromise national security without adding any appreciable benefit to the determination of the truth, or the veracity or bias of witnesses.

If the defense believes that it is necessary to present evidence or cross-examine witnesses about the exact locations of USCP cameras or USSS procedures, the government requests that the Court conduct a hearing in camera to resolve the issue.  Courts have found that in camera proceedings are appropriate in circumstances where security concerns like these are present. *See United States v. Nixon*, 418 U.S. 683, 714 (1974) (affirming district court's order for in camera inspection of subpoenaed presidential materials); *United States v. Kampiles*, 609 F.2d 1233, 1248 (7th Cir. 1979) ("It is settled that in camera . . . proceedings to evaluate bona fide Government claims regarding national security information are proper."); *In re Taylor*, 567 F.2d 1183, 1188 (2d Cir. 1977) (finding that in camera proceedings "serve to resolve, without disclosure, the conflict between the threatened deprivation of a party's constitutional rights and the Government's

claim of privilege based on the needs of public security."); *United States v. Brown*, 539 F.2d 467, 470 (5th Cir. 1976) (*per curiam*) (same). At any such hearing, the defendant should be required to make a specific proffer of some relevant purpose that is not substantially outweighed by the prejudice that disclosure would inflict on the government's security interests. *Cf. United States v. Willie*, 941 F.2d 1384, 1393 (10th Cir. 1991) (explaining that a "proffer of great specificity" was necessary to support admission of testimony that could have proper or improper purposes).

## II. Motion in *Limine* No. 2: To Preclude Defendant from Arguing Entrapment by Estoppel, Public Authority, or Entrapment

The government moves in *limine* to prohibit the Defendant from making arguments or attempting to introduce non-relevant evidence that 1) former President Trump (or any other Executive Branch official) gave permission for Alexander Sheppard ("Sheppard") to attack the U.S. Capitol, which would raise the affirmative defenses of public authority or entrapment-by-estoppel, or 2) that Sheppard was enticed or entrapped by law enforcement in attacking the U.S. Capitol. The former issue has been previously briefed in the context of Defendant's Notice of Public Authority Defense, *see* ECF 40, 43, 51, 56, and 57; the government's presentation of the case law relevant to the affirmative defenses of public authority and/or entrapment-by-estoppel is recapitulated below.

Sheppard's assertion that he cannot be held criminally liable because his actions were authorized by former President Trump must be precluded because, as Chief Judge Beryl Howell has recognized, "following orders, without more, can[not] transform an illegal act into a legal one" and "even if former President Trump in fact [explicitly directed the rioters' actions,] his statements would not immunize defendants charged with offenses arising from the January 6 assault on the Capitol from criminal liability." *United States v. Chrestman*, 525 F. Supp. 3d 14, 32-33 (D.D.C. 2021). Indeed, judges in this District have repeatedly rejected a defendant's attempt to rely on the

entrapment-by-estoppel defense to counterbalance the strength of the government's case during a challenge to the defendant's pretrial detention. *See also United States v. Chansley*, 525 F. Supp. 3d 151, 168 (D.D.C. 2021) ("The Court need not dwell on defendant's invocation of the estoppel-by-entrapment defense. The same argument was raised and rejected in another case involving a participant in the January 6th events, and the Court adopts the reasons for rejecting that argument set forth there by Chief Judge Beryl Howell.").

Moreover, on at least two occasions, other judges of this District have precluded defendant from raising one or both defenses at trial. Judge Walton, applying the case law described below, precluded a January 6 defendant from invoking the entrapment-by-estoppel and public authority defenses at trial. *See United States v. Thompson*, No. 21-cr-161-RBW, Dkt. 69 at 3-4 (D.D.C. Mar. 25, 2022). Judge Kollar-Kotelly did the same with respect to the first of those defenses. *United States v. Grider*, No. CR 21-022 (CKK), 2022 WL 3030974, at *2-4 (D.D.C. Aug. 1, 2022). As demonstrated by those cases, judges of this District have determined well in advance of trial that those defenses can and should be precluded. The question of whether a defendant may seek to introduce evidence in support of public authority and/or entrapment by estoppel defenses presents a threshold legal determination for the judge, and not the trier of fact, to adjudicate. Where, as a here, the defendant cannot meet his threshold burden, the Court should preclude defendant as a matter of law from making arguments or attempting to introduce non-relevant evidence in support of those affirmative defenses.

As a matter of law, neither defense could apply on these facts and so Sheppard cannot invoke either at trial. The entrapment-by-estoppel defense applies only if the defendant was "actively misled . . . about the state of the law defining the offense," and relied on that misleading advice. *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018). No such advice was given to

Sheppard on or before January 6, and Sheppard has not proffered any evidence to the contrary. The public authority defense, meanwhile, applies only to a "defendant who knows the conduct he has been authorized to commit is illegal," but believes he is acting as an agent of a government official who possessed actual authority to order his conduct. *United States v. Alvarado*, 808 F.3d 474, 485 (11th Cir. 2015). The defense is

> narrowly defined . . . and a defendant will not be allowed to assert the defense, or to demand that the jury be instructed on it, unless he meets certain evidentiary prerequisites. First . . . a federal law enforcement officer must have actually authorized the defendant to commit the particular criminal act at issue, and the defendant must have reasonably relied on that authorization when engaging in that conduct. Second, the government official on whom the defendant purportedly relied must have actually had the authority to permit a cooperating individual to commit the criminal act in question.

