**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Criminal Action No. 21-203 (JDB)** |
| **ALEXANDER SHEPPARD,** | |
| **Defendant.** | |

**MEMORANDUM OPINION**

Defendant Alexander Sheppard is charged via indictment with six offenses related to the breach of the United States Capitol on January 6, 2021.  Sheppard has filed three motions seeking dismissal of some counts, transfer of venue, and further discovery.  He also filed a notice informing the Court and the government that he intends to present a public authority defense, and the government has requested that the Court preclude him from doing so.  For the reasons set forth below, the Court will deny his motion to dismiss and motion to transfer venue, deny in part and grant in part his motion to compel discovery, and preclude Sheppard from relying on a public authority defense at trial.

**Background**

Alexander Sheppard traveled to Washington, D.C. in early January 2021 to protest the results of the November 2020 presidential election.  See Statement of Facts [ECF No. 1-1] at 4. On January 6, while Sheppard was in Washington, the U.S. Congress was convened in the Capitol for a joint session to certify the electoral vote count.  Id. at 1.  The joint session began at approximately 1:00 p.m. and was supposed to continue throughout the afternoon.  See id. However, in the early afternoon, a large crowd gathered outside the Capitol.  Id.  Despite the presence of barricades and U.S. Capitol Police ("USCP") attempting to keep the protesters out of the Capitol and away from the building, the crowd overwhelmed the USCP and forced their way

1

into the Capitol around 2:00 p.m.  Id.  Shortly after, around 2:20 p.m., members of the House of Representatives and Senate, as well as then-Vice President Michael Pence, were forced to evacuate and effectively suspend the joint session.  Id.

Social media posts and video footage show Sheppard inside the Capitol on January 6.  See Statement of Facts at 3–4.  The government asserts that Sheppard entered around 2:15 p.m. and, while inside the Capitol, "confront[ed] the officers guarding the doors while members of Congress were still being evacuated from the House Chamber" and recorded video of the members of Congress evacuating and of himself announcing "they've shut down Congress, let's f***ing go!" Gov't's Opp'n to Def.'s Mot. to Transfer Venue [ECF No. 45] ("Opp'n to Venue Mot.") at 2.

A grand jury charged Sheppard with six offenses via indictment: obstruction of an official proceeding and aiding and abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One); entering and remaining in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1) (Count Two); disorderly and disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(2) (Count Three); entering and remaining on the floor of Congress in violation of 40 U.S.C. § 5104(e)(2)(A) (Count Four); disorderly conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five); and parading, demonstrating, or picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six).  Indictment [ECF No. 8].

On October 21, 2022, Sheppard filed three motions: (1) a motion to dismiss four counts of the indictment, see Mot. to Dismiss Counts One, Two, Three, and Six of the Indictment [ECF No. 37] ("Mot. to Dismiss"); (2) a motion to transfer venue, see Mot. for Transfer of Venue [ECF No. 38] ("Venue Mot."); and (3) a motion to compel additional discovery from the government, see Mot. to Compel Disc. [ECF No. 39] ("Disc. Mot.").  Sheppard also filed a notice of public authority defense, informing the Court pursuant to Federal Rule of Criminal Procedure 12.3 that he intends

to assert a defense at trial that "he was acting under actual or believed public authority at the time of the alleged offenses."  Notice of Public Authority Defense [ECF No. 40].

The government timely responded to all three motions.  See Opp'n to Mot. to Dismiss [ECF No. 46]; Opp'n to Venue Mot.; Resp. to Disc. Mot. [ECF No. 53].  It also filed a response to Sheppard's notice of public authority defense, arguing that the Court should preclude Sheppard from pursuing a public authority defense.  Opp'n to Notice of Public Authority Defense [ECF No. 43].  Sheppard filed a reply in support of his motion to compel discovery, Reply in Supp. of Disc. Mot. [ECF No. 54], and the parties further briefed the propriety of a public authority defense, see Reply to Opp'n to Notice of Public Authority Defense [ECF No. 51]; Gov't's Further Resp. in Opp'n to Notice of Public Authority Defense [ECF No. 56]; Def.'s Resp. to Gov't's Suppl. Brief Regarding Notice of Public Authority Defense [ECF No. 57].  The motions are now ripe for decision.

## Analysis

### I.     Motion to Dismiss

Sheppard's first motion seeks dismissal of Counts One, Two, Three, and Six of the indictment.  Mot. to Dismiss at 1.  As he acknowledges, the challenges to Counts One, Two, and Three are "identical to the ones raised" and rejected in a case before this Court, United States v. McHugh (McHugh I), 583 F. Supp. 3d 1 (D.D.C. 2022), as well as decisions from other courts in this District, see, e.g., United States v. Andries, Crim. A. No. 21-93 (RC), 2022 WL 768684 (D.D.C. Mar. 14, 2022).  Mot. to Dismiss at 2.  And although Sheppard describes his challenge to Count Six as a "new facial constitutional challenge," id. at 1, this Court has already denied an almost identical motion.  See United States v. Nassif, Crim. A. No. 21-421 (JDB), 2022 WL 4130841, at *2–6 (D.D.C. Sept. 12, 2022).

A criminal defendant may move to dismiss the indictment against him for "failure to state an offense" pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v).  Two bases for dismissal are relevant here.  First, if the statutory provision at issue does not cover the charged conduct, the indictment fails to state an offense.  McHugh I, 583 F. Supp. 3d at 10 (citing United States v. Montgomery, 578 F. Supp. 3d 54, 59 (D.D.C. 2021)).  In assessing whether to grant a motion to dismiss under Rule 12(b)(3)(B)(v), courts consider whether the allegations in the indictment, assumed to be true, "would be sufficient to permit a jury to find that the crimes charged were committed."  United States v. Bozell, No. 21-CR-216 (JDB), 2022 WL 474144, at *2 (D.D.C. Feb. 16, 2022) (quoting United States v. Bowdoin, 770 F. Supp. 2d 142, 146 (D.D.C. 2011)).  Second, if a statute is unconstitutional, the charges based on that statute must be dismissed.  Id.  On either basis, courts dismiss indictments "only in unusual circumstances."  United States v. Ballestas, 795 F.3d 138, 148 (D.C. Cir. 2015).

### A.  Challenges to 18 U.S.C. § 1512(c)(2)

The statute under which Sheppard is charged in Count One reads:

(c) Whoever corruptly--

> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c).

Sheppard makes three arguments as to why this count should be dismissed: (1) the vote certification on January 6, 2021 was not an "official proceeding" as required by the statute, Mot. to Dismiss at 7–10, (2) the statute is unconstitutionally vague, id. at 10–18, and (3) the statute

requires an "action with respect to a document, record, or other object," which the indictment does not allege, id. at 18–21.

