**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA,**

**v.**

**ALEXANDER SHEPPARD,**

**Defendant.**

**Case No. 21-CR-203 (JDB)**

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Alexander Sheppard to a high-end sentence of 37 months incarceration (the government and probation calculated a sentencing guidelines range of 30-37 months), 36 months supervised release, $2000 restitution, and the mandatory special assessment.

## I.    INTRODUCTION

The defendant, Alexander Sheppard, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Sheppard came to Washington D.C. on January 6 to send a message. And he did—making

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

his way through several police lines to just outside the House Chamber and terrifying police officers, members of Congress and their staffers, and others working in the Capitol that day. And crucially for the purposes of sentencing, that is a message he continues to deliver to this day to tens of thousands of followers, more than two years later, on multiple social media platforms.

Sheppard was among the first rioters to enter the Capitol and joined others in overrunning multiple police lines established to stop the mob's spread. Inside the Crypt, he and fellow rioters pushed through a police line designed to prevent the mob from moving towards the House chamber where members of Congress were present. He then recorded a video of himself proudly proclaiming: "I'm here with some goddamn heroes, and we just shut down Congress! They called an emergency session, they said we're too scared, they've shut down Congress. Let's fucking go!" Exhibit ("Ex") 2; the same video was introduced at trial as Government Exhibit ("Tr. Gov't Ex.") 301.

Sheppard eventually made his way to the hallway outside the Speaker's Lobby and screamed at the three remaining police officers guarding the last doors separating rioters from members of congress and staff evacuating the House chamber. He videotaped fleeing members of congress and staff and looked on as other rioters violently punched out the windows of the doors—just inches away from the officers' heads. Sheppard left only after witnessing another rioter in the same crowd get shot by law enforcement after attempting to climb through the broken windows of the same doors.

The government's recommendation in this case reflects its substantial concern that Sheppard's actions on that day may not be his last. As described below, in the days following

January 6, Sheppard posted a number of threatening statements on social media, including threats directed towards Vice President Pence and frustration with Republican senators who certified the electoral votes. For instance, on January 9, 2021, Sheppard posted on Parler, "[w]e shouldn't hang Mike Pence. Firing squad!" Tr. Gov't Ex. 355. Sheppard continues to post prolifically on a variety of social media platforms to this day, to express his disappointment in the jury's verdict in this case and to continue to spread false information about the 2020 presidential election to tens of thousands of followers. For instance, in December 2021, Dr. Alan Keyes interviewed Sheppard on his show, "Let's Talk America with Dr. Alan Keyes" and Sheppard posted a video of the interview to Rumble. Ex. 6. During the interview, Sheppard said that he got "sucked in" to the Capitol and that January 6 was a "set-up" by the FBI.

Since he was charged for his conduct on January 6, Sheppard has also failed to comply with pretrial services and engaged in additional criminal conduct. Sheppard failed to report by phone as required on at least seven occasions, resulting in pretrial services request to remove him from supervision. Dkt. 80 at 2. He was repeatedly warned about these infractions. *Id*. Roughly one month before his trial, Sheppard was arrested in Ohio for driving under the influence. He failed to report his arrest to the Court, and pretrial services learned of the arrest just prior to his trial. Since then, he failed to appear to appear at a March 22, 2023 pretrial conference in connection with this case, resulting in the issuance of a bench warrant.[2] *See* Dkt. 80 at 2, PSR ¶ 55. Sheppard's arrest

---

[2] According to Ohio court records, the defendant finally sought to remove that bench warrant on April 11, 2023, the same day that the defendant submitted his objections to the PSR in this case and roughly two weeks after pretrial services circulated the draft Presentence Investigation Report. Sheppard's driving under the influence case is now scheduled for a pre-trial conference on May 11, 2023. 2022 TR C 149767 FCMC Case Information (fcmcclerk.com), last checked on April 18,

3

for driving under the influence is worrisome enough.  *See United States v. Woods*, 21-cr-476 (APM), Dkt. 46 at 3 (January 6 defendant awaiting sentencing caused a multi-car crash while driving under the influence, killing a 35-year old woman and significantly injuring two others); *United States v. Hernandez*, 21-cr-747-JEB, Dkt. 40 at n. 3; Lauren Trager, KMOV4, *Grieving family demands answers after Sullivan woman convicted in Capitol insurrection charged in deadly drunk driving crash* (Feb. 2, 2023 at 11:31 PM EST) (available at https://www.kmov.com/2023/02/03/grieving-family-demands-answers-after-sullivan-woman-convicted-capitol-insurrection-charged-deadly-drunk-driving-crash/).[3] But Sheppard's failure to report his arrest to this Court and then his subsequent failure to appear at his state court hearing is troubling and is indicative of a refusal to take judicial orders seriously.

For these reasons, the government recommends that the Court sentence Sheppard to 37 months' incarceration for obstructing an official proceeding under 18 U.S.C. § 1512(c)(2) and related misdemeanors, which is at the high end of the advisory Guidelines' range of 30-37 months as calculated by the government and probation. A 37-month sentence reflects the seriousness of Sheppard's conduct on January 6 and thereafter.

## II.     FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the statement of facts filed in this case, Dkt. 1-1, for a

---

2023.

[3] Woods will be sentenced on April 7, 2023. The government recommended an upward variance of 70 months incarceration from a sentencing guidelines range of 46-57 months incarceration in that case. See 21-cr-476 (APM), Dkt. 46 (Government's Sentencing Memorandum).

short summary of the attack on the United States Capitol when Congress met in a Joint Session on January 6, 2021 to certify the results of the November 3, 2020 presidential election and rioters sought to disrupt the peaceful transfer of power.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and

Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.8

million dollars.

**B.      Sheppard's Role in the January 6, 2021 Attack on the Capitol**

Sheppard's crimes are documented through videos, photos, and text messages recovered from his phone, social media, open-source video, and surveillance footage from inside of the Capitol.

Sheppard took to social media after the November 3, 2020 presidential election to express his disappointment with the outcome. On December 30, 2021 he wrote, "[m]illions of us will be in Washington D.C. on January 6th to protest the RIGGED election and the acts of WAR that China committed on our country. I'll see you there!" On January 6, Sheppard wrote, "[a]nother rigged election because Trump won't send in the military."

Sheppard left his home in Ohio on January 5, 2021, and drove overnight to Washington, D.C., in order to attend President Trump's rally at the Ellipse. Along the way, Sheppard made a video of himself driving to Washington, D.C., which he posted to Facebook and in which he stated, "we're not going to stand for it, we're making America great again." Tr. Gov't Ex. 321.