*Id.* at 484. Here, no executive official had actual authority to ask Sheppard to unlawfully enter the Capitol, to participate in overrunning the police line in the Crypt, to race through the building to the entrance of the Speaker's Lobby while it was being protected by Capitol Police, to yell in the direction of the officers, and to obstruct Congress's certification of the Electoral College vote. Moreover, both defenses also require that the defendant's reliance or belief be *reasonable*. Even if Sheppard believed that former President Trump authorized him to engage in illegal conduct, or that the statutes he is now charged with had been interpreted to permit his conduct, neither belief would be reasonable.

"In a variety of procedural contexts, the vast majority of cases have held, as a matter of law, that the defense was unavailable on the facts of the case." *United States v. Conley*, 859 F. Supp. 909, 926 (W.D. Pa. 1994). Courts have routinely rejected either jury instructions or requests to put on evidence by defendants whose proffered evidence fails, as a matter of law, to meet the defenses' requirements. *E.g.*, *United States v. Nichols*, 21 F.3d 1016, 1018 (10th Cir. 1994)

(affirming denial of motion to appoint psychological expert to testify in support of entrapment-by-estoppel defense); *United States v. Weitzenhoff*, 35 F.3d 1275, 1290 (9th Cir. 1993) (upholding refusal to instruct jury on entrapment-by-estoppel defense); *United States v. Brebner*, 951 F.2d 1017, 1024-27 (9th Cir. 1991) (affirming exclusion of evidence purporting to raise the defense as immaterial as a matter of law); *United States v. Etheridge*, 932 F.2d 318, 320-21 (4th Cir. 1991) (order granting motion in limine precluding evidence upheld).

In *United States v. Thompson*, No. 21-cr-161-RBW, the defendant was charged with Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c)(2) and (2) (Count One); Theft of Government Property under 18 U.S.C. § 641 (Count Two); Entering and Remaining in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(1) (Count Three); Disorderly and Disruptive Conduct in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(2) (Count Four); Disorderly Conduct in a Capitol Building under 40 U.S.C. § 5104(e)(2)(D) (Count Five); and Parading, Demonstrating, or Picketing in a Capitol Building under 40 U.S.C. § 5104(e)(2)(G) (Count Six). In early January 2022, Thompson filed a pretrial motion seeking to have the U.S. Marshals Service serve subpoenas on former President Trump and others (including Rudolph Giuliani and other members of the former President's "inner circle"). *Id.* Dkt. 44 at 2. Judge Walton denied that motion, *id*. Dkt. 51, and directed Thompson to explain why those witnesses had relevant testimony. Thompson's filing asserted, in relevant part, that he intended to rely upon their testimony in support of two affirmative defenses: public authority and entrapment-by-estoppel. In response, the United States argued that the defendant should be precluded from asserting both defenses. Judge Walton agreed and issued an order finding that the "testimony of the putative witnesses . . . is inadmissible in support of either of the first two versions of the public authority defense as described by the defendant." *Id.* Dkt. 69 at 2.

At trial, the jury heard evidence of certain statements made by former President Trump and Rudolph Giuliani on January 6, 2021, but the Court cautioned the jury that such statements "had been admitted for a limited purpose" and instructed the jury that "[y]ou're not to consider that evidence for any other purposes.  Neither former president Donald Trump nor Rudy Giuliani actually had the power to authorize or make legal the alleged crimes charged in this case."  April 14, 2022 Transcript at 618-619.  The Court did not instruct the jury on the public authority or entrapment-by-estoppel affirmative defenses.

Likewise, in *United States v. Grider*, No. CR 21-022 (CKK), the defendant was charged with Civil Disorder under 18 U.S.C. § 231(a)(3) (Count One); Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c)(2) and (2) (Count Two); Destruction of Government Property under 18 U.S.C. § 1361 (Count Three); Entering and Remaining in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(1) (Count Four); Disorderly and Disruptive Conduct in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(2) (Count Five); Engaging in Physical Violence in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(4) (Count Six); Disorderly Conduct in a Capitol Building under 40 U.S.C. § 5104(e)(2)(D) (Count Seven); Act of Physical Violence in the Capitol Grounds or Buildings under 40 U.S.C. § 5104(e)(2)(F); and Parading, Demonstrating, or Picketing in a Capitol Building under 40 U.S.C. § 5104(e)(2)(G) (Count Nine).  On June 22, 2022, Grider filed a "Notice of Intent to Raise Public Authority Defense," *id.* Dkt. 102, and the following day, Judge Kollar-Kotelly issued a Minute Order directing legal briefing on the issue.  On July 7, 2022, Grider filed his "Brief in Support of Defendant's Notice of Intent to Raise Public Authority Defense." *Id.* Dkt. 108.  In his brief, Grider pointed to language from former President Trump's speech on January 6, 2021, as the basis for his assertion of the affirmative defense.  *Id.* at 3.  The Government filed its opposition on July 20,

2022, noting that the entrapment-by-estoppel defense applies only where a defendant was "actively misled . . . about the state of the law defining the offense" and relied upon that misleading advice, and asking that the Court preclude the defense in advance of trial. *Id.* Dkt. 111 at 6 (citing and quoting *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018)).