Starting with Sheppard's first argument, "official proceeding" is defined as "a proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B). Sheppard argues that the history and context of the statute suggest "official proceeding" is limited to proceedings with a similar "'adversarial nature' as court proceedings where there is a potential for witnesses to be influenced or documents destroyed." Mot. to Dismiss at 6. Thus, Sheppard argues, Congress's certification of the 2020 presidential election results was not an "official proceeding" as used in § 1512(c) because it was a "ceremonial and administrative event," not a traditional investigative hearing. See id. at 7–10.

Courts have repeatedly heard and rejected this argument. See, e.g., McHugh I, 583 F. Supp. 3d at 11–18 (rejecting this challenge and noting that "five other judges in this District" had already done so).[1] Courts considering the question have concluded that a "proceeding before Congress" is broader than purely investigatory hearings, id. at 17 n.10, but that "not every activity undertaken by Congress" qualifies, id. at 12. Rather, the word "official" and, in the statutory definition, the word "before" connote some level of formality that a proceeding must have to fall within the ambit of the statute. See United States v. Sandlin, 575 F. Supp. 3d 16, 22–23 (D.D.C. 2021). Courts have also concluded that the Congressional vote certification is a sufficiently formal event: "[t]here is a presiding officer, a process by which objections can be heard, debated, and ruled upon, and a decision—the certification of the results—that must be reached before the session can be adjourned." Id. at 23; see also McHugh I, 583 F. Supp. 3d at 14 (noting that the formality is evident because the "Constitution of the United States mandates the proceeding's occurrence" and a statute prescribes even the minute details like the date, seating arrangements,

---

[1] The Court's decision in McHugh I provides a more fulsome discussion of many of the arguments raised in Sheppard's motion to dismiss. That discussion applies with equal force to Sheppard's arguments and is incorporated in full here.

and time allotted for debate).  And Sheppard's argument that the definition of official proceeding is limited in some other way—it must be "adjudicative" or feature evidence or witnesses, Mot. to Dismiss at 9–10—is "undermined by the clear text of 18 U.S.C. § 1515(a)(1)(B)."  United States v. Gillespie, Crim. A. No. 22-60 (BAH), 2022 WL 17262218, at *3 (D.D.C. Nov. 29, 2022). Hence, the Court reaffirms its conclusion that the 2020 vote certification that took place on January 6, 2021 was an "official proceeding" as used in § 1512(c) and rejects that basis for dismissal.

Sheppard's second argument is that both the "official proceeding" definition and § 1512(c)(2)'s requirement that a defendant act "corruptly" are unconstitutionally vague.  The Fifth Amendment ensures that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  "A criminal statute violates this fundamental principle if it permits the government to deprive a defendant of his liberty 'under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.'"  Nassif, 2022 WL 4130841, at *6 (quoting Johnson v. United States, 576 U.S. 591, 595 (2015)).

But "a statutory term is not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'"  United States v. Bronstein, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (alteration in original) (quoting Roth v. United States, 354 U.S. 476, 491 (1957)).  And although a law is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes," Johnson, 576 U.S. at 595, that is an objective standard—"the vagueness determination 'must be made on the basis of the statute itself and other pertinent law, rather than on the basis of an ad hoc appraisal of the subjective expectations of particular defendants,'" McHugh I, 583 F. Supp. 3d at 18 (quoting Bouie v. City of Columbia, 378 U.S. 347, 355 n.5 (1964)).

As for the term "official proceeding," Sheppard argues that it is unconstitutionally vague because there is a "lack of cohesiveness among jurisdictions as to what does or does not qualify." Mot. to Dismiss at 11. But a statute is not unconstitutionally vague simply because a statute's meaning "may vary depending upon whom you ask." Bronstein, 849 F.3d at 1107. Hence, the term "official proceeding" does not render the statute unconstitutional.

The term "corruptly" is not defined in the statue. Sheppard relies heavily on United States v. Poindexter, 951 F.2d 369 (D.C. Cir. 1991), which—he argues—found that the word "corruptly" was "vague on its face" when used in a similar statute. See Mot. to Dismiss at 12–13. However, Poindexter itself declined to hold that "corruptly" is "unconstitutionally vague as applied to all conduct," 951 F.2d at 385 (emphasis added), and courts "have since cabined Poindexter's holding to its facts and have not read it 'as a broad indictment of the use of the word "corruptly" in the various obstruction-of-justice statutes,'" Sandlin, 575 F. Supp. 3d at 31 (quoting United States v. Shotts, 145 F.3d 1289, 1300 (11th Cir. 1998)). Thus, as this Court concluded in McHugh I, Poindexter does not control the analysis. See 583 F. Supp. 3d at 19. And despite the fact that the term is "inherently imprecise," it "has acquired a settled legal meaning through numerous, consistent interpretations by courts around the country—it has thus been made specific by settled interpretations and is not impermissibly vague." Id. at 19–20 (cleaned up). Specifically, a defendant acts "corruptly" if he has a "consciousness of wrongdoing," id. at 20 & n.17 (citing various courts of appeal concluding the same), and if he "'know[s] that his actions [a]re likely to affect' a particular proceeding," id. at 20 (quoting Montgomery, 578 F. Supp. 3d at 83). The Court sees no reason to disturb its previous holding on this issue and thus will not dismiss Count One as unconstitutionally vague.

Third, relying on United States v. Miller, 589 F. Supp. 3d 60 (D.D.C. 2022), Sheppard argues that § 1512(c)(2) only applies to actions taken "with respect to a document, record, or other

object in order to corruptly obstruct, impede, or influence an official proceeding." Mot. to Dismiss at 18–21 (quoting <u>Miller</u>, 589 F. Supp. 3d at 78). This Court has considered and declined to adopt the reasoning and holding of <u>Miller</u> numerous times and will decline to do so here for the reasons stated in those decisions. <u>See</u> <u>United States v. McHugh</u> (<u>McHugh II</u>), Crim. A. No. 21-453 (JDB), 2022 WL 1302880, at *2–12 (D.D.C. May 2, 2022); <u>Bozell</u>, 2022 WL 474144, at *5; <u>United States v. Brock</u>, Crim. A. No. 21-140 (JDB), 2022 WL 3910549, at *2 (D.D.C. Aug. 31, 2022); <u>see also</u> <u>United States v. Grider</u> (<u>Grider I</u>), Crim. A. No. 21-022 (CKK), 2022 WL 3016775, at *3 & n.3 (D.D.C. July 29, 2022) (collecting cases from other judges in this District concluding the same).

Hence, the Court rejects all of Sheppard's arguments to dismiss Count One.

### B. Challenges to 18 U.S.C. § 1752

Counts Two and Three of the indictment charge Sheppard with violating two subsections of 18 U.S.C. § 1752. Indictment at 2. Both require Sheppard to have taken action in "any restricted building or grounds."[2] As relevant here, the phrase "restricted building or grounds" is defined in the statute as "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B). Sheppard argues that the Capitol building and grounds were not "restricted building or grounds" as defined in the statute because the Secret Service did not restrict the area, Mot. to Dismiss at 22–24, and because Vice President Pence was not "temporarily visiting" the Capitol on January 6, <u>id.</u> at 24–26.