Once in Washington, D.C., Sheppard attended the rally; afterwards, he walked to the Capitol. Sheppard entered onto the Capitol grounds, passed beneath scaffolding for the Inaugural platform, and climbed the exterior stairs on the west side of the building. At approximately 2:16 p.m., Sheppard entered the Capitol through the Senate Wing Doors that other rioters had breached just minutes earlier. The glass in those doors was shattered when Sheppard entered. Other rioters did not wait to use the broken door; climbed through adjacent windows with the glass broken out. Inside, alarms were blaring and the floor was covered in broken glass.



*Image 1:* *Sheppard (red circle) entering the Capitol*

From there, Sheppard proceeded to the Crypt, where he encountered a line of police officers blocking further access to the building. Over a period of minutes, the northside of the Crypt filled with other rioters, as Sheppard shouted and chanted just feet from the police line. Once rioters in the Crypt reached critical mass, Sheppard, who was near the front of the crowd, pushed other rioters who, in turn, pushed through the police line. Ex. 1; Tr. Gov't Ex. 507



***Image 2:*** *Sheppard (red circle/yellow arrow) pushing through police line in the Crypt (Exhibit 1)*

Once through, Sheppard proceeded towards the Memorial Door staircase, pounding on office doors and shouting as he moved through the building.   That was particularly aggravating conduct because it contributed to the terror of Congressional staffers and others who were sheltering in their offices during the riot.   *See* https://rollcall.com/2021/01/28/insurrection-aftermath-staffers-struggle-with-trauma-guilt-and-fear/ (visited April 14, 2023) ("Congressional staffers are still struggling in the aftermath of the Jan. 6 attack on the Capitol, whether they hid from the violent mob in their workplace or watched in terror from home.").



*Image 3: Sheppard (red circle) pounding on office doors (Tr. Gov't Ex. 509B)*

Sheppard took multiple photos inside of the Capitol and recorded a video of himself proudly proclaiming: "I'm here with some goddamn heroes, and we just shut down Congress! They called an emergency session, they said we're too scared, they've shut down Congress. Let's fucking go!" Ex. 2.



*Image 4: Sheppard recording a video of himself in the Capitol (Exhibit 2)*

As Sheppard, in the midst of other rioters, climbed stairs to the second floor where the House and Senate Chambers are located, the mob chanted ominously, "Nancy! Nancy! Nancy!" Once on the second floor, Sheppard proceeded directly through Statuary Hall to join the growing crowd of rioters pressing up against yet another police line, within sight of the Main House Chamber door. Inside, members and staff were working to evacuate the House chamber and could

hear the shouting mob just outside the door. Sheppard stood, chanting and yelling at the police line.



***Image 5:*** *Sheppard (red circle) shouting just outside the House chamber (Tr. Gov't Ex.506)*

Shortly thereafter, the mob overwhelmed that police line and pushed its way up to the inner door to the House Chamber. Sheppard stood in the middle of the mob shouting.



***Image 6:*** *Inside House Chamber after mob reached the inner door* (Drew Angerer/Getty Images)

Sheppard left the area of the Main House Chamber Door to explore the hallways alongside the House Chamber. He walked to the Rayburn room but quickly raced out in response to calls from other rioters. Sheppard was among the first rioters who gathered outside the doors of the Speaker's Lobby, effectively the back door to the House Chamber, and was one of the first to confront the police line and barricade in that area.



*Image 7: Sheppard (red circle) encountering officers in front of the Speaker's Lobby doors*

Behind the three remaining officers, through the glass windows of the barricaded doors, Sheppard watched members of Congress and staff evacuating the House chamber. In fact, he videotaped their flight through the glass windows separating him from the Speaker's Lobby. Ex. 3; Tr. Gov't Ex. 303.



**Image 8:** *Sheppard's footage of evacuating members of Congress and staff (Exhibit 3)*

Standing just feet from where police officers stood guarding the evacuation, Sheppard screamed and shouted at those officers while watching other rioters shatter the windows on the doors immediately in front of him. Ex. 4; Tr. Gov't Ex. 510.



*Image 9:* Sheppard (yellow circle) shouting at officers guarding Speaker's Lobby doors (Exhibit 4)



*Image 10: Sheppard shouting at officers in front of the Speaker's Lobby doors (Exhibit 5)*



*Image 11: Rioters punching through windows of Speaker's Lobby doors (Exhibit 5)*



***Image 12:*** *Rioters punching through windows of Speaker's Lobby doors (Exhibit 5)*

Sheppard remained at the doors screaming at officers for several minutes, as captured on various third-party videos. Ex. 5; Tr. Gov't Ex. 511. He remained there castigating the officers until another rioter began to climb through one of the broken windows and was shot by a police officer on the other side of the doors. Sheppard made no effort to leave the U.S. Capitol building until after the rioter was shot.



*Image 13: Sheppard shouting as he leaves the Capitol*

At approximately 2:55 p.m., roughly 40 minutes after he entered, Sheppard left the U.S. Capitol building. On his way out, he shouted "they killed a girl for Jeffrey Epstein and Communist China!" In the days after January 6, Sheppard lied to his parents and others about being in the Capitol on January 6.

### Sheppard's Social Media After January 6, 2021

After January 6, Sheppard posted a number of statements on social media, including threats directed towards Vice President Pence and expressions of frustration with Republican senators who certified the electoral votes.

```
2021-01-09T17:44:24Z    What happened at the Capitol building is what should
                        be expected when your votes don't count

2021-01-09T21:52:41Z    What happened on the 6th is what you should expect
                        when you sell our votes to China
```

| | |
|---|---|
| 2021-01-09T18:23:02Z | I'm fine with hanging Pence tbh and I'm a conservative |
| 2021-01-09T18:25:37Z | Mike Pence deserves a firing squad |
| 2021-01-09T20:07:28Z | "We shouldn't hang Mike Pence. Firing squad!" |
| 2021-01-10T19:20:18Z | I'm tired of seeing Republican senators bitch and moan about Biden when they literally certified his fake votes |

***Image 14:*** *Sheppard's social media communications on January 9 and 10, 2021*

These messages were posted on or about January 9 and January 10, days after Sheppard stood inside of the U.S. Capitol building at the Speaker's Lobby doors.   Tr. Gov't Ex. 351-356.

Sheppard also made his lack of remorse clear in a journal entry dated January 15, 2021, in which he stated: "I didn't want to let Biden get into office. I've always believed that President Trump would save our country from the secret societies who wished to destroy the United States and everyone in it. . . . President Trump won the election in the biggest landslide the country's ever seen, but Biden committed massive fraud. 99% of the country thinks he's gotten away with it at this point. I hope he didn't." Tr. Gov't Ex. 361 at 3.