Judge Kollar-Kotelly rejected Grider's proposed affirmative defense and issued a Memorandum and Order explaining that "[b]ecause no such defense is available under Defendant's proffered facts, the Court shall not read an entrapment-by-estoppel instruction to the jury." *United States v. Grider*, 2022 WL 3030974, *1 (D.D.C. Aug. 1, 2022) (Kollar-Kotelly, J.).[2]  In particular, Judge Kollar-Kotelly cited and quoted Chief Judge Howell's description of the defense as requiring the defendant to meet four separate elements:

> To win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation.

*United States v. Chrestmann*, 525 F. Supp. 3d 14, 31 (D.D.C. 2021) (internal quotations and brackets omitted) (quoting *Cox*, 806 F.3d at 1191).  In that case, the Chief Judge's analysis focused on the fourth element, namely, whether reliance upon former President Trump's statements was reasonable. *Id.* 31-33.  In *Grider*, however, Judge Kollar-Kotelly focused on the first, rather than final prong, to reject the applicability of the affirmative defense, observing that "[r]egardless of whether Defendant can satisfy the fourth prong, reliance, he certainly cannot satisfy the first prong,

---

[2] Bench trial in that case began on December 12, 2022. *See* Minute Order dated September 22, 2022.

that President Trump 'actively misled him about the state of the law.'" *Grider*, 2022 WL 3030974, *3.

In order to satisfy the first prong, "Federal Courts of Appeals have concluded . . . that, for an entrapment-by-estoppel defense to be available, a 'government official or agent [must have] actively assured a defendant that certain conduct is legal.'" *Id.* (citing *United States v. Spires*, 79 F.3d 464, 466 (5th Cir. 1996); *Garcia v. Does*, 779 F.3d 84, 95 (2d Cir. 2015); and *Chrestmann*, 525 F. Supp. 3d at 32 ("Each of [these] case[s] involved either a misunderstanding of the controlling law or an effort by a government actor to answer to complex or ambiguous legal questions defining the scope of prohibited conduct under a given statute."). The *Grider* Court rejected the defendant's claimed defense because "former President Trump's statements did not in any way address the *legality* of the actions he urged his supporters to take. He did not, for example, assure them that marching along Pennsylvania was 'lawful' or that occupying the Capitol grounds was 'permissible.'" *Id.* (emphasis in original). Finally, although the *Grider* Court found it unnecessary to reach the question of whether the defendant relied "in good faith on any purported unlawful instruction by former President Trump," it observed that even if "former President Trump *did* direct Grider and others to break into the Capitol to obstruct Congressional proceedings, it is obvious that the President cannot 'waive statutory law' and 'sanction conduct that strikes at the very heart of the Constitution' in order to 'immunize from criminal liability those who seek to destabilize or even topple the constitutional order." *Grider*, 2022 WL 3030974, *4 (citing and quoting *Chrestmann*, 525 F. Supp.3d at 32-33). Accordingly, the *Grider* Court determined that it "shall not instruct the jury on a defense of entrapment by estoppel." *Id.*

A.        Entrapment-by-Estoppel

The defense of entrapment by estoppel on "applies to a defendant who reasonably relies on the assurance of a government official that specified conduct will not violate the law." *United States v. Alvarado*, 808 F.3d 474, 484–85 (11th Cir. 2015). Such reliance must be "objectively reasonable." *United States v. Barker*, 546 F.2d 940, 948 (D.C. Cir. 1976); *United States v. Votrobek*, 847 F.3d 1335, 1344 (11th Cir. 2017). As Chief Judge Howell wrote last year in rejecting the idea of an entrapment-by-estoppel defense for January 6 defendants:

> [A President] cannot, in keeping with his constitutional function and his responsibilities under Article II, lawfully permit actions that directly undermine the Constitution. Thus, a President cannot, within the confines of his constitutional authority, prevent the constitutionally mandated certification of the results of a Presidential Election or encourage others to do so on his behalf, nor can he direct an assault on the coequal Legislative branch of government. Were a President to attempt to condone such conduct, he would act *ultra vires* and thus without the force of his constitutional authority. . . . Put simply, even if former President Trump in fact [explicitly directed the rioters' actions,] his statements would not immunize defendants charged with offenses arising from the January 6 assault on the Capitol from criminal liability.

*Chrestman*, 525 F. Supp. 3d at 32-33. The D.C. Circuit came to the same conclusion when addressing Oliver North's contention that President Reagan authorized his obstruction of Congress in that case: "'[n]either the President nor any of [North's] superiors had the legal authority to order anyone to violate the law,' particularly if such 'orders,' explicit or implicit, represented nothing more than [the President's] desires." *United States v. North*, 910 F.2d 843, 891 n.24 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990).