As with Sheppard's § 1512 arguments, his challenges to § 1752 have been rejected by this Court and others in this District. <u>See, e.g.</u>, <u>Bozell</u>, 2022 WL 474144, at *8–9; <u>United States v.</u>

---

[2] 18 U.S.C. § 1752(a)(1) (Count Two) proscribes certain conduct "in any restricted building or grounds," and § 1752(a)(2) (Count Three) proscribes certain conduct "in, or within such proximity to, any restricted building or grounds." Sheppard's argument for dismissal is the same for both counts as there is no other restricted building or grounds he is alleged to have been "in proximity to" besides the Capitol.

Nordean, 579 F. Supp. 3d 28, 59–60 (D.D.C. 2021).  The plain language of the statute "says nothing about who must do the restricting," McHugh I, 583 F. Supp. 3d at 30 (internal quotation marks omitted), and Sheppard's arguments as to the purpose, legislative history, and precedent do not undermine the plain language of the statute.  Moreover, Vice President Pence was "temporarily visiting" the Capitol on January 6, 2021.  His time at the Capitol was set to end when the certification concluded—and was thus temporary—and is appropriately classified as a "visit" because he was "there for a particular purpose . . . for a limited time." Id. at 33–34 (quoting Visit, Webster's Third New International Dictionary Unabridged (1961)).  Thus, for the reasons described at length in this Court's previous opinions, the Court concludes that Vice President Pence was "temporarily visiting" the Capitol, and the Capitol building and parts of the Capitol grounds were "restricted" as required by § 1752.

### C.  Challenge to 40 U.S.C. § 5104(e)(2)(G)

Sheppard's final challenge is to Count Six, which charges him with violating 40 U.S.C. § 5104(e)(2)(G).  The statute states in relevant part that "[a]n individual or group of individuals may not willfully and knowingly . . . parade, demonstrate, or picket in any of the Capitol Buildings." 40 U.S.C. § 5104(e)(2)(G).  Sheppard argues that the statute is both overbroad, as it criminalizes conduct protected by the First Amendment, Mot. to Dismiss at 27–30, and unconstitutionally vague, id. at 30–33.  This Court has already concluded that the statute is neither overbroad nor unconstitutionally vague, see Nassif, 2022 WL 4130841, at *2–7, and adopts that reasoning by reference here.  Thus, the Court will only briefly repeat its reasoning.

Under the overbreadth doctrine, a statute is facially invalid under the First Amendment "if it prohibits a substantial amount of protected speech." United States v. Williams, 553 U.S. 285, 292 (2008).  "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." Members of City Council

of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 800 (1984). The overbreadth analysis balances the risk that enforcement of the law could "deter[] people from engaging in constitutionally protected speech" against the harm of invalidation: preventing "perfectly constitutional" applications of the law "directed at conduct so antisocial that is has been made criminal." Williams, 553 U.S. at 292. That balance is maintained by "vigorously enforc[ing] the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." Id. (emphasis in original).

First Amendment doctrine classifies spaces as public or nonpublic, and the government has much wider latitude to regulate speech in a space designated as a nonpublic forum. "In a public forum, 'the rights of the state to limit expressive activity are sharply circumscribed,' limited to regulations 'necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end.'" Nassif, 2022 WL 4130841, at *3 (quoting Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 45 (1983)). In contrast, "[t]he government 'may reserve' a nonpublic forum 'for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because officials oppose the speaker's view.'" Id. (quoting Perry, 460 U.S. at 46). Government property is a nonpublic forum if it "is not by tradition or designation a forum for public communication," for example, museums and offices. Perry, 460 U.S. at 46.

The Capitol building is "a nonpublic forum where the government may limit First Amendment activities so long as the restrictions 'are reasonable in light of the purpose of the forum and are viewpoint neutral.'" Nassif, 2022 WL 4130841, at *4 (quoting Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 806 (1985)). Like an office building, "the inside of the Capitol is not open to meetings by the public at large," and its most important spaces, including the Senate and House galleries, floors, and committee hearing rooms, are designed to facilitate

10

"the orderly and formal presentation of testimony in the form of debate and discussion by elected officials and authorized witnesses." Bynum v. U.S. Capitol Police Bd., 93 F. Supp. 2d 50, 56 (D.D.C. 2000). The purpose of the forum is to "permit[] 'Congress peaceably to carry out its lawmaking responsibilities' and allow[] 'citizens to bring their concerns to their legislators.'" Nassif, 2022 WL 4130841, at *5 (quoting Bynum, 93 F. Supp. 2d at 55). In light of that purpose, the proscription in § 5104(e)(2)(G) is reasonable, as it prevents actions "that Congress reasonably could have concluded would disrupt its legislative process." Id. Finally, the statute is viewpoint neutral: it "contains nothing limiting its application to a particular viewpoint." Id. Given that the statute permissibly targets conduct in a nonpublic forum, it does not restrict a substantial amount of protected speech and is not unconstitutionally overbroad.

The statute is also not unconstitutionally vague. As described above, a criminal statute is facially invalid if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." Johnson, 576 U.S. at 595. Sheppard argues that the word "demonstrating" is standardless and provides no notice as to the conduct it punishes. See Mot. to Dismiss at 30–33. But "demonstrating" is an intuitive term with an objective meaning, which is made even clearer by its neighbors in the statute, "picketing" and "parading." As this Court held in Nassif, the statute "prohibits taking part in an organized demonstration or parade that advocates a particular viewpoint"—regardless of the substance of the viewpoint—"such as, for example, the view that the 2020 U.S. Presidential Election was in some way flawed." 2022 WL 4130841, at *6. Hence, for the reasons discussed here and in greater detail in Nassif, the Court reaffirms its conclusion that § 5104(e)(2)(G) is not unconstitutionally vague.

## II.   Motion for Change of Venue

Sheppard filed a motion for change of venue, requesting that his trial be moved from Washington, D.C. to his home district in Ohio. Venue Mot. at 1. As he acknowledges, the motion

is almost identical to that filed in United States v. McHugh, Crim. A. No. 21-453 (JDB), but includes "some changes based on recent events." Id. at 1 n.1. The Court will deny the motion for largely the same reasons it denied the change-of-venue motions in McHugh, Nassif, and Brock. See Min. Entry, McHugh, Crim. A. No. 21-453 (JDB) (D.D.C. May 4, 2022); Nassif, 2022 WL 4130841, at *8–10; Brock, 2022 WL 3910549, at *4–8.[3]

If a criminal defendant requests a transfer of venue and demonstrates that "so great a prejudice against the defendant exists in the [original] district that the defendant cannot obtain a fair and impartial trial there," a court must transfer the defendant's trial to a different district. Fed. R. Crim. P. 21(a); see also Skilling v. United States, 561 U.S. 358, 378 (2010) ("The Constitution's place-of-trial prescriptions . . . do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial . . . ."). This prejudice exists only in "extreme circumstances"—when the population in the original district is "so aroused against [the defendant] and so unlikely to be able objectively to judge [the defendant's] guilt or innocence on the basis of the evidence presented at trial that [his] due process rights [will be] violated" if the case is not transferred. United States v. Haldeman, 559 F.2d 31, 60–62 (D.C. Cir. 1976) (en banc) (per curiam).