Sheppard has participated in a number of recorded interviews concerning January 6.   For example, in an interview posted on or about November 2, 2021, called "Alex Sheppard: We Are Only One Arrest Away from Decertifying the 2020 Election," Exhibit 13, *available at* https://rumble.com/vomoju-alex-sheppard-explains-whats-going-on-with-the-arizona-audit.html (last viewed on April 20, 2023), Sheppard stated the following:

- "But what it really comes down to, like you ask, is the hammer going to come down?   Are we going to remain a two-tier justice system in America, where patriots, uh peaceful protestors, conservatives, on top of anyone who's affiliated with President Trump, are we just going to let them continue to target us, uh, and have these corrupt prosecutors go after

everyone while we have evidence of serious crimes, crimes against our country, of treason, of crimes against humanity frankly, uh, we have got to right the ship." Ex. 13 at 3:45 to 4:23.

- "I think that there is something that all of us can be doing to push the needle forward to take our country back. You know, when we were getting ready for this call, I told you that tomorrow I'm going to be going out to Georgia for an election integrity rally, with a lot of great patriots who want to audit the vote and decertify Georgia, I think we all need to be fearless and continue telling the truth about what's really going on in our country, uh, I highly recommend non-compliance with all these illegal and illegitimate mandates by the unelected Biden regime. So, there's a lot of things." Ex. 13 at 15:59 to 16:45.

Micajah Jackson, another January 6 defendant, interviewed Sheppard in Findlay, Ohio, and posted the recording on his Rumble account on or about December 11, 2021, as "Revolting against the regime with Alex Sheppard." Ex. 10, also available at https://rumble.com/user/TheJFKReport (last viewed on April 18, 2023).



*Image 15: Sheppard Rumble Interview (Exhibit 10)*

During their interview, Sheppard spoke about his experience on January 6, and made the following statements:

- "[W]e were under the understanding that we had a First Amendment right to assemble and everyone around me, uh, I was right outside of I believe the House chamber, and we saw the members of the House Chamber, er, excuse me the members of Congress, we saw them evacuate or whatever, um, and we were standing there with the guards, and everyone around us was saying 'stay peaceful, stay peaceful, we're here to make our voices heard' et cetera, and then out of nowhere, we heard this big gunshot, and I was apparently just a couple of rows back from Ashli Babbitt when she got shot and there was no warning for Ashli, uh, she got murdered, frankly." Ex. 10 at 8:41 to 9:30.

- "The FBI, in my opinion, and I think the facts have laid this out, totally planned this false flag, this hoax, to set people up and to really take away our First Amendment right to assemble. Ex. 10 at 14:48 to 15:06.

- "And [Nancy Pelosi] is leading the Committee. And she brings in RINOs like Liz Chaney and Adam 'Crying' Kinzinger and all of these people, who don't want to get to the bottom of it, who don't want to get the truth. And then they brought the Capitol Police officers in who were total crisis actors, they were making stuff up. Harry Dunn, uh, or as I like to call him, Harry Dunce, he was a police officer, a black guy, who said, that there were about 20-25 Trump supporters yelling to the N-word at him, inside the Capitol, I'd love to see footage of that if that actually happened, but they come in with all of these stories and all these fairy tales, but they never provide the evidence. And they've been hiding the evidence like you said for so long. There's over 14,000 hours of video footage in the People's House, the United States Capitol, that people aren't allowed to see because the FBI knows, and the DOJ knows, that not only will people be found innocent, hundreds and hundreds of people that they are trying to charge, they're going to be found innocent, but then it's also going to show that they covered up the murder of Ashli Babbitt and the murder of Roseanne Boyland, and other, and the assault of so many peaceful protestors that day. Ex. 10 at 16:06 to 17:25.

- "I went and I marched towards the Capitol. And, then, it just kind of all happened at once, and next thing you know, you know I had no plans of going in the Capitol, but next thing you know I'm in there, and uh that's when they shot Ashli, and then after that, everyone was like, 'They just shot this girl' and they said, 'OK, we're going to send in medics,' so we're all clearing the way for them to send in a medic and the medic that they were supposed to send in never came, instead a ton of guys with riot shields came to push everyone out and apparently clear up the crime scene." Ex. 10 at 24:35 to 25:16.

- "At some point we gotta accept responsibility for the fact that we did walk into the FBI's trap and Nancy Pelosi's trap, and, you know, if that were a crime, I'd plea to it. I don't know that it is one. Ex. 10 at 28:04 to 28:22.

Roughly one week later, on or about December 17, 2021, Dr. Alan Keyes interviewed Sheppard on his show, "Let's Talk America with Dr. Alan Keyes." Ex. 6.  Sheppard added the video to his rumble.com account ("AlexSheppard, 1.1K Followers").[4] Exhibit 6. During the interview, Sheppard spoke at length about his time at the U.S. Capitol on January 6, 2021 (Ex. 6 beginning at approximately 9:15), and made the following statements:

- "But then afterwards I went down to the Capitol building, um, while we were there, you know, all of us peaceful outside were getting tear gassed, and then next you thing you know I got sucked into the building, I had no intentions of going into the building that day but it just ended up happening, um, and then while we were in there even Capitol Police officers were there and nobody said this is an unlawful protest you guys need to leave the building. There was nothing like that that was said." Ex. 6 at 10:37 to 11:09.

- "Next thing you know we're outside the Congress Chamber, the House Chamber of Congress, and we see the Congress people leaving, evacuating, and next thing you know, I hear a loud gunshot, and it turns out I was about a row or two back when Ashli Babbitt got shot right there." Ex. 6 at 11:15 to 11:38.

---

[4] Sheppard's Rumble account includes 8 other videos demonstrating his substantial knowledge of the details of the electoral certification, spreading false information about the events of January 6, interviewing other January 6 defendants, and attacking the Department of Justice and FBI, including videos titled "ABSOLUTE PROOF Antifa Planned To Storm Capitol On January 6th: John Sullivan FULL Chat Logs," "Auditor SPEAKS OUT: "Arizona Needs to be Decertified. There Was Rampant Fraud In This Election" that have received tens of thousands of views. These videos reveal Sheppard's considerable knowledge of the details of the certification and in one of these videos, titled "VICTORY: DOJ Fails To Throw 1/6 Defendant In Prison For 60 Days," Sheppard concludes by saying that despite "prosecutorial misconduct and political persecution," "it didn't stop us, and it won't stop us," and advertising several social media accounts he is still active on. *See* Exhibit 7 at 10:50. The PSR contains account information for several of Sheppard's social media accounts, including his Rumble account. *See* PSR ¶ 63. These videos remain publicly available on Sheppard's Rumble account: https://rumble.com/user/AlexSheppard (last visited on April 18, 2023).

- "I'm one of the lucky ones, because I'm not sitting there in the D.C. gulag, where people are being tortured seven days a week, 23 hours a day solitary confinement, so I'm grateful for that." Ex. 6 at 12:28 to 12:40.