Chief Judge Howell's opinion in *Chrestman*, which Judge Lamberth adopted with respect to this issue in the *Chansley* case, 525 F. Supp. 3d at 168, adopted a four-part test from the Tenth Circuit, which limits the entrapment-by-estoppel defense to narrow circumstances. *Chrestman*,

14

525 F. Supp. 3d at 33 (citing *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018)). "To win

an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1)

that a government agent actively misled him about the state of the law defining the offense; (2)

that the government agent was responsible for interpreting, administering, or enforcing the law

defining the offense; (3) that the defendant actually relied on the agent's misleading

pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in

light of the identity of the agent, the point of law misrepresented, and the substance of the

misrepresentation." *Cox*, 906 at 1191.

      Here, the defendant cannot meet the requirements of the Tenth Circuit's four-part test.  To

start, Sheppard has not and cannot point to any government official who advised him that his

conduct was legal or who provided any interpretation of the law that covered his alleged criminal

conduct.  Former President Trump's speech on January 6 could not serve this purpose.  As but just

two examples, former President Trump did not state that the U.S. Capitol grounds were no longer

"restricted" under 18 U.S.C. § 1752(a), nor that efforts to corruptly obstruct the certification of the

Electoral count would be permissible notwithstanding 18 U.S.C. § 1512(c)(2).  He therefore did

not "actively mis[lead]" defendant "about the state of the law defining the offense."  *Cox*, 906 F.3d

at 1191.  Sheppard has not identified anyone else who might have authority to do so who did so

either.

      And even if Sheppard were able to point to a government official, which he cannot, he

cannot show that his reliance was reasonable. "[R]easonable reliance occurs" only "if 'a person

sincerely desirous of obeying the law would have accepted the information as true, and would not

have been put on notice to make further inquiries.'" *United States v. Lynch*, 903 F.3d 1061, 1077

(9th Cir. 2018) (internal quotation marks omitted); *United States v. Corso*, 20 F.3d 521, 528 (2d

Cir. 1994) (adopting "sincerely desirous" standard).  It is objectively unreasonable to conclude that President Trump or any other Executive Branch official could authorize citizens to engage in violent or assaultive conduct toward law enforcement officers and interfere with the Electoral College proceedings that were being conducted.  Indeed, the Supreme Court has made clear that an entrapment by estoppel defense is not available in cases where a government official's directive constitutes a "waiver of law" beyond the official's lawful authority.  *Cox v. Louisiana*, 379 U.S. 559, 569 (1965) (Drawing an "obvious[]" distinction between identifying an area for lawful protest and "allowing one to commit, for example, murder or robbery."). Any "instruction" from a President or other Executive Branch official to wage an unlawful assault on the Legislative Branch of government would exceed those officials' constitutional authority.  *Id.*, citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588–89, 614 (1952) (enjoining actions taken by the President that exceeded his constitutional powers).  This is because "no President may unilaterally abrogate criminal laws duly enacted by Congress as they apply to a subgroup of his most vehement supporters." *Chrestman*, 525 F. Supp. 3d at 32.  Accordingly, any purported reliance on the words of an Executive Branch official would be *per se* unreasonable.

Accordingly, Sheppard should be precluded from raising this defense.

### B. Public Authority

"The public authority defense allows 'the defendant [to] seek[ ] exoneration based on the fact that he reasonably relied" on the "actual authority of a government official to engage him in a covert activity.'" *United States v. Fulcher*, 250 F.3d 244, 253-54 (4th Cir. 2001); Fed. R. Crim. P. 12.3(a)(1). "The difference between the entrapment by estoppel defense and the public authority defense is not great." *Burrows*, 36 F.3d at 882; *United States v. Baker*, 438 F.3d 749, 753 (7th Cir.

2006) ("The elements that comprise the two defenses are quite similar."). Any such defense would fail for the same reasons identified above.

First, "[t]he validity of" the public-authority "defense depends upon whether the government agent in fact had authority to empower the defendant to perform the acts in question. If the agent had no such power, then the defendant may not rest on the 'public authority' [defense]." *Burrows*, 36 F.3d at 881-82 (quoting *Baptista-Rodriguez*, 17 F.3d at 1368 n.18).[3] The circuits that have considered the issue are unanimous on that point.[4] Neither the President nor any other Executive Branch official has the authority to empower citizens to enter restricted Capitol

---

[3] In *United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976) (per curiam), the court reversed the convictions of two defendants who participated in the burglary of Daniel Ellsberg's psychiatrist's office. The defendants claimed they did so at the behest of E. Howard Hunt, a long-time CIA agent who worked under the supervision of John Ehrlichman in the White House. *North*, 910 F.2d at 879. The case featured fractured separate opinions from the three-judge panel. Judge Wilkey, half of the two-judge majority, wrote that a defendant's reasonable reliance on the "apparent authority" of a government official (there, Hunt) to authorize his conduct could make out a defense. *Id.* (quoting *Barker*, 546 F.2d at 949 (opinion of Wilkey, J.). But that portion of *Barker* was not the controlling rationale, and the panel majority in *North* subsequently rejected North's request for an instruction invoking his superiors' "apparent authorization of his action." *Id.* at 881. In any event, Judge Wilkey's application of reasonable reliance in *Barker*—where the defendants, each of whom had worked with the CIA, claimed that a government official (and previous CIA supervisor) authorized what they allegedly were told was a counter-espionage operation—has no analogue here.