In determining whether there is a presumption of prejudice in a local population, courts look to three factors relevant here: "(1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; and (3) the time period between the arrest and trial, as it relates to the attenuation of the media coverage." Brock, 2022 WL 3910549, at *6 (citing Skilling, 561 U.S. at 382–84). None of these factors weighs in favor of transfer here.

---

[3] Numerous other courts have denied change-of-venue motions in January 6 cases for similar reasons. See, e.g., United States v. Garcia, Crim. A. No. 21-0129 (ABJ), 2022 WL 2904352, at *6–15 (D.D.C. July 22, 2022); United States v. Rhodes, No. 22-cr-15 (APM), 2022 WL 2315554, at *20–23 (D.D.C. June 28, 2022); United States v. Bochene, 579 F. Supp. 3d 177, 180–83 (D.D.C. Jan. 12, 2022).

As explained in Brock, Washington, D.C. has well over 600,000 residents, a size that the Supreme Court has recognized leads to a "reduced likelihood of prejudice."  2022 WL 3910549, at *6 (quoting Skilling, 561 U.S. at 382).  Sheppard puts forth a number of reasons why the characteristics of the D.C. jury pool make the location particularly prejudicial, but none are persuasive.  This is a diverse district with hundreds of thousands of potential jurors who are able to judge Sheppard's guilt or innocence with an open mind, and any potential issues Sheppard flags, such as employment with the federal government or unshakable biases against January 6 defendants, can be addressed during voir dire.  See id. at *6–7.

The media coverage of the events of January 6 has been neither "blatantly prejudicial" nor localized to Washington, D.C.  See Skilling, 561 U.S. at 382.  News coverage has persisted in national media, even when describing events here.  For example, Sheppard cites recent statements by politicians and celebrities from the Washington, D.C. area, but those statements were published in national news sources, such as Sports Illustrated and Roll Call.  See Venue Mot. at 15–18 & nn.28–36.  He also gives no reason to believe that public figures from outside Washington did not make similar statements.  Further, the news coverage in Washington contains no mention of Sheppard himself.  Cf. Skilling, 561 U.S. at 384 n.17 ("[W]hen publicity is about the event, rather than directed at individual defendants, this may lessen any prejudicial impact." (internal quotation marks omitted)).  Notably, Sheppard requests a transfer to Ohio—a place where the media has, in fact, covered him by name.  See, e.g., Marc Kovac, Columbus, Powell Men Latest Ohioans Charged with Entering Capitol During Jan. 6 Riot, The Columbus Dispatch (Feb. 24, 2021, 12:08 p.m.), https://www.dispatch.com/story/news/crime/2021/02/23/capitol-riot-arrests-derek-jancart-columbus-ohio-social-media/4567302001/.  The nature and volume of news coverage in Washington, D.C. is thus not a reason to transfer this case to Ohio.

Third, the time between January 6, 2021 and Sheppard's trial does not weigh in favor of transfer. Although there has been ongoing news coverage during that period, the coverage is "not of the type or tenor requiring a transfer of venue"—it remains relatively noninflammatory and national in scope. Nassif, 2022 WL 4130841, at *10.

Finally, the Court notes one compelling fact that undermines motions to transfer venue in this and other January 6 cases: in the highest-profile January 6 case to go to trial, United States v. Rhodes, a Washington, D.C. jury acquitted every defendant of some counts. See Min. Entry, United States v. Rhodes, No. 22-15 (APM) (D.D.C. Nov. 29, 2022). The Rhodes verdict underscores the conclusion of this Court and other courts about the D.C. jury pool: D.C. jurors can make individualized decisions about January 6 defendants' guilt or innocence on each count, based on the evidence presented, even for defendants who—unlike Sheppard—personally received intensive national news coverage.

Hence, the Court will deny Sheppard's motion to transfer venue.

## III.   Public Authority Defense

Sheppard has notified the Court and the government that he intends to raise two closely related affirmative defenses at trial: a "public authority" defense and an "entrapment-by-estoppel" defense.[4] See Notice of Public Authority Defense. These defenses—which are often conflated—derive from a series of Supreme Court cases finding that a conviction for actions taken in reasonable reliance on certain statements by government officials "would be to sanction an indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State had clearly told him was available to him." Cox v. Louisiana, 379 U.S. 559, 571 (1965) (quoting Raley v. Ohio, 360 U.S. 423, 425–26 (1959)). Sheppard intends to argue that his actions

---

[4] This disclosure is required under Federal Rule of Criminal Procedure 12.3.

on January 6 were taken in reasonable reliance on statements made by then-President Trump at his rally on January 6, 2021.  See Notice of Public Authority Defense; Reply to Opp'n to Notice of Public Authority Defense at 6–7 & n.3.

Although some courts of appeal have considered and defined these defenses, the D.C. Circuit has not articulated in a binding opinion either the elements of the defenses or the procedure by which a court should consider them.  Sheppard relies heavily on the D.C. Circuit's opinion in United States v. Barker, which reversed the conviction of two men who participated in the break-in of Daniel Ellsberg's psychiatrist's office in the 1970s.  See 546 F.2d 940, 941–42 (D.C. Cir. 1976).  The opinion in Barker is fractured, but the two judges in the majority—writing separately— found that the district court erred in refusing to recognize the possibility that the defendants' reliance on their White House superior's authority to authorize the break-in could be a complete defense.  See id. at 943–57.  One judge concluded that the public authority defense was available only when

> an individual (1) reasonably, on the basis of an objective standard, (2) relies on a (3) conclusion or statement of law (4) issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field.  The first three issues are of course of a factual nature that may be submitted to a jury; the fourth is a question of law as it deals with interpretations of the parameters of legal authority.

Id. at 955 (opinion of Merhige, J.).

The D.C. Circuit later revisited the public authority defense in United States v. North, 910 F.2d 843 (D.C. Cir.), opinion withdrawn and superseded in part on reh'g, 920 F.2d 940 (D.C. Cir. 1990), an appeal by Oliver North of his conviction on three charges related to the Iran-Contra affair.  The D.C. Circuit affirmed the district court's refusal to instruct the jury that reliance "in good faith on a superior's apparent authorization of his action," if "reasonable based on the facts as he perceived them," would be a complete defense.  Id. at 878–79.  In discussing Barker, the North court concluded that having "read Barker, and reread it," the court still "[could not] find in

15

it a rule of law to apply." Id. at 879. It noted, however, that under Judge Mehrige's articulation of the defense quoted above, "North [did] not even claim that he relied on any 'conclusion or statement of law,' let alone one 'issued by an official charged with interpretation, administration, and/or enforcement responsibility in the relevant legal field.'" Id. at 880 (quoting Barker, 546 F.2d at 955 (opinion of Merhige, J.)).