- "We now know that it was a total set-up by the FBI, and I do think Nancy Pelosi is suspect number one which is why she can't be leading the investigation into January 6.   You were talking about the separation of powers earlier; first of all, we know that the legislative branch is supposed to make laws, not enforce them, so I don't know what this even has to do with them, and they were never threatened on January 6 by anybody, so they're acting like they were threatened." Ex. 6 at 16:32 to 17:03.

- "[Y]ou're right, it's a Reichstag moment, that they can use to go after our liberties, and they really use January 6 to distract from November 3, the real insurrection, which was the rigged election. . . . A report came out last month that Lindsey Graham told Capitol police officers 'you have guns use them' and then we know Ashli Babbitt got shot we know Roseanne Boyland now got killed, um, I think that's an incitement of violence, and it's so shameful that people like him and Mitch McConnel came out and wanted Trump to denounce this quote/unquote riot and this quote/unquote insurrection, even though he incited violence." Ex. 6 at 17:56 to 18:42.

- "I was there peacefully. Everyone around me was peaceful." Ex. 6 31:31 to 31:36.

- "I agree with you that it's been a very two-tiered justice system, because I personally am a believer in law and order, and I support the police . . . . We have no law and order.   All we have is the FBI going around and hunting people down for being in the building on January 6, yet they're hiding over 14,000 hours of footage from that building that day, and the reason they're hiding it is because they know their narrative is going to completely fall about once the American people really see the truth about what happened." Ex. 6 at 32:10 to 32:58.

- "[Nancy Pelosi's] January 6 Committee is a total sham and it's ridiculous.  One thing about that, you know they had the four Capitol Police officers testify and they lied, they perjured themselves. Michael Fanone said that Trump should be arrested over what happened on January 6 that sounds like a politician, that doesn't sound like a serious Capitol Police officer, and then worst of all in my opinion, Harry Dunn, black police officer, uh, he said that about 20-25 Trump supporters were yelling the 'N-word' at him. So the question is there's all these stories, there's all these fairy tales, where's the body cam footage, because I know that didn't happen, you know that didn't happen, where is the body cam footage where is the actual evidence to go along with all this stuff. Ex. 6 at 41:28 to 42:16.

- "In my opinion it looks like the Government and, you know, forces working with them were trying to kill many more people on January 6 then they actually did." Ex. 6 at 42:42 to 42:52.

- "And, that kind of speaks to what you are saying, people are rising up and people are tired of getting pushed around by these guys." Ex. 6 at 43:17 to 43:23.

Even since his conviction at trial, Sheppard has continued to post to various social media platforms virtually nonstop—sometimes twenty times or more in a day—to tens of thousands of followers, attacking the Department of Justice, the Federal Bureau of Investigation, and others, while continuing to spread false information about the 2020 presidential election. For instance, in August 2022, Sheppard posted that there was "a special place in hell" for "the FBI" and called its employees "cowards and traitors" on Gettr, where he had more than 20,000 followers as of April 2023. Exhibit 8. Later that month, he posted "[o]bstruction of justice is the same PHONY charge that I'm fighting as a January 6th defendant. Now the FBI wants to pin the same charge on the duly ELECTED president Of The United States. What a disgrace!" *Id*. The same month, he posted "I just learned how much evidence the FBI doctored and planted in their case against me. I've never seen anything like it." *Id*. In September 2022, Sheppard posted "[G]od Bless America and God Damn the traitors who stole it. Your time is coming!" *Id*. In October 2022, Sheppard called the riot a "false flag," and in November 2022 Sheppard posted "[t]he 2020 Presidential Election was rigged and it must be fixed if America ever wants to call itself a Republic Again. Also—free EVERY January 6th defendant!" *Id*.

Sheppard has been equally, if not more, prolific on Twitter, where he had more than 66,000 followers as of April 2023. In March 2023, Sheppard posted "[w]hen President Donald Trump is arrested tomorrow, it will prove beyond a shadow of a doubt that every January 6th protester was

arrested simply for supporting him," garnering more than 1,200 likes. Exhibit 9. He also posted "[w]e proved with audits across the Country that the 2020 Presidential Election was STOLEN, and instead of being rewarded with the rightful reinstatement of the victor, we were kicked off social media by Federal Law Enforcement. People have now lost ALL trust in the FBI and DOJ!"[5] *Id*.

Sheppard has likewise continued to participate in recorded interviews since his conviction. In an interview posted on or about March 13, 2023, called "Alex Sheppard Shares His First-Hand Experience from January 6," Exhibit 12, available at https://rumble.com/v2cy0k6-alex-sheppard-shares-his-first-hand-experience-from-january-6th.html (last viewed on April 20, 2023), Sheppard stated the following:

- "John Sullivan, another defendant charged for January 6 conduct] broke like 5 different pretrial release conditions, they said stay off Twitter, they said no reaching out to your organization, and like, three other things, and he violated all of them, and then this Judge says, 'Oh well, I don't think it is a big issue that he violated all, like 4-5 release conditions.' And if I did that, if I violated one of my release conditions, then I'm being thrown in jail." Ex. 12 at 18:37 to 19:07.

- "It was all the parading all that other stuff, and then it was felony obstruction of an official proceeding.   So it's taken two years for them to finally get us what they considered all the evidence although I think they held a lot of evidence back as we see, uh, but, anyways, I went to trial in D.C. uh, about a month ago, it was, uh, I forget the day, I went to trial about a month ago, and I got convicted by a D.C. jury on 5 of 6 of those counts, including the felony, uh so my sentencing date is April 27th, and uh, yeah, so it's not looking good, we've got you know several appeals and different things going, we think we have a lot of grounds to appeal on, especially with the new information that's been coming out." Ex. 12 at 19:31 to 20:21.

- "Media outlets are still calling it a violent insurrection. The DOJ in, in trials, referred to it as an insurrection, by the time my trial came up, they had to agree not to call it an insurrection, they called it a riot, but they had to agree, you cannot call it an insurrection. So, no, I think there needs to be big time accountability for the media companies that have

[5] As of April 20, 2023, Sheppard's Twitter account (@NotAlexSheppard) and Gettr account (@AlexSheppard) were publicly visible.

really um damaged a lot of great patriots. And, you know, I don't really even see myself as the victim here as much as I do, because I was only in jail for a day, um, you know, and then I was released, and now I'm looking at some time, like you said, there are people who have been sitting in DC and Florida and other places, they've been sitting there this whole time, no I don't think it's right, you know, in my jury selection, you know, we were trying to strike biased jurors from the jury pool in D.C. and it was, I mean, you had to be there it was the most fascinating thing, we had a list of so many questions, uh, 'did you watch news coverage of January 6 that day,' every single one of my jurors and potential jurors that we struck, watched footage of January 6 on the news when they're lying about it that day, and they watched uh you know, a lot of them watched, a lot or bits and pieces of the January 6 Committee, which is all Democrats on the Committee, including Liz Chaney and Kinzinger, its, and its, the other issue with this whole thing is the separation of powers: legislative branch, executive branch, judicial. The executive branch is in charge of enforcing the law, they are the prosecutors, um, so why do we have the legislative branch who is in charge of making the laws running this, this, witch hunt quote/unquote investigation, um, and it totally, it taints the judicial process when you do something like that." Ex. 12 at 24:07 to 26:08.