[4] *See, e.g.*, *United States v. Holmquist*, 36 F.3d 154, 161 nn. 6-7 (1st Cir. 1994) (characterizing as "nonexistent" and "not a defense at all" the "'defense' of apparent public authority" based "on a mistaken but good-faith belief that one's conduct is authorized by the government"); *United States v. Duggan*, 743 F.2d 59, 84 (2d Cir. 1984) (declining to adopt view that "a defendant may be exonerated on the basis of his reliance on an authority that is only apparent and not real"); *United States v. Pitt*, 193 F.3d 751, 758 (3d Cir. 1999), *abrogated on other grounds by Honeycutt v. United States*, 137 S. Ct. 1626 (2017); *Fulcher*, 250 F.3d at 254 ("we adopt the unanimous view of our sister circuits that the defense of public authority requires reasonable reliance upon the actual authority of a government official"); *United States v. Sariles*, 645 F.3d 315, 318-19 (5th Cir. 2011) ("the public authority defense requires the defendant reasonably to rely on . . . actual, not apparent, authority"); *cf. United States v. Sampol*, 636 F.2d 621 (D.C. Cir. 1980) (noting in dicta that defendants' claim that CIA officer had conspired with them to murder an ambassador "would not have created a defense if appellants' participation in the crimes had been established," and therefore describing evidence of the officer's employment with the CIA as likely "immaterial").

grounds, assault Capitol Police officers, or obstruct congressional proceedings. *E.g.*, *North*, 910 F.2d at 891 n.24.

Second, "a defendant makes out a defense of public authority only when he has shown that his reliance on governmental authority was reasonable as well as sincere." *Burrows*, 36 F.3d at 882; *Fulcher*, 250 F.3d at 254; *Sariles*, 645 F.3d at 318-19. Again, any reliance on an Executive Branch official's statements would here be objectively unreasonable for the reasons given above, and again, Sheppard should be precluded from raising this defense as a matter of law.

### C.     Entrapment

Insofar as Sheppard may seek to claim that he was entrapped by law enforcement officers at the U.S. Capitol into committing some or all of the crimes with which he is charged, he should also be precluded from raising this defense as a matter of law at trial.  The government is aware of no evidence that could support such a defense.  Therefore, absent a proffer as to how such a defense could arise at trial, the government seeks an order precluding the Defendant, through the introduction of evidence or counsel's questions or argument, from arguing or claiming that they were entrapped by law enforcement officers into committing the charged offenses.

"A valid entrapment defense has two related elements: government inducement of the crime and a lack of predisposition on the part of the defendant to engage in criminal conduct." *Matthews v. United States*, 485 U.S. 58, 63 (1988).  A defendant arguing entrapment must show that "the criminal design originate[d]" with the law enforcement officers, "and [that] they implant[ed] in the mind of an innocent person the disposition to commit the alleged offense and induce[d] its commission in order that they may prosecute." *Sorrells v. United States*, 287 U.S. 435, 442 (1932).  "At a minimum, this requires a showing that the government agent actually solicited or suggested the criminal conduct." *United States v. Solofa*, 745 F.3d 1226 (D.C. Cir.

2014) (internal citations omitted); *United States v. Robinson*, No. CR 16-98 (CKK), 2021 WL 2209403, at \*11 (D.D.C. May 31, 2021) (laying out case law as quoted above).

The Government alleges that the Defendant passed police perimeters and barricades, entered into the U.S. Capitol, participated in overrunning the police line in the Crypt, screamed in the direction of police officers at the doors of the House Speaker's Lobby, and videotaped the evacuation of the House floor, in service of an attempt to obstruct or impede or influence the certification of the 2020 Electoral College vote.  There is no evidence that any government agent or law enforcement officer induced the Defendant to commit any of the alleged crimes. And there is certainly no evidence that a law enforcement agent or officer "actually solicited or suggested the criminal conduct" to the Defendant.  *Sologa*, 745 F.3d 1226.  Absent any such evidence, a defendant may not present such an entrapment theory to the jury. *E.g.*, *Robinson*, 2021 WL 2209403, at \*11 (affirming denial of entrapment instruction when defendant "failed to point to any evidence" of entrapment).

In short, the conduct of the Defendant was plainly beyond any conduct that could be reasonably sanctioned, and he was not actively misled or entrapped into committing the alleged crimes.  The Defendant should be prohibited from making arguments or attempting to introduce non-relevant evidence—either through cross-examination or his own case-in-chief—that he had permission to commit any of the crimes charged or that he was entrapped by law enforcement into doing so.

### III. Motion in *Limine* No. 3: To Preclude the Defendant from Suggesting That His Speech or Conduct was Protected by the First Amendment

The United States moves *in limine* for an order regarding two First Amendment-related issues.  First, the Court should find that the government may use otherwise-protected speech (such as political speech) as evidence in this trial.  Second, the Court should preclude any argument,

questioning, or evidence suggesting that the First Amendment permitted the Defendant to enter or "protest" in the restricted area at the U.S. Capitol on January 6.