Thus, the state of the public authority defense (and its close cousin, entrapment-by-estoppel) in the D.C. Circuit remains somewhat unsettled. In light of that uncertainly, district courts in this Circuit have adopted other courts of appeals' formulations of the two defenses. For example, United States v. Chrestman adopted the standard articulated by the Tenth Circuit:

> [T]o win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation.

525 F. Supp. 3d 14, 31 (D.D.C. 2021) (quoting United States v. Cox, 906 F.3d 1170, 1191 (10th Cir. 2018)); see also United States v. Grider (Grider II), Crim. A. No. 21-022 (CKK), 2022 WL 3030974, at *2 (D.D.C. Aug. 1, 2022) (citing Chrestman's four-factor test).

The parties here dispute a number of issues related to the two defenses, such as whether the official seemingly sanctioning Sheppard's conduct must have had actual authority, or if apparent authority suffices, and whether the elements of the defense are questions of fact for the jury or questions of law for the Court to decide.

The Court does not need to answer either of those questions to resolve the issue presented now. A defendant is only entitled to a jury instruction on an affirmative defense "if there is sufficient evidence from which a reasonable jury could find for the defendant on that theory."

United States v. Nwoye, 663 F.3d 460, 462 (D.C. Cir. 2011) (internal quotation marks omitted).[5] Prior to trial it is difficult to determine whether Sheppard will provide sufficient evidence supporting some elements of the public authority defense and/or the entrapment-by-estoppel defense, such as whether Sheppard "actually relied on," Chrestman, 525 F. Supp. 3d at 31, statements by former President Trump.  But in this case, the Court can determine, without hearing evidence at trial, that Sheppard's public authority defense as he describes it will fail because former President Trump's statements did not amount to an express or implied statement of the law.

Despite the uncertainty over the elements of the defenses, it is undisputed that Sheppard must show that he relied on a "conclusion or statement of law" by the relevant official—here, then-President Trump.  See, e.g., Reply to Opp'n to Notice of Public Authority Defense at 2; North, 910 F.2d at 880.  The authorization need not necessarily be clear-cut—there is no requirement that former President Trump said exactly: "It is legal for you to enter the Capitol today and stop the certification."  The official's words or conduct can, in some instances, imply that the conduct is legal.  For example, in Cox, the police officers on the scene informed demonstrators that they could protest across the street from a government building.  379 U.S. at 569–71.  The Supreme Court overturned the demonstrators' convictions for demonstrating "near" the building because the protesters were "[i]n effect . . . advised that a demonstration at the place it was held would not be one 'near' the courthouse within the terms of the statute."  Id. at 571 (emphasis added).  But even in Cox, the implication of the officers' statements was that demonstrating in the relevant spot would be legal.  That differs from a case like Meyers v. City of New York, No. 1:14-CV-09142 (ALC), 2019 WL 1397186 (S.D.N.Y. Mar. 28, 2019), aff'd, 812 F. App'x 11 (2d Cir. 2020), in

---

[5] This is true even if, as the defense argues, the final resolution of the defense's applicability is a question of fact for the jury.  To get to that point, the defense must offer some evidence showing its applicability at all.  See North, 910 F.2d at 880 (affirming refusal to give jury instruction because the defendant did not identify a "conclusion or statement of law"—one of the factors that Sheppard identifies as a question of fact for the jury).

which protesters were arrested for erecting tents in Zuccotti Park and refusing to leave following a dispersal order from the police, id. at *1.  The protesters argued an entrapment-by-estoppel defense because, prior to the dispersal order, then-Mayor Michael Bloomberg had stated that "as long as the protestors obey the laws, we'll allow them to express themselves."  Id. (cleaned up). Even if that statement implied that the mayor would choose not to arrest the protestors for demonstrating in the park, "it 'did not advise [the protestors] that the behavior for which they were [prosecuted] was lawful.'"  Grider II, 2022 WL 3030974, at *3 (alterations in original) (quoting and describing Meyers, 2019 WL 1397186, at *17).

These cases underscore that the public authority and entrapment-by-estoppel defenses are available only when the official's statements or conduct state or clearly imply that the defendant's actions are lawful.[6]  See Chrestman, 525 F. Supp. 3d at 32 (analyzing cases finding the public authority defense applicable and concluding that each featured "either a misunderstanding of the controlling law or an effort by a government actor to answer . . . complex or ambiguous legal questions defining the scope of prohibited conduct under a given statute").

Sheppard has already disclosed the statements by former President Trump he intends to rely on, and this Court joins the Grider court in concluding that President Trump neither stated nor implied that entering the restricted area of the Capitol grounds and the Capitol building or impeding the certification of the electoral vote was lawful.  See 2022 WL 3030974, at *3. Sheppard points to the following statements made by former President Trump in his speech:

> And after this, ***we're going to walk down, and I'll be there with you***, we're going to walk down. . . .  I know that everyone here will soon be marching over to the *Capitol building* to peacefully and patriotically make your voices heard. . . .  And they want to recertify their votes. . . .  **But the only way that can happen is if Mike Pence agrees to send it back. . . . If not . . .  you will have an illegitimate**

---

[6] Some courts of appeal have taken a more restrictive view: that the government official must have "actively assure[d] a defendant that certain conduct is legal."  E.g., United States v. Spires, 79 F.3d 464, 466 (5th Cir. 1996). This Court does not decide whether the assurances must be express, or how heavily implied they must be, because it concludes that former President Trump neither said nor implied that Sheppard's actions were legal.

**President.** That's what you'll have.  And we can't let that happen. . . .  **We must stop the steal** and then we must ensure that such outrageous election fraud never happens again. . . .  **And we fight.  We fight like hell**.  **And if you don't fight like hell, you're not going to have a country anymore . . . . So we're going to, we're going to walk down Pennsylvania Avenue . . .  And we're going to the Capitol, and we're going to try and give them the kind of pride and boldness that they need to take back our country. . . .  So let's walk down Pennsylvania Ave**.

Reply to Opp'n to Notice of Public Authority at 7 (emphases in original).