- "Well, so I, there was, there was the certification or whatever, but, but no, you're right, you're right, they weren't going on, but you know, they basically argued they weren't going on because of me, and because of other people who were charged with that, yeah and then they dragged out one of Mike Pence secret service agents at my trial, and they dragged out a chief capitol police guy who's now basically a professional witness testifying in all of these trials, and you know I had five witnesses in my trial, uh, and of them, four of them had no personal recollection of me. Uh, the one witness in my trial that had any recollection of me was the FBI agent who was investigating me. The police officers didn't have any recollection of me or anything like that, um, so the way I see it basically is I was convicted of a crime with no real, in my opinion, no victim, and no witness.   So, yeah, I think you're right." Ex. 12 at 36:06 to 37:17.

### Sheppard's Testimony at Trial

Sheppard testified at trial on January 25, 2023. *See* Ex. 11. Much of that testimony was false. For instance, he testified that, as he made his way through the Capitol grounds, he did not see any barricades, snow fencing, or other signs marking the area as restricted. Ex. 11 at 83-84. He identified a photograph of himself standing beneath the inaugural stage scaffolding but denied seeing a man climbing the scaffolding. *Id.* at 84. He walked up the exterior stairs that led through

the scaffolding to the upper terrace and insisted that he did not see individuals climbing the walls to get up to that same terrace. *Id.* at 85-86. He testified that, upon entering into the building, he did not see other rioters climbing through windows or the broken glass and did not hear the blaring alarms despite being shown numerous videos in which they could be heard. *Id.* at 86-88. He said he did not see anybody being violent inside the building. *Id.* at 88. But Sheppard was not wearing a blindfold or ear plugs while he approached and then entered the Capitol building, and his testimony on those points beggars belief given the contrary video evidence presented at trial.

Sheppard testified truthfully in other respects, and those portions of his testimony fully supported the guilty verdicts.   For instance, he admitted entering the Capitol building, indicating that he "should have known better in hindsight" but that he was not really thinking at the time. Ex. 11 at 86. He acknowledged that he was aware about the certification of the votes at the Capitol on January 6. *Id.* at 157; 194; 235. He admitted to pushing past the police line in the Crypt, despite the fact that the officers were trying to stop the rioters from moving forward. *Id.* at 91-92. He eventually conceded his behavior was disruptive. *Id.* 187-189. He agreed that he was happy because Congress got shut down. *Id.* 100.

At other points, Sheppard offered exceedingly weak excuses for his unlawful conduct. He admitted to banging on doors while inside, and said he was "being a sheep, and . . . just doing what the people in front of me were doing." Ex. 11 at 94. He conceded that he chanted along with the crowd but claimed that he did not think his presence in the Capitol would interfere with Congress's duties.  *Id.* at 96 - 97.   When asked about the video he made of himself claiming to have shut down Congress, Sheppard testified that he was merely repeating what others were saying and that

he thought it meant that they had decided to send the "votes back to the states"; that when he said members of Congress were scared, that he meant they were scared of "political consequences"; and that when he said, "let's fucking go," it was just a "phrase of excitement or whatever." *Id.* at 99–101. On cross-examination, Sheppard acknowledged that the security breach resulting from the mob breaking into the Capitol building caused Congress to shut down, and that he was celebrating that fact in his video. *Id.* 204 – 212.

Sheppard also testified about his presence at the Speaker's Lobby doors. He dubiously testified that he despite observing and videoing people evacuating the House chamber, he did not know what they were doing. *Id.* 106-07. Notwithstanding his incendiary social media posts and media interviews in the days and weeks following the riot, he claimed that he regretted acting disorderly and being "inappropriate" towards the officers, *id.* at 221, conceding that his "presence there did make the officers' job more difficult." *Id.* at 108. When asked why he continued to yell at police officers, he recognized that he "shouldn't have." *Id.*  He acknowledged on cross-examination that the people in his video were fleeing from the mob and evacuating the House chamber. *Id.* at 218-19.

Sheppard later testified that he lied to his parents and others and told them that he had not gone into the building, but claimed it was because he did not want to involve his parents in "the situation that I got caught up in." *Id.*at 114. Finally, Sheppard admitted to deleting posts from his Facebook account after January 6, claiming that he is "staying off social media and just focusing on my biz." *Id.* at 123.

### III.    THE CHARGES AND PLEA AGREEMENT

On March 12, 2021, a federal grand jury returned an indictment charging Sheppard with

six counts:

- Obstruction of an official proceeding in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One);

- Entering and remaining in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1) (Count Two);

- Disorderly and disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(2) (Count Three);

- Entering and remaining on the floor of Congress in violation of 40 U.S.C. § 5104(e)(2)(A) (Count Four);

- Disorderly conduct in a Capitol building (Count Five) in violation of 40 U.S.C. § 5104(e)(2)(D); and

- Parading, demonstrating, or picketing in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six).[6]

Dkt. 8. On January 26, 2023, a jury convicted Sheppard of Counts One, Two, Three, Five, and Six,

and acquitted him on Count Four.

### IV.    STATUTORY PENALTIES

Sheppard now faces sentencing on the counts of conviction above.  As noted by the

Presentence Report issued by the U.S. Probation Office, Sheppard faces up to 20 years of

imprisonment, a term of supervised release of not more than three years, a fine up to $250,000,

and a mandatory special assessment of $100 for Count One; up to one year of imprisonment, a

---

[6] The government filed an amended indictment striking language regarding the Vice-President Elect on January 17, 2023. Dkt. 72.

term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25 for each of Counts Two and Three; and up to six months of imprisonment, a fine up to $5,000, and a mandatory special assessment of $10 for each of Counts Five and Six.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the Presentence Report (PSR) and the calculated guidelines range of 30-37 months incarceration. However, the PSR mistakenly fails to include a full Guidelines analysis for all three Counts to which the Guidelines apply—Counts One, Two, and Three. Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]"

for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The PSR does not follow these steps. It concludes (see PSR ¶ 39) that Counts One, Two, and Three group— a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4). That Guidelines analysis is as follows:

Count One: 18 U.S.C. § 1512(c)(2)[7]

| U.S.S.G. §2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. §2J1.2(b)(2) | Resulted in Substantial Interference[8] | +3 |
| U.S.S.G. §3C1.1 | Obstructing the Administration of Justice | +2 |
| | **Total** | **19** |

Count Two: 18 U.S.C. § 1752(a)(1)

| U.S.S.G. §2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. §2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds[9] | +2 |
| U.S.S.G. §2B2.3(c)(1) | Cross-reference[10] | |

---

[7] As the PSR properly notes, pursuant to U.S.S.G. § 1B1.9, the Guidelines do not apply to counts of conviction that are Class B misdemeanors, and so do not apply to Counts Five or Six here. PSR ¶¶ 38, 88, 98, 108.