The Defendant has not moved to dismiss any of the counts in this case on First Amendment grounds. In a January 19, 2021 FBI interview, however, Sheppard claimed his actions on January 6 were to protest what he considered a rigged election.  And other January 6 defendants have at times challenged the charges against them on First Amendment grounds (unsuccessfully).  *See, e.g., United States v. Nordean*, 579 F. Supp. 3d 28, 52 (D.D.C. 2021).  Thus, a pretrial ruling from the Court on these two issues would assist the parties by establishing what role the First Amendment may permissibly play at the trial.

First, the government can introduce the Defendant's or others' statements into evidence, even if those statements might themselves be shielded from prosecution as protected speech. (Indeed, the following argument applies equally to any otherwise-protected *conduct* of the Defendant, such as statements made prior to January 6, 2021 about challenging the election.)  This should be uncontroversial; the use of speech to prove a crime is commonplace and well established. As the Supreme Court has noted: the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."  *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like."  *Id*.

Courts across the country, including this Court, have allowed evidence of defendants' statements for the purposes sanctioned by *Mitchell*.  In a different January 6 case, this Court noted, "even if [defendant's] statements were themselves protected, the First Amendment does not

prohibit their consideration as evidence of motive or intent." *United States v. Chansley*, 525 F. Supp. 3d 151, 164 (D.D.C. 2021).  In another, Judge Cooper ruled similarly:

> Nor does the Court find any First Amendment concerns in the government's use of Robertson's statements to show intent.... If Robertson had expressed his views only through social media, he almost certainly would not be here. But he also allegedly took action—entering the Capitol without lawful authority in an alleged attempt to impede the Electoral College vote certification.  His words remain relevant to his intent and motive for taking those alleged actions.

*United States v. Robertson*, 2022 WL 969546 at *6 (D.D.C. 2022) (internal citation omitted). Outside of the context of January 6, courts have cited *Mitchell* to uphold the admission of a wide range of statements, including but not limited to rap lyrics and terrorist writings.  *See, e.g., United States v. Smith*, 967 F.3d 1196, 1205 (11th Cir. 2020) (rap lyrics); *United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) ("The speech was not the basis for the prosecution, but instead it was used to establish the existence of, and [defendant's] participation in, the alleged RICO enterprise") (internal citation omitted) (rap lyrics and tattoos); *United States v. Salameh*, 152 F.3d 88, 111-12 (2d Cir. 1998) (the defendants were not "prosecuted for possessing or reading terrorist materials. The materials seized … were used appropriately to prove the existence of the bombing conspiracy and its motive").

Such speech is particularly relevant here.  The Defendant's charges include several counts that require the government to prove Defendants' intent – such as obstruction of an official proceeding, which requires the government to prove, among other elements, that the Defendant intended to obstruct Congress that day.  The Defendant is not being prosecuted *for* his speech; rather, his speech is evidence of the crimes he committed.  Accordingly, the government asks that the Court rule that the First Amendment does not bar admission at trial of any statement that the government offers to establish Defendant's motive, intent, or an element of the crime, such as whether he knew he lacked permission to enter the restricted area at the Capitol that day.

Second, the Court should preclude the defense from eliciting evidence, arguing, or asking questions suggesting that there was a First Amendment right to protest inside the restricted area at the Capitol that day.  At trial, the government will show that the Capitol Grounds were restricted on January 6 within the meaning of 18 U.S.C. § 1752(c)(1)(B) (defining a "restricted building or grounds" as "any posted, cordoned off, or otherwise restricted area … of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting").

There is no First Amendment right to protest in a restricted area.  The government can—and did on January 6—restrict an area that is a traditional public forum for legitimate government ends. This Court has affirmed that the government may close a public forum in similar circumstances.  *See Mahoney v. U.S. Marshals Service*, 454 F. Supp. 2d 21, 32-33 (D.D.C. 2006) (U.S. Marshals Service did not violate First Amendment by restricting access to sidewalk in front of St. Matthew's Cathedral for Red Mass, even though sidewalk was a traditional public forum).

Other courts unsurprisingly have similarly upheld temporary closures of traditional public fora for safety reasons.  *See Mahoney*, 454 F. Supp. 2d at 21; *Menotti v. City of Seattle*, 409 F.3d 1113, 1129-30 (9th Cir. 2005) (finding that an emergency order closing a core area of downtown Seattle to protests during World Trade Organization conference was constitutional in part because its purpose was to maintain and restore civic order); *Marcavage v. City of New York*, 489 F.3d 98, 105 (2d Cir. 2012) ("[T]here can be no doubting the substantial government interest in the maintenance of security at political conventions"); *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1222  (10th Cir. 2007) ("In this case, there can be no doubt that the City's interest in providing security to a gathering of defense officials is of the highest order"); *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004) (upholding a street-closure plan around

the Democratic National Convention that made it nearly impossible for groups wishing to demonstrate to do so within sight and sound of the delegates).

On January 6, 2021, the United States Capitol Police and the United States Secret Service coordinated to establish a restricted perimeter around the Capitol building that encompassed a portion of the Capitol grounds.  No member of the public, including the Defendant, had a First Amendment right to engage in protest or speech within that restricted area.  The Court should enter an order precluding the Defendant from eliciting testimony to the contrary and precluding defense counsel from arguing to the contrary or stating during *voir dire*, questioning, or opening or closing statements that Defendants were engaged in protected speech or pursuing their "right" to protest at any point when they were on U.S. Capitol grounds.