These words only encourage those at the rally to march to the Capitol—nothing more—and do not address legality at all.  But, although his express words only mention walking down Pennsylvania Avenue <u>to</u> the Capitol, one might conclude that the context implies that he was urging protestors to do something more—perhaps to enter the Capitol building and stop the certification.[7]  But even if so, there is simply no indication that Trump informed the protestors that doing so would be legal, as required to make out either defense.  His speech simply suggests that it would be an act of "boldness" to "stop the steal."  Thus, allowing Sheppard's reliance on these words would be an instance of allowing "following orders, without more, [to] transform an illegal act into a legal one"—something the D.C. Circuit has unequivocally declined to do.  <u>North</u>, 910 F.2d at 881.  Sheppard will accordingly not be permitted to rely on this defense in pursuit of discovery or to present evidence and argument to that effect at trial.[8]

---

[7] The House Select Committee to Investigate the January 6th Attack on the United States Capitol has concluded that former President Trump's behavior starting in late 2020 and through January 6, 2021 violated at least four federal statutes.  <u>See</u> Introductory Material to the Final Report of the Select Committee, Select Committee to Investigate the January 6th Attack on the United States Capitol (Dec. 19, 2022).  Although the Committee has concluded that President Trump's speech on January 6th was part of the conduct that violated the statute, <u>see id.</u> at 40-55 (describing how Trump "summon[ed] a mob to Washington, and knowing they were angry and armed, instruct[ed] them to march to the Capitol"), that conclusion is consistent with the Court's findings.  For example, the Committee concluded that former President Trump acted "corruptly"—that is, he knew that stopping the vote certification was not lawful.  <u>Id.</u> at 78-79; <u>see also id.</u> at 4 (noting that Trump "corruptly pressured Vice President Mike Pence to refuse to count electoral votes during Congress's joint session on January 6th" "[d]espite knowing that such an action would be illegal").  The report also notes President Trump's instruction in his speech to, for instance, "fight like hell," <u>id.</u> at 79, which could signal to protesters that entering the Capitol and stopping the certification would be unlawful.  Thus, the conclusions reached here—that even if protesters believed they were following orders, they were not misled about the legality of their actions and thus fall outside the scope of any public authority defense—is consistent with the Select Committee's findings.

[8] Sheppard urges the Court to wait to rule on the availability of the public authority defense until after the evidence has been presented at trial.  <u>See</u> Def.'s Resp. to Gov't's Suppl. Brief Regarding Notice of Public Authority

## IV.    Motion to Compel Discovery

Sheppard's final motion seeks an order compelling certain categories of discovery from the government.  Under Federal Rule of Criminal Procedure 16(a), upon a defendant's request, the government must "permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control" and, as relevant here, "the item is material to preparing the defense."  Fed. R. Crim. P. 16(a)(1)(E)(i).  The government also has an affirmative duty under Brady v. Maryland, 373 U.S. 83 (1963), to disclose "evidence in its possession that is favorable to the accused and material either to a defendant's guilt or punishment."[9]  United States v. Trie, 21 F. Supp. 2d 7, 23 (D.D.C. 1998).  Evidence is material if there is a "reasonable probability" that it would impact the outcome of the proceeding. United States v. Bagley, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.); see id. at 685 (White, J., concurring in part) (agreeing with Justice Blackmun's definition of "material" on behalf of a majority of the Court).  "To determine whether documents or other discovery are 'material in

---

Defense at 1.  But because the Court is able to rule based on what has been presented and proffered, and because resolution of the issue impacts whether certain categories of discovery are relevant or not, it is appropriate to decide the issue now.

[9] Sheppard asks the Court to adopt the standard for pretrial disclosure under Brady articulated in United States v. Safavian: any evidence that "may be 'favorable to the accused' . . . must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial."  233 F.R.D. 12, 16 (D.D.C. 2005).  The pretrial setting differs from the posture presented in Brady and its progeny, as those courts had the benefit of understanding what evidence was actually presented at trial and, thus, what evidence "likely would affect the outcome."  Sheppard argues that in the pretrial setting, it does not make sense for the prosecution to guess whether a certain piece of evidence would be influential or not, and there accordingly should be no "materiality" requirement under Brady.  See Disc. Mot. at 4 & n.4.

Practically speaking—and, for the situation presented here—there is unlikely to be much daylight between the two standards.  Precisely because the prosecution does not know what will be presented at trial, any evidence favorable to the accused may later be found to be "material."  See Kyles v. Whitley, 514 U.S. 419, 439 (1995) ("This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence.  This is as it should be." (citation omitted)).  When discovery disputes come before the district court, it is even less likely that a court will be able to distinguish between evidence that is merely favorable and evidence that rises to some indeterminate level of "likely" to change the outcome.  And particularly given that "courts in this jurisdiction look with disfavor on narrow readings by prosecutors of the government's obligations under Brady," United States v. Edwards, 191 F. Supp. 2d 88, 90 (D.D.C. 2002), the practical effect of either standard will be to require the prosecution to provide the defense with favorable information in its possession—as the Court expects here.

preparing the defense,' a court must focus on the charge(s) set forth in the indictment because the indictment delineates the evidence to which a defendant must respond." United States v. Williamson, Crim. A. 14-151 (RMC), 2014 WL 12695538, at *3 (D.D.C. Oct. 23, 2014).

### A.  The United States Secret Service is Part of the Prosecution Team

As an initial matter, the parties dispute whether the government has an obligation to turn over any documents in the possession of the United States Secret Service ("USSS").  The USSS was involved in the security planning and the decisions related to Vice President Pence and President Trump's logistics on January 6 and officers of the USSS were present at the Capitol that day. See, e.g., Reply in Supp. of Disc. Mot. at 2 (citing a document filed under seal that "specifies that the USSS is one of the agencies that [was] involved in the 'multi-agency teleconference' that planned for the January 6, 2021 event").  Sheppard argues that because the USSS "participated in the investigation and prosecution of the offenses charged . . . the government has an obligation to seek from [the USSS] all information subject to disclosure under the Rules." See Disc. Mot. at 8.

The government opposes this characterization, citing a case stating that the USSS is not considered part of the prosecution team for purposes of Brady.  See Resp. to Mot. to Compel at 4 (citing United States v. Stewart, 433 F.3d 273, 298 (2d Cir. 2006)).  But the scope of Brady obligations "does not turn on the status of the person with actual knowledge, such as a law enforcement officer, prosecutor or other government official"—the analysis focuses on the "specific circumstances" of their involvement.  Stewart, 433 F.3d at 298; see also United States v. Libby, 429 F. Supp. 2d 1, 9 (D.D.C. 2006) ("The 'possession, custody, or control' inquiry is fact-intensive and must be resolved on a case-by-case basis.").  Given that Brady covers "branches of government closely aligned with the prosecution," United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992) (internal quotation marks omitted), in some prosecutions the USSS would be outside the scope, but in others it would be "closely aligned."