[8] For the reasons explained by this Court in *United States v. Brock*, 21-cr-140 (JDB), dkt. 107 at 8-12. Sheppard's offense "resulted in substantial inference with the administration of justice." *See also United States v. Reid*, 21-cr-316 (DLF), dkt. 40 (arguing for application of this adjustment and responding to arguments advanced by the court in *United States v. Seefried*, 21-cr-287 (TNM), Dkt. 123); *United States v. Rubenacker*, No. 21-cr-193 (BAH) (applying adjustment). The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Sheppard was found guilty of corruptly obstructing and impeding an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

[9] Section 2B2.3 gives "restricted building or grounds" the meaning that the phrase is given in 18 U.S.C. 1752. U.S.S.G. §2B2.3 cmt. n.1.

[10] The cross-reference applies since the Section 1752(a)(1) offense was committed with an intent

| U.S.S.G. §2X1.1(a) | Base Offense Level | 17 |
| U.S.S.G. §3C1.1 | Obstructing the Administration of Justice | +2 |
| | **Total** | **19** |

Count Three: 18 U.S.C. § 1752(a)(2)

| U.S.S.G. §2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. §2A2.4(b)(1)(A) | Physical contact[11] | +3 |
| U.S.S.G. §3C1.1 | Obstructing the Administration of Justice | +2 |
| | **Total** | **14** |

| **Combined Offense Level** | | **19** |
| Acceptance of Responsibility | | 0 |
| | | |
| **Total Offense Level:** | | **19** |

Sheppard objected to the PSR on the ground that he was entitled to a two-level offense level

reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility. Such an adjustment, the

---

to commit a felony (18 U.S.C. § 1512). *See* U.S.S.G. § 2B2.3(c)(1) and § 2X1.1 n.2.

[11] As described above, Sheppard's pushing with others to overpower the police line in the Crypt "involved" physical contact. *See* Exhibit 2. Physical contact need not be direct and encompasses indirect uses of force. *See, e.g.*, *United States v. Taliaferro*, 211 F.3d 412, 415-16 (7th Cir. 2000) (specific offense characteristic properly applied where inmate threw a cup of urine into a prison guard's face); *United States v. Shelton*, 431 F. Supp. 2d 675, 675-77 (E.D. Tex. 2006) (defendant threw a cup containing feces and urine at a prison guard, which struck his head, face, and chest), *aff'd*, 230 F. App'x 457 (5th Cir. 2007). Courts have held that the specific offense characteristic applied to a defendant who worked in concert with a codefendant who made indirect contact with the victim. *See United States v. Beltran-Higuera*, 642 F. App'x 780, 782–84 (9th Cir. 2016) (enhancement properly applied where defendant manned the fuel lines of a ship that fled from the Coast Guard for several hours, even after he saw the codefendant ship captain violently resist a USGS order to "heave to" and then ram the USCG vessel; "the district court did not clearly err in finding that [defendant] could reasonably foresee that his actions could bring about further physical contact between [codefendant] and the officers"). Other courts in this district have applied this specific offense characteristics in cases involving the indict use of force. *See, e.g., United States v. Romero*, 21-cr-677 (TSC) (applying physical contact specific offense characteristic in January 6 case involving defendant who pushed against others against police line); *United States v. Baugh*, 22-cr-313 (JEB) (same).

guidelines commentary makes clear, "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, application n.2.

Sheppard does not dispute that legal principle, but effectively claims he did not deny the essential factual elements of guilt at trial. But Sheppard is wrong. While he did stipulate to some relevant facts, he did *not* stipulate to the disputed, key fact at trial: his intent. As this Court will recall, Sheppard's defense at trial was that he lacked the criminal *mens rea* to have committed certain offenses, most importantly the felony obstruction offense in Count One.

That is a denial of the *fact* of Sheppard's *mens rea*, not a "legal argument" divorced from the factual elements (such as a claim that a statute does not cover the admitted factual conduct, or that the admitted conduct is constitutionally protected). Moreover, the guidelines commentary makes clear that "[c]onduct resulting in an enhancement under § 3C1.1 . . . ordinarily indicates that the defendant has not accepted responsibility for his conduct." U.S.S.G. § 3E1.1, application n.4. Sheppard took the stand in service of his factual *mens rea* defense and testified falsely. As explained below Sheppard's perjurious statements warrant a Section 3C1.1 enhancement, and so Sheppard is precluded from receiving acceptance of responsibility for that reason too.

Finally, acceptance of responsibility is clearly inappropriate in this case where Sheppard continues to post false information about the 2020 presidential election and disclaim responsibility for his actions to this day, more than two years later, as described above. *See* §3E1.1 n.5 (stating that the sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility and is entitled to "great" deference).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 87. Accordingly, based on the government's calculation Sheppard's Guidelines imprisonment range is 30-37 months' imprisonment.

With respect to the application of §3C1.1, the government and U.S. Probation Office also agree that this Court should apply Section 3C1.1's two-level enhancement for obstruction of justice. *See* U.S.S.G. §3C1.1. Application Note 4(B) of Section 3C1.1 states that "committing . . . perjury" is one type of conduct to which the two-level obstruction enhancement applies. *United States v. Dunnigan*, 507 U.S. 87, 92-95 (1993) (confirming that perjury merits the obstruction enhancement under Section 3C1.1); *see* U.S.S.G. § 1B1.1(b) ("The court shall then consider … any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence.").[12]

Whether Sheppard committed either type of conduct must be shown only by preponderance of the evidence. It is true that "[a]t one time," the D.C. Circuit required proof of perjury for 3C1.1 purposes by clear-and-convincing evidence. *United States v. Makki*, 47 F. Supp. 2d 25, 29 n.3 (D.D.C. 1999) (citing *United States v. Montague*, 40 F.3d 1251, 1253 (D.C. Cir. 1994)). But that "was based on a reading of the then-effective Application Note 1 to § 3C1.1, which stated that with regard to 'alleged false testimony or statements by the defendant, such testimony or statements should be evaluated in a light most favorable to the defendant.'" *Id.* (quoting *Montague*, 40 F.3d at 1253). "The U.S. Sentencing Commission, however, eliminated the distinction in 1997