## IV. Motion in *Limine* No. 4: To Preclude Defendants from Arguing or Commenting in a Manner That Encourages Jury Nullification, Whether During *Voir Dire* or During Trial

The Defendant should be prohibited from making arguments or attempting to introduce non-relevant evidence that encourages jury nullification.  As the D.C. Circuit has made clear,

> A jury has no more "right" to find a "guilty" defendant "not guilty" than it has to find a "not guilty" defendant "guilty," and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law. Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power.

*United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983); *United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997) (same).  Evidence that only serves to support a jury nullification argument or verdict has no relevance to guilt or innocence.  *See United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir. 1975); *see also United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) ("No reversible error is committed when evidence, otherwise inadmissible under Rule 402 of the Federal Rules of Evidence, is excluded, even if the evidence might have encouraged the jury to disregard the law and to acquit the defendant").

The government has identified the following subject areas that are not relevant to the issues before the jury and that could serve as an improper invitation for the jury to nullify its fact-finding and conclusions under the law.  The Court should preclude any reference to these issues, either during *voir dire*, argument or questioning by counsel, or in the defense case-in-chief.

### A.    Statements Regarding the Alleged Offenses' Punishment or Collateral Consequences of Conviction

The Defendant may face significant prison time were he to be found guilty here, and the Defendant should not be permitted to arouse the jury's sympathy by introducing any evidence of or attempting to argue about the hardships of prison, the potential effect of incarceration on Defendant's family, or the possibility that a significant portion of his life may be spent in prison. It is black-letter law that the jury should not consider such penalties in reaching its verdict.  *See, e.g.*, *United States v. Reed*, 726 F.2d 570, 579 (9th Cir. 1984) (a defendant's possible sentence "should never be considered by the jury in any way in arriving at an impartial verdict as to the guilt or innocence of the accused."); *Rogers v. United States*, 422 U.S. 35, 40 (1975) (jury should have been admonished that it "had no sentencing function and should reach its verdict without regard to what sentence might be imposed"). Indeed, courts in this district often give a jury instruction stating exactly that: "The question of possible punishment of the defendant in the event a conviction is not a concern of yours and should not enter into or influence your deliberations in any way. The duty of imposing sentence in the event of a conviction rests exclusively with me. Your verdict should be based solely on the evidence in this case, and you should not consider the matter of punishment at all."  D.C. Redbook 2.505.

Thus, the above-mentioned issues are irrelevant, and any reference to them would invite jury nullification and should be excluded. *See United States v. Bell*, 506 F.2d 207, 226 (D.C. Cir. 1974) ("evidence which has the effect of inspiring sympathy for the defendant or for the victim  .

. . is prejudicial and inadmissible when otherwise irrelevant") (internal citation omitted); *United States v. White*, 225 F. Supp. 514, 519 (D.D.C 1963) ("The proffered testimony (which was clearly designed solely to arouse sympathy for defendant) was thus properly excluded.").

### V. Motion in *Limine* No. 5: To Admit Defendant's Out-of-Court Statements as Statements by a Party Opponent Under Federal Rule of Evidence 801(d)(2)(A)

Under Federal Rule of Evidence 801(d)(2)(A), an opposing party's statement is not hearsay if it "was made by the party in an individual or representative capacity," Fed. R. Evid. 801(d)(2)(A), or if it "is one the party manifested that it adopted or believed to be true" *id.* 801(d)(2)(B). *See, e.g.*, *United States v. Blake*, 195 F. Supp. 3d 605, 609 (S.D.N.Y. 2016) ("[A] party's own statement, if offered against him, is not hearsay.").  Here, the government intends to introduce the statements of the Defendant, including those made to law enforcement during non-custodial interviews and in recorded communications (e.g., text messages, emails, Facebook posts) prior to and after January 6.  Assuming proper foundation is laid that the statements were made by the Defendant, the Court should admit these statements when offered by the government against Defendants—even if offered for the truth of the matters asserted—because they are statements by a party-opponent and, therefore, non-hearsay evidence under Rule 801(d)(2)(A).

### VI. Motion in *Limine* No. 6: To Preclude Defendant's Use of His Own Out-of-Court Statements as Inadmissible Hearsay

While the government may use the statements of a defendant against him under Federal Rule of Evidence 801(d)(2), the defense may not admit a defendant's own out-of-court statements, which are hearsay. *See e.g.*, *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1987) (A defendant cannot present "self-serving hearsay" to the jury without the benefit of cross-examination by the United States).  Defendants who choose not to testify and subject themselves to cross-examination thus do not have the right to present self-serving hearsay statements.  *See United States v. Wilkerson*, 84 F.3d 692 (4th Cir. 1996).  "[W]hen the defendant seeks to introduce

his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *United States v. Blake*, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016), quoting *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982).