Here, the government concedes that it has already "obtained certain materials from the USSS in connection with [the] investigation of the January 6 attack," Resp. to Disc. Mot. at 5, and it regularly calls a USSS agent to testify in January 6 cases.  Thus, while the "exact contours of the roles played" by the USSS in the prosecution are unclear, it is apparent that the prosecution has "sought and received a variety of documents pertinent to the investigation" from the USSS and that the USSS has contributed to the investigation in other ways.  Libby, 429 F. Supp. 2d at 10–11.  The USSS played an integral role in aspects of January 6, and the document-sharing between the USSS and the U.S. Attorney's Office suggests that the government declining to search for and produce potentially material documents from the USSS "would clearly conflict with the purpose and spirit of the rules governing discovery in criminal cases."  Id. at 11; see also United States v. Santiago, 46 F.3d 885, 894 (9th Cir. 1995) (rejecting Rule 16(a) standard based on "whether the agency in question had participated in the investigation" and instead asking whether the "United States Attorney had 'knowledge of and access to' the documents").  Accordingly, the Court concludes that materials in the possession of the USSS are not categorically outside of the prosecution's possession or control in this case.

However, that is not to say that Sheppard is entitled to broad swaths of discovery from the USSS.  Their role on January 6 and in the investigation is much more limited than the USCP's, for example.  The defense does not claim that the USSS played any role in setting up the restricted area or grounds around the Capitol, cf. Mot. to Dismiss at 22–23, communicating the restriction to the public, or otherwise guarding the Capitol (beyond their specific duties related to Vice President Pence).  As will be discussed below, the discovery that the government is required to produce from the USSS is thus quite limited based on the materiality requirement.

**B.  Sheppard Is Not Entitled to Discovery Based on Deletion of USSS Messages**

As part of his discovery request, Sheppard seeks information from the government "pertaining to the investigation of the Secret Service after the Department of Homeland Security learned of the deletion of messages before and after January 6, 2021."  Disc. Mot. at 2.  This request refers to public reports that 10 USSS agents' phones had metadata suggesting that text messages sent around January 6 were not retained.  Id. at 7.  Sheppard argues "[t]his investigation as well as information regarding all Secret Service and/or Capitol police communications during January 6, 2021, is relevant to impeachment testimony and the ability of the defense to potentially rebut the government's claim that all areas were clearly restricted at all times."  Id.

Where, as here, evidence is only "potentially useful" to a criminal defendant, failure to preserve the evidence does not constitute a denial of due process under Brady unless the defendant shows bad faith by the government.  Arizona v. Youngblood, 488 U.S. 51, 58 (1988).

The government argues that Sheppard has not shown that the evidence was destroyed in bad faith.  See Resp. to Mot. to Compel at 8–9 (citing Youngblood, 488 U.S. at 57–58).  Sheppard responds that he has no way of knowing if the evidence was destroyed in bad faith—hence his discovery request—and in any event, withholding material exculpatory evidence is always a Brady violation, regardless of whether the government acted in bad faith in doing so.  See Reply in Supp. of Disc. Mot. at 7–9.

Even if the evidence was, in fact, intentionally destroyed, the Court would not conclude that it was done "in bad faith" as that term is used in Youngblood.  The bad-faith standard recognizes that there are instances where the substance of the missing evidence is unknown— making it impossible for the defendant to prove a Brady violation—but "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant."  United States v. Vega, 826 F.3d 514, 533 (D.C. Cir. 2016) (quoting Youngblood, 488 U.S. at 58).  The

Due Process Clause's proscription is hence confined to "only those cases" where the evidence is material or the police's conduct suggests there is exonerating evidence. Id. And further, the police's conduct only gives rise to such suggestion if "the police[] [had] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." In re Sealed Case, 99 F.3d 1175, 1178 (D.C. Cir. 1996) (quoting Youngblood, 488 U.S. at 57 n.*).

As an initial matter, cases discussing this standard squarely place the burden on the defendant to show bad faith, including that the police had knowledge of the exculpatory value of the destroyed evidence. See, e.g., United States v. McKie, 951 F.2d 399, 403 (D.C. Cir. 1991) ("In Youngblood, the Court held that to establish a due process violation, the defendant bears the burden of proving that the government failed in bad faith to preserve material and potentially exculpatory evidence." (emphasis in original)); In re Sealed Case, 99 F.3d at 1178 (rejecting due process claim because "[the defendant] has forwarded no evidence" to that effect); United States v. Marshall, 116 F.3d 942, at *2 (D.C. Cir. 1997) (table case) ("Marshall never established bad faith, and thus, the constitutional remedies are unavailable to him.").

Sheppard argues that he has no way of making that showing without discovery. Limited discovery may be proper in some instances to obtain information about constitutional violations, see, e.g., United States v. Armstrong, 517 U.S. 456, 468 (1996) (discussing the availability of limited discovery to bolster a race-based selective prosecution claim), but this is not such a case. Sheppard has "advanced no credible argument that the destroyed evidence was 'potentially exculpatory,'" United States v. Burnett, 827 F.3d 1108, 1116 (D.C. Cir. 2016) (quoting McKie, 951 F.2d at 403), let alone that the USSS agents were aware of its exculpatory nature. In fact, all information available to the Court suggests that the messages would have minimal, if any, relevance to Sheppard's case.

There is nothing obviously relevant about the USSS agents' messages—whatever they may be—to Sheppard's knowledge of the restricted area, his disorderly conduct, or any other elements of the crimes charged. See, e.g., Vega, 826 F.3d at 533 (applying bad-faith standard to missing "photographs used in the witnesses identifications"). Sheppard cites the possibility of rebutting "the government's claim that all areas were clearly restricted at all times." Disc. Mot. at 7.[10] But the USSS was not responsible for setting up or maintaining the restricted area perimeter, cf. Mot. to Dismiss at 22–23, and Sheppard offers no reason why the messages at issue would shed light on the position of barriers at the relevant time. The information available to the Court suggests that USSS agents were involved in protecting former Vice President Pence inside the Capitol and also had input on former President Trump's movements that day. See Reply in Supp. of Disc. Mot. at 9. But communications sent in furtherance of those roles are not relevant to Sheppard's actions or his intent, as Sheppard does not assert that he interacted with any USSS agents or was aware of any communications between them.[11] To the extent he argues the messages could include communications with the USCP, who were interacting with rioters and managing the restricted area, those communications could be produced through discovery from the USCP.

In short, there must be some clearer link between the evidence alleged to have been destroyed and the defense's case to order the wide-reaching discovery Sheppard seeks. Cf. United

---

[10] Sheppard also argues that the destroyed messages may have impeachment value. Disc. Mot. at 7. The government represents that if it calls any USSS agents, it will "provide any impeaching material or statements." Resp. to Disc. Mot. at 5.

[11] As an example of potentially exculpatory evidence, Sheppard points to the revelation by the January 6 House Committee that "the USSS prevented former President Trump from joining his constituents at the Capitol building despite his many efforts to do so." Reply in Supp. of Disc. Mot. at 8–9. The relevance of that fact is somewhat hard to discern—at most, the relevance would be that former President Trump expressed a desire to join the protestors which could, theoretically, speak to Sheppard's intent and awareness. But it would only do so if Sheppard himself knew of President Trump's movements or plans. Thus, any internal communications would not be relevant because Sheppard was not aware of them.