---

[12] Application Note 4(F) adds that "providing materially false information to a judge" is another type of conduct that merits the two-level enhancement.

when it amended Application Note 1 'so that it no longer suggests the use of a heightened standard of proof [when the court applies an enhancement for perjury].'" *Id.* (quoting U.S.S.G. Appendix C, amend. 566 (1997)). The D.C. Circuit subsequently stated that it had "construed the amendment to mean that while proof of perjury by clear and convincing evidence had formerly been required, such allegations could now be proven by a preponderance of the evidence." *United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) (citing *United States v. McCoy*, 242 F.3d 399, 407 n.14 (D.C. Cir. 2001)). While *Montague* has not, to the government's knowledge, been expressly overruled, the government is not aware of it having been cited favorably in a perjury 3C1.1 case that involved the post-1997 guidelines.[13] Regardless of which standard applies, however, the evidence is more than sufficient to find that Sheppard committed perjury.

Sheppard committed perjury if he gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94. A "material" statement is one that concerns "information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 n.6.

At trial, Sheppard committed perjury when he made the statements described below under oath. These statements were false, concerned a material matter, and were made with the willful

---

[13] In the Second Circuit, which also applied a clear-and-convincing standard before 1997, courts appear to have moved back to a preponderance standard due to the Sentencing Commission's amendment. *See United States v. Jasper*, 291 F. Supp. 2d 248, 259-261 (S.D.N.Y. 2003), *aff'd*, 108 F. App'x 18 (2d Cir. 2004); *see also United States v. Thundershield*, 474 F.3d 503, 509 (8th Cir. 2007) (discussing the pre-1997 heightened burden cases like *Montague* and then stating that "[c]ases decided under the post–1997 version of § 3C1.1 apply a preponderance-of-the-evidence standard").

intent to provide false testimony.  *See* PSR ¶¶ 29-30.  For example, Sheppard tried to explain away his celebratory video about having shut down Congress by stating that he was merely repeated what others were saying and that he thought it meant that they had decided to send the vote back to the states, and that the politicians were simply scared of the political consequences. Likewise, Sheppard testified at trial that he was not sure why the people he videoed at the House Speaker doors were standing there, Ex. 11 at 105-106 , but in his interview with Alan Keyes he claimed, "next thing you know, we're outside the Congress Chamber, the House Chamber of Congress, and we see the Congress people leaving, evacuating."  Sheppard's false statements at trial were material because they related directly to whether he had the requisite *mens rea* for the offenses charged.  These portions of Sheppard's testimony were false, concerned a material matter, and were made with the willful intent to provide false testimony. The two-level enhancement for obstruction of justice under U.S.S.G. §3C1.1 therefore applies to Counts One through Three.

Application note 7 of Section 3C1.1 states that its enhancement does not automatically apply when the underlying offense is obstruction of justice (that is, on top of the offense's base offense level). But the note is clear that the enhancement *does* apply if there is a second act of obstruction that occurs "during the investigation, prosecution, or sentencing of the obstruction offense itself." U.S.S.G. § 3C1.1 app n.7. Here, Sheppard's underlying offense was obstructing the congressional certification, while the two-level 3C1.1 enhancement is applied based on his separate act of perjury, which occurred "during the . . . prosecution" of his underlying obstruction offense. *Id.* Thus, the two-level enhancement applies. Indeed, a number of courts have applied the

§3C1.1 adjustment to January 6 defendants who testified falsely at trial. *See, e.g., United States v. Hale-Cusanelli*, 21-cr-37 (TNM); *United States v. Bledsoe*, 21-cr-204 (BAH); *United States v. Thompson*, 21-cr-161 (RBW); *United States v. Reid*, 21-cr-316 (DLF).[14]

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the recommended sentence.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Sheppard's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a constitutional crisis. As indicated by Captain Patton's and Special Agent Yetter's testimony at trial, Sheppard's actions—reaching the House Chamber—were unusually dangerous and traumatizing. Sheppard was among the first rioters to make entry into the Capitol building on January 6, roughly four minutes after the initial breach at the Senate Wing Doors. He was at the forefront of the push to overrun the police line in the Crypt that led to rioters spreading into the House side of the Capitol. He pushed through yet another police line to get within feet of the main House door, and when they proved blocked, was among the very first to proceed to the House Speaker's Lobby doors where he screamed at the handful of police officers as members of congress and staff fled the House Chamber. The nature and circumstances of Sheppard's offenses were of

---

[14] To the extent that the Court concludes that the adjustment under Section 3C1.1 does not apply, Sheppard's willingness to make such far-fetched claims while testifying under oath should support a higher sentence.

the utmost seriousness, and fully support the government's recommended sentence of 37 months incarceration.

### B.  The History and Characteristics of the Defendant

While Sheppard lacks any criminal history prior to the instant offenses, his continued and prolific social media posting attacking the Department of Justice and FBI and spreading false information regarding the 2020 presidential election (as described above), repeated failure to comply with pretrial services, and arrest on a new offense and subsequent failure to report that offense or appear in court after that arrest create substantial concern about Sheppard's risk of recidivism.

In a pretrial violation report dated January 19, 2023, pretrial services indicated that Sheppard failed to report by telephone on the weeks of 11/06/2021, 5/7/2022, 10/08/2022, 10/15/2022, 11/12/2022, 12/24/2022, and 12/31/2022 and was warned several times regarding his contact infractions. Dkt. 80 at 2. The report also indicated that Sheppard was arrested in Worthington County, Ohio on December 22, 2022 for Driving While Under The Influence of Alcohol, and Failure to Control and that he had not reported any rearrests nor contact with law enforcement to pretrial services. *Id*. Accordingly, pretrial services requested Sheppard's removal from supervision. *Id*. The PSR indicates that Sheppard was scheduled to appear in court for a pretrial conference on March 22, 2023, in connection with that case. He failed to appear, and an arrest warrant was issued on March 22, 2023. PSR ¶ 55. According to court records, the arrest warrant was only lifted on April 11, 2023, on the day that defense counsel filed its objections to the pre-sentence report.

In short, the defendant's history and characteristics, including his arrest for driving under the influence after January 6 and failure to appear in court in connection with that case, create a troubling pattern and weigh in favor of the recommended high-end sentence in this case.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Sheppard's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[15] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant is perhaps the single factor that weighs most strongly in favor of the government's recommended sentence.

First, the defendant's criminal history category score of I arguably understates the defendant's risk of recidivism in light of his subsequent arrest during the pendency of this case.