Nor does Federal Rule of Evidence 106, the "Rule of Completeness," provide an unbounded end-run around that prohibition against hearsay. That rule provides that, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. Rule 106 directs the Court to "permit such limited portions [of a statement] to be contemporaneously introduced as will remove the distortion that otherwise would accompany the prosecution's evidence." *United States v. Sutton*, 801 F.2d 1346, 1369 (D.C. Cir. 1986) (emphasis added). The rule does not "empower[] a court to admit unrelated hearsay." *United States v. Woolbright*, 831 F.2d 1390, 1395 (8th Cir. 1987) (emphasis added). "The provision of Rule 106 grounding admission on 'fairness' reasonably should be interpreted to incorporate the common-law requirements that the evidence be relevant, and be necessary to qualify or explain the already introduced evidence allegedly taken out of context . . . In almost all cases we think Rule 106 will be invoked rarely and for a limited purpose." *Sutton*, 801 F.2d at 1369.

Thus, Rule 106 only applies when the government's introduction of a defendant's statements is "misleading because of a lack of context," leading to a "distortion" of the defendant's meaning. *Sutton*, 801 F.2d at 1369; *United States v. Castro-Cabrera*, 534 F. Supp. 2d 1156, 1160 (C.D. Cal. 2008) (rule applies only if the statements offered by the defendant are necessary "to prevent the Government from offering a 'misleadingly-tailored snippet'"). By contrast, the rule cannot be used to generally introduce exculpatory portions of a statement merely because they

"they were made contemporaneously with other self-inculpatory statements" offered by the government. *Ortega*, 203 F.3d at 682; *United States v. Williston*, 862 F.3d 1023, 1038 (10th Cir. 2017) ("The rule of completeness . . . does not give an interview declarant a general right to introduce selected statements to try to counter the statements in the proponent's offered segment."). Courts therefore routinely preclude defendants from offering their own exculpatory or otherwise potentially relevant statements, even if those statements appear close in time to those offered by the government.

This Court should ensure that any relevant statements of the Defendants offered by the Defendants be necessary to correct a misleading statement offered by the government (under Rule 106) or otherwise admissible under an exception to the hearsay rules.

### VII. Motion in *Limine* No. 7: To Admit Certain Statutes and Records

#### A.      Judicial Notice of the Federal Electoral College Certification Law

The proceedings that took place on January 6, 2021, were mandated by, and directed under the authority of, several constitutional and federal statutory provisions. In fact, as Vice President Pence gaveled the Senate to Order on January 6, 2021 to proceed with the Electoral College Certification Official Proceeding, he quoted directly from, and cited to, Title 3, United States Code, Section 17.

The government requests that the Court take judicial notice of, and admit into evidence, copies of Article II, Section 1 of the Constitution of the United States, the Twelfth Amendment, as well as 3 U.S.C. §§ 15-18 relating to the Electoral College Certification Official Proceedings. These are attached as Exhibits 1-6. It is well established that district courts may take judicial notice of law "without plea or proof." *See United States v. Davila-Nieves*, 670 F.3d 1, 7 (1st Cir. 2012). The government makes this request even though "no motion is required in order for the court to take judicial notice." *Moore v. Reno*, No. 00-5180, 2000 U.S. App. LEXIS 35425; 2000 WL

1838862 (D.D.C. Nov. 14, 2000).   Further, "where a federal prosecution hinges on an interpretation or application of state law, it is the district court's function to explain the relevant state law to the jury." S*ee United States v. Fazal-Ur-Raheman-Fazal*, 355 F.3d 40, 49 (1st Cir. 2004).  Here, that principle indicates the jury is entitled to an explanation of the relevant statutes and constitutional provisions that govern the certification of the Electoral College vote.

### B.   Admission of the Congressional Record and S. Con. Res 1

The Congressional proceedings on January 6, 2021 were memorialized in the Congressional Record.  The Congressional Record is a public record under Federal Rule of Evidence 902(5). *MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 503-504 (S.D.N.Y. 2017) (Congressional transcripts).  The government may introduce portions of the Congressional Record at trial, including the bodies' "concurrent resolution to provide for the counting on January 6, 2021, of the electoral votes for President and Vice President of the United States," S. Con. Res. 1, 117th Cong. (2021).   These records should be admitted as self-authenticating. Rule 902 provides that a record can be "self-authenticating," meaning it "require[s] no extrinsic evidence of authenticity in order to be admitted."  Fed. R. Evid. 902.  One example is an "Official Publication[]," defined as any "book, pamphlet, or other publication purporting to be issued by a public authority."  Fed. R. Evid. 902(5).  The congressional record qualifies as one such congressionally published record, and so is self-authenticating under Rule 902(5).

//

//

//

//

**CONCLUSION**

For the reasons set forth above, the United States respectfully requests that this Court grant the government's seven motions in *limine* as described in this omnibus motion.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/ Craig Estes
CRAIG ESTES
Assistant United States Attorney
United States Attorney's Office for the District of Massachusetts (detailee)
Massachusetts Bar No. 670370
craig.estes@usdoj.gov
(617) 748-3100

/s/ Sonia Mittal
SONIA MITTAL
Assistant United States Attorney
United States Attorney's Office for the District of Columbia
Illinois Bar No. 6314706
sonia.mittal@usdoj.gov
(202) 821-9470