Because Sheppard was not aware of the messages on January 6, 2021, and has not shown their relevance to the "nature and circumstances" of his offense, see 18 U.S.C. § 3553, nor to any other sentencing factors, they are not relevant to sentencing either.

States v. Taylor, 312 F. Supp. 3d 170, 179 (D.D.C. 2018) ("[N]ot every allegation of government bad faith requires an evidentiary hearing . . . ."). It very well may be that the missing text messages contain evidence that is generally related to some aspects of January 6—President Trump's movements and decision-making; Vice President Pence's evacuation—but Sheppard is only entitled to go down this path if the evidence is relevant to him. Because he has not made any showing that it is, the Court will deny his request for discovery relating to destroyed USSS text messages.

### C. Secret Service and Capitol Police Communications

Sheppard next asks for Secret Service and/or Capitol Police communications related to six categories of information. Three of the requests are highly intertwined: Sheppard requests communications related to (1) "the decision to declare parts of the Capitol Grounds and Complex restricted (including identification of any such restricted area and mechanisms used to delineate restricted areas)," (2) "any steps taken to communicate restricted areas to the public," and (3) "the status of any sign postings, racks, cordons, or other restrictions after the certification proceedings were halted." Disc. Mot. at 2. As the government asserts, the reason for declaring the area restricted is not relevant to Sheppard's conduct. And both the communication strategy and the status of "sign postings, racks, cordons, or other restrictions" are only relevant if Sheppard received the communication, saw the barriers, or was otherwise aware of them, so his request as written is significantly broader than what is relevant.

In reply, Sheppard clarifies that he is simply seeking any communications that would shed light on the "markings [that] were present at [the] time [Sheppard arrived at the Capitol] so that he would be aware the area was restricted." Reply in Supp. of Disc. Mot. at 6. That specific information is relevant to his defense, as § 1752 requires knowledge that the area is restricted. Thus, if the government has not already done so, the Court will order it to turn over any

communications in its possession that would show the status of barriers, police lines, or other indicia of a restricted area at the relevant time and place.[12]

The parties agree that the government may have already turned over information relevant to the request, but Sheppard takes issue with the manner of disclosure. The discovery in this case, like all other January 6 cases, has been extensive, with "terabytes of discovery" in the database that defense counsel has had to sift through. See Reply in Supp. of Disc. Mot. at 7. Sheppard claims that the government has "simply pointed the defense to Evidence.com or Relativity," where the extensive discovery is stored, rather than providing "specific case discovery." Id.

The Court is wary of requiring the government to, in effect, do defense counsel's work for them and of inserting itself into the fray of micromanaging discovery in these cases. However, "to the extent that the government knows of any [Brady] material in its production," the Court will "require [the government] to identify" it. United States v. Saffarinia, 424 F. Supp. 3d 46, 86 (D.D.C. 2020); cf. United States v. Hsia, 24 F. Supp. 2d 14, 29 (D.D.C. 1998) ("The government cannot meet its Brady obligations by providing Ms. Hsia with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack."). If the government is independently aware of particular evidence demonstrating Sheppard's lack of awareness of the Capitol's restricted status, and where to locate such evidence in the voluminous discovery, it should inform defense counsel.

Sheppard's fourth discovery request asks for communications related to "the reasons the certification proceedings were delayed." Disc. Mot. at 2. The government represents that it has

---

[12] Sheppard has conceded that the USSS had no role in establishing and maintaining the perimeter, so unless he is able to show otherwise, the government need not engage in a "fishing expedition," Williamson, 2014 WL 12695538, at *2 (quoting United States v. Roybal, Crim. No. 12-3182 JB, 2014 WL 4748136, *14 (D.N.M. Sept. 4, 2014)), in searching for such information in the USSS's possession.

already produced this information to Sheppard, Resp. to Disc. Mot. at 7, and so the Court will deny this request as moot.

Sheppard's fifth request seeks communications related to "the status of any open or unlocked doors after the certification proceedings were halted." Disc. Mot. at 2. The government responds that the "status of the doors is not relevant" because the fact that "additional measures could have been taken to prevent a crime is not a defense." Resp. to Disc. Mot. at 7. That may be true, but whether a door through which Sheppard entered was locked or unlocked could certainly be relevant to, for example, his awareness of the restricted status of the building or grounds. But the status of <u>other doors</u>—ones that Sheppard did not enter through or come into contact with—is not relevant. Sheppard states that the "government has [already] provided discovery showing that Mr. Sheppard entered the Capitol building through an unlocked and wide open door," Reply in Supp. of Disc. Mot. at 7, and the government represents that it will provide any relevant information on this point not previously provided, Resp. to Disc. Mot. at 7. Thus, there appears to be no outstanding relevant discovery.

Finally, Sheppard asks for "the identity/actions of any law enforcement personnel who encouraged activity among the crowd at the Capitol or Capitol Grounds on January 6, 2021." Disc. Mot. at 2. The government is not aware of any such law enforcement personnel and has produced all evidence of law enforcement's interactions with the rioters as well as "materials related to any allegations of misconduct by law enforcement personnel that day." Resp. to Disc. Mot. at 7. It has accordingly satisfied its obligations under this request.

### D. Communications Between President Trump's Former Staff

Sheppard's last discovery request seeks "[a]ny communications between former President Trump's former staff on the day of January 6, 2021, regarding former President Trump's failure to stop the riot as well as affirmative steps he took to further encourage it." Disc. Mot. at 2. This

request is directly related to Sheppard's proposed public authority defense, discussed above. Because the Court has precluded this defense, the evidence sought is not relevant for that purpose.

Even if the public authority defense is rejected, Sheppard argues, "this evidence is certainly relevant and admissible to negate [his] intent." Reply in Supp. of Disc. Mot. at 11. It may be that former President Trump's statements or actions that Sheppard perceived or of which he was otherwise aware are relevant to the question of intent. Nothing in this opinion limits his ability to testify or put forth evidence of former President Trump's speech and its effect on his mental state.[13] But that information is already within his possession—there is nothing the government could turn over that would speak specifically to his intent. He was not aware of the communications sent between President Trump's former staff on January 6. Hence, they have no bearing on his intent. Further, Sheppard has not shown that those messages are within the "possession, custody, or control" of the prosecution. The Court will accordingly deny this request.

## Conclusion

For the foregoing reasons, the Court will deny Sheppard's motion to dismiss and motion to transfer venue; will grant in part and deny in part his motion to compel; and will preclude Sheppard from relying on a public authority (or estoppel-by-entrapment) defense at trial. A separate Order consistent with this opinion will issue.

/s/
JOHN D. BATES
United States District Judge

Dated: December 28, 2022

---

[13] If the parties anticipate a dispute as to the admissibility of this evidence, they may file a motion in limine addressing this issue at a later time (notwithstanding the December 16, 2022 deadline for motions in limine).