---

[15] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

Second, as described above, Sheppard's continuing attacks and spreading of false information about the 2020 presidential election indicate a clear lack of remorse that makes specific deterrence the key consideration in this case. Some of his posts threaten violence against political officials. For instance, immediately after January 6, Sheppard posted numerous threatening posts to Parler concerning Vice President Mike Pence. After his arrest and prior to trial, Sheppard has recorded himself on multiple occasions defending the "peacefulness" of January 6 and insisting that it was an FBI and/or Antifa "set-up" in order to malign Trump supporters, as well as claiming that Congress was never in fact threatened. *See United States v. Brock*, 21-cr-140 (JDB) (defendant's social media before and after January 6 was aggravating).

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

41

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing

philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[16]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[17]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[16] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[17] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, particularly given Sheppard's re-arrest and failure to appear during the pendency of that new case, Sheppard's case is most analogous to others who–like Sheppard—clearly intended to obstruct the certification proceeding, penetrated deeply into the building, were prolific users of social media, and showed little to no remorse for their actions or engaged in subsequent criminal activity.

In *United States v. Bledsoe*, 21-cr-204 (BAH), the defendant was convicted by a jury of violating 18 U.S.C. § 1512(c)(2) and § 2, 18 U.S.C. §§ 1752(a)(1) and (a)(2), and 40 U.S.C. § 5104(e)(2)(D) and (G). Bledsoe posted photos to social media of rioters scaling walls on his way to the Capitol and yelled "[w]e in this bitch! In the Capitol! This is our house! We pay for this shit! Where's those pieces of shit at?" as he entered the Capitol through the Senate Wing doors. Bledsoe walked throughout the Capitol, including in the Crypt, joining other rioters in chants. As rioters ascended the stairs leading up to the second floor where the House and Senate Chambers are located along with office suites, including Speaker Pelosi's suite, other members of the mob ominously chanted, "Nancy! Nancy! Nancy!" Like Sheppard, Bledsoe chose to continue up the stairs rather than turning around to leave. On the second floor, Bledsoe filmed a selfie-style video in the Rotunda while yelling, "Our House!" He also circled the House Chamber, all while members of Congress were trapped inside and unable to evacuate. Bledsoe remained inside the Capitol for a total of 22 minutes before leaving. He showed no remorse after the fact, bragging about "storm[ing] the Capitol" and reposting a photograph mocking members of Congress cowering in fear on January 6 on social media.

Bledsoe likewise testified at trial. He made self-serving statements that minimized his participation and conduct in the unprecedented attack on the Capitol. Bledsoe testified that when he entered the Capitol and yelled, "Where are those pieces of shit at?", he was not referring to politicians but simply meant, "…where can we go protest at…". Bledsoe testified that he believed the rioters were permitted to enter the Capitol to protest because he saw police officers standing near the outside of the Senate Wing Door who did not leave their post to prevent the rioters' entry. Bledsoe denied seeing signs of forced entry and hearing an alarm blaring as he crossed the threshold into the Capitol.

After trial Bledsoe, similarly failed to comply with pretrial services, resulting in a pretrial violation report being filed on July 6, 2022.

The government and probation calculated a sentencing guidelines range of 70-87 months, due in substantial part to the application of an eight-point adjustment under §2J1.2(b)(1)(B) for threatening to cause bodily injury and recommended a sentence of 70 months incarceration. Chief Judge Howell agreed with the government and probation's guidelines range calculation and imposed a sentence of 48 months incarceration.

While Bledsoe's guidelines range of 70-87 months incarceration is certainly higher than Sheppard's of 30-37 months, the case and the ultimate sentence imposed are nonetheless comparable and support the high-end recommendation in this case. As mentioned, the higher guidelines range in Bledsoe was due in substantial part to the application of an eight-point adjustment under §2J1.2(b)(1)(B) for threatening to cause bodily injury—an adjustment that the government is not seeking here. Nevertheless, Sheppard's threatening conduct at the Speaker's

Lobby doors was unusually aggravating and should be considered under § 3553. Moreover, Sheppard's conduct is arguably worse than Bledsoe's in several respects. First, Sheppard continues to post non-stop on social media, and spreading false information about the 2020 presidential election. Second, Sheppard was arrested roughly a month before trial, failed to report the arrest to pretrial services, and then failed to appear at a scheduled pretrial conference in connection with the case. Sheppard has not expressed remorse for his actions–as described above, he continues to defend every day on social media, raising specific deterrence concerns not presented in the Bledsoe case.[18]

Similarly, this court sentenced the defendant in *United States v. Brock*, 21-cr-316 (JDB) after to 24 months' incarceration. Brock, a retired Lieutenant Colonel in the Air Force, stormed the United States Capitol building on January 6, dressed in tactical gear. Dressed in combat gear, he made his way to the Senate floor, where members of Congress had evacuated minutes before. While the sentencing guidelines range in Brock's case was higher than the range in this case (57-71 months), again in large part due to the application of §2J1.2(b)(1)(B), this case also supports a high-end sentence given Sheppard lacks Brock's history of military service and his pride in the events of January 6 in social media posts to tens of thousands of followers more than two years later.

## VII.   RESTITUTION

---

[18] Christopher Grider, another January 6 defendant who was present at the same pivotal moment at the Speaker's Lobby doors will be sentenced on May 23, 2023. *See United States v. Grider*, 21-cr-22 (CKK). In that case, the government likewise recommended a high-end sentence of 87 months incarceration from a sentencing guidelines range of 70-87 months incarceration.

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).[19]  Both require

---

[19] While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v. Zerba,* 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[20]   *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[21]   *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to

---

[20] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).
[21] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."  *Fair*, 699 F.3d at 513.  Here, the Court should find that Sheppard's conduct in entering the Capitol building as part of a mob caused damage to that building.

determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[22]

---

[22] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Sheppard to pay $2,000 in restitution for his convictions. This amount fairly reflects Sheppard's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity. *See United States v. Brock*, 21-cr-140 (JDB), dkt. 98 at 7 (judgment ordering $2000 restitution to the Architect of the Capitol in case involving conviction on similar charges).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a high-

end sentence of 37 months incarceration, 36 months supervised release, $2000 restitution, and the mandatory special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:     /s/ Sonia Mittal
        SONIA MITTAL
        Assistant United States Attorney
        United States Attorney's Office for the
        District of Columbia
        Illinois Bar No. 6314706
        sonia.mittal@usdoj.gov
        (202) 821-9470

        /s/ Craig Estes
        CRAIG ESTES
        Assistant United States Attorney
        United States Attorney's Office for the
        District of Columbia
        Massachusetts Bar No. 670370
        craig.estes@usdoj.gov
        (617) 748-3100