## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No.   21-cr-203 (JDB)** |
| **ALEXANDER SHEPPARD** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Mr. Sheppard was only 21 years old when he was called to Washington, D.C. by former President Donald Trump to attend a rally and to protest what he convinced Mr. Sheppard was an illegal election. Mr. Sheppard has no criminal history and up until this point led a simple, law abiding life outside of Columbus, Ohio.

Mr. Sheppard exercised his constitutional right to a jury trial because, while he admitted he was not supposed to enter the Capitol building and engage in disorderly conduct, he did not have a specific intent to *corruptly* obstruct the Electoral College Certification Vote. However, in exercising his right to have a trial, Mr. Sheppard testified before the jury and the Court and expressed remorse for his conduct and admitted that his actions were foolish and wrong, and that he regretted his behavior.

The government's recommendation fails to properly assess the sentencing factors. Its request for 37 months' incarceration is excessive and is not proportionate to Mr. Sheppard's conduct in this case. Its argument is based almost entirely on

post January 6 statements on social media uttered by an influenced young man who was repeating the same rhetoric and propaganda of others. Most importantly, many of his words contradicted his actual behavior on January 6, 2021. This recommendation as well as probation's recommendation should be rejected.

When looking at his specific conduct on January 6, 2021, and the rest of the 3553(a) factors, a lengthy period of incarceration is not warranted. Based on a thorough consideration of each sentencing factor, Mr. Sheppard respectfully requests that the Court consider his young age, his background and history, and his genuine remorse which he expressed at trial and grant a variance from the guideline range of 10-16 months and to fashion a non-custodial sentence that includes a substantial amount of home detention and community service as conditions of probation.[1] Counsel submits that when reviewing past felony *and misdemeanor* Jan. 6 sentences in this jurisdiction, that this recommendation is sufficient but not greater than necessary to accomplish the goals of sentencing.

## **BACKGROUND**

On February 22, 2021, Mr. Sheppard was charged via complaint with one count of Obstruction of an Official Proceeding in violation of 18 USC §1512(c)(2), in addition to misdemeanor trespass and disorderly conduct offenses for his participation in the events on January 6, 2021. The government obtained an indictment for the same charges on March 12, 2021. For several months, Mr.

---

[1] Below is an in-depth analysis of many January 6 defendants who have been sentenced to various charges. Counsel for Mr. Sheppard submits this recommendation based on this analysis and based on Mr. Sheppard's young age.

Sheppard, through counsel, attempted to negotiate and resolve the matter to a misdemeanor disposition with no success. Undersigned counsel directed the government to a variety of other similar cases that resolved to misdemeanors (that are also outlined below). Despite vigorous attempts to resolve the case to a misdemeanor contained in the indictment, the government insisted that the only plea offer it would extend would be to the most serious felony charge in the indictment. Mr. Sheppard still wished to resolve this matter before trial and even petitioned the government to extend a felony plea to Civil Disorder pursuant to 18 U.S.C. §231 – despite the fact that this charge would still make Mr. Sheppard a young felon. Even still, the government was unwilling to extend such a plea as it had in hundreds of other similar cases.

Before January 6, 2021, Former President Trump encouraged millions of ordinary Americans to travel to D.C. to attend the "Stop the Steal" rally, where he would further encourage them to head to the Capitol building to protest the certification of the Electoral College Vote. In what the January 6 Committee tasked with investigating the events called "The Big Lie," the former President summoned his supporters to travel to D.C. based on false claims that the 2020 Presidential election was "stolen" from him.[2] This lie was told over and over beginning immediately after the 2020 election results where the former President even falsely

---

[2] Shivaram, Deepa, *The House Jan. 6 committee releases its final report on the Capitol attack*, NPR, December 22, 2022, available at
https://www.npr.org/2022/12/21/1144489935/january-6-committee-full-report-release.

declared victory.[3] The former President convinced ordinary Americans, like Mr.
Sheppard, who were not experts in election law, that irregularities existed in the
voting practices and that the fraud would be uncovered. He held rallies all over the
country, repeating these claims and firing up his base of followers.

So, when the former President invited millions of his supporters to travel to
D.C. on the same day as the electoral certification, he gave them false hope that
their voices could somehow change the electoral certification results and that they
could encourage Mike Pence and other Republican leaders to reject the votes from
states that had claimed voter fraud. Below are examples of some of the political
rhetoric that was spreading through the Trump supporter community prior to
January 6, 2021 that came directly from former President Trump:

> WE HAVE JUST BEGUN TO FIGHT!!! – **Tweet from Trump on
> December 12, 2022**.[4]

> A great report by Peter. Statistically impossible to have lost the 2020
> Election. Big protest in D.C. on January 6th. Be there, will be wild! –
> **Tweet from Trump on December 19**.[5]

> The Justice Department and the FBI have done nothing about the
> 2020 Presidential Election Voter Fraud, the biggest SCAM in our
> nation's history, despite overwhelming evidence. They should be
> ashamed. History will remember. Never give up. See everyone in D.C.
> on January 6th.[6] – **Trump tweet from December 26, 2022**.

> If you are planning to attend peaceful protests in D.C. on the 6th, I
> recommend wearing a body camera. The more video angles of that day

---

[3] *Id.* at pg. 36 of final report.
[4] Sherman, Amy, *A Timeline of what Trump said before Jan. 6 Capitol riot*, Politifact, The
Poyner Insttitute, January 11, 2021, available at
https://www.politifact.com/article/2021/jan/11/timeline-what-trump-said-jan-6-capitol-riot/
[5] *Id.*
[6] *Id.*

the better. – **retweet by Trump on January 3, 2022**.[7]

If the liberal Democrats take the Senate and the White House – and they're not taking this White House – we're going to fight like hell, I'll tell you right now,"…We're going to take it back." – **Trump's words at a rally in Georgia on January 4, 2021.**[8]

If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect and even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike can send it back! - **Tweet from former President Trump at 1:00 am on January 6, 2021.**[9]

On January 6, 2021, Mr. Sheppard attended the rally he was invited to by his President, where he listened to several speeches encouraging the crowd to march to the Capitol to "stand up for this country and stand up for what is right.[10]" The Former President Trump, after several minutes of reiterating his claims that the election was stolen, said the following to the crowd (including Mr. Sheppard) on January 6, 2021:

We will not let them silence your voices. We're not going to let it happen, I'm not going to let it happen…..We're gathered together in the heart of our nation's capital for one very, very basic and simple reason – to save our democracy….Now, it is up to Congress to confront this egregious assault on our democracy. And after this, ***we're going to walk down, and I'll be there with you***, we're going to walk down…I know that everyone here will soon be marching over to the *Capitol building* to peacefully and patriotically make your voices heard….And they want to recertify their votes…**But the only way that can happen is if Mike Pence agrees to send it back…If**

_____

[7] *Id.*

[8] *Id.*

[9] *January 6 Report* at 61.

[10] *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

**not…you will have an illegitimate President.** That's what you'll have. And we can't let that happen…**We must stop the steal** and then we must ensure that such outrageous election fraud never happens again….**And we fight. We fight like hell**. **And if you don't fight like hell, you're not going to have a country anymore…..So we're going to, we're going to walk down Pennsylvania Avenue…And we're going to the Capitol, and we're going to try and give them the kind of pride and boldness that they need to take back our country.. So let's walk down Pennsylvania Ave.**[11]

Even as the Capitol building was getting ravaged by a crowd with no leader, the former President Trump did and said nothing for hours.[12] The only thing he did during the crucial hours of the attack was post a Tweet at 2:24 p.m. saying "Mike Pence didn't have the courage to do what should have been done to protect our country and our Constitution.[13]"

## **ARGUMENT**

### I.   **Legal Standard**

The Court is well aware that the Supreme Court's opinions in *Kimbrough v. United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007),

---

[11] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at https://www.usnews.com/news/politics/articles/2021-01-13/transcript-of-trumps-speech-at-rally-before-us-capitol-riot (last viewed on Nov. 22, 2022). (emphases added).
[12] Jonathan Allen, *On Jan. 6, Trump ignored all pleas to call off the mob attacking the Capitol while 'pouring gasoline on fire' aide says*, NBC News, July 21, 2022, available at https://www.nbcnews.com/politics/congress/prime-time-jan-6-hearing-focuses-trumps-inaction-187-minutes-mayhem-rcna36737
[13] Ewan Palmer, *Donald Trump Tweeted Attack on Mike Pence Minutes After Hearing VP Was Fleeing Capitol Rioters*, Newsweek, February 11, 2021 available at https://www.newsweek.com/donald-trump-tweeted-attack-mike-pence-minutes-capitol-rioters-1568568. (last viewed on November 29, 2022).

have dramatically altered the law of federal sentencing.  While courts must continue to consider the sentencing guidelines, Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. §3553(a).[14]  As the Supreme Court made clear in *Kimbrough* and *Gall*, the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. §3553(a).

In two more summary reversals, the Court further clarified that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors.  *Nelson v. United States*, 129 S. Ct. 890 (2009), 2009 WL 160585 (Jan. 26, 2009); *Spears v. United States*, 129 S. Ct. 840 (2009), 2009 WL 129044 (Jan. 21, 2009).  "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in *Nelson*.  2009 WL 160585, at *1.  "The Guidelines are not only *not mandatory* on sentencing courts; they are also not be presumed reasonable." *Id.* At *2.  In other words, a sentencing court may not rely on the Sentencing Guidelines range as a default to be imposed unless a basis exists to impose a sentence inside that range.  Rather, the court must weigh each of the factors and impose a sentence that

---

[14] Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment.  *See* 18 U.S.C. §3553(a).

constitutes the least amount of imprisonment necessary pursuant to Section 3553(a).

II.   **Imposing a Variant Sentence is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).**

a.   **Mr. Sheppard's Personal History and Characteristics**

Mr. Sheppard was born in the Columbus, Ohio area and he has been living there ever since. He was raised by both of his parents, in an average middle-class family. Mr. Sheppard's parents both worked for banks as underwriters. Mr. Sheppard recalls that at times, they were laid off from various positions leading to times of financial instability. However, he was raised in a loving environment with loving and dedicated parents along with his older brother.



When Mr. Sheppard was just a young child, he suffered from speech impediments and his parents placed him in therapy to improve his speech. He

worked hard and eventually overcame this disability. Mr. Sheppard attended the local public high school near Columbus where he played football and participated in choir. His favorite subject was history. From a very young age, Mr. Sheppard exhibited a strong work ethic. Although he was not the most athletic young man, he worked very hard and was loved by his fellow teammates. He also worked at Chipotle after school and often after football practice, where also worked hard and was loved by his colleagues.

     Mr. Sheppard was also interested in helping others from a young age. In fact, right after his high school graduation, instead of asking for graduation money, he requested money to fund his trip to Honduras to assist in building affordable housing for Hondurans in need. There, he spent a week using affordable building materials to build an outdoor kitchen.



After high school, Mr. Sheppard attended some college but shortly realized it was not the path for him and got involved in the sales world when he became a Cutco sales agent. In this job, he was able to travel and see the world and became interested in entrepreneurship. Mr. Sheppard also excelled in this work and it brought him a major sense of accomplishment. Tragically, when the COVID-19 Pandemic ravaged the world, Mr. Sheppard's business was destroyed because it was based entirely on physical contact with customers. It was devastating to Mr. Sheppard not to be able to continue his promising career.

 It also was during that time that he read a book authored by Donald Trump, called "Think BIG and Kick Ass in Business and Life." After reading this book, Mr. Sheppard became inspired by Donald Trump. It was only during the 2020 Presidential campaign that Mr. Sheppard became engaged in politics and only because of former President Donald Trump. He followed him avidly on Twitter and other platforms and was convinced by many of his campaign platforms that promised success for ordinary Americans. Mr. Sheppard also felt personally afflicted by the COVID-19 restrictions – ones that Trump eventually called an end to with a lot of resistance by the Democratic Party. Mr. Sheppard expressed his support of Donald Trump on many different social media platforms.

**Time** 2020-11-24 04:19:34 UTC
**Message** I am a Trump supporter.  Not a Republican.

When the former President Trump claimed the 2020 election was stolen, Mr. Sheppard believed him wholeheartedly. Despite never being a social activist and

leading a completely average and normal life, Mr. Sheppard was so influenced by his President that he drove all the way to Washington, D.C. to support him.

### b.  Nature and Circumstances of the Offense

Mr. Sheppard traveled from Ohio to Washington, D.C. the night of January 5, 2021. On the way to D.C., Mr. Sheppard messaged his friend saying that he was "on his way to D.C. to protest the election." *See* Trial Transcript, Day 4 at 49. Mr. Sheppard also recorded a video of himself proclaiming his intentions to protest what he believed was a fraudulent election. *Id*. at 49-50, 77. (*see* gov. admitted exhibit 321). On January 6, 2021, Alexander Sheppard attended the "Stop the Steal Rally," where he heard the former President Donald Trump tell the crowd that they needed to go down to the Capitol building to protest in order to encourage Mike Pence and Senators to vote to send back the votes to the states. *Id*. at 79-81 (*see* def. admitted exhibit 1). Prior to this speech, Mr. Sheppard had no prior intention of entering the Capitol building. He traveled alone and was not part of any organized group. Wearing a blue hooded sweatshirt and a red Make America Great Again Hat, Mr. Sheppard walked to the Capitol Building with the crowd. *See* Trial Transcript, Day 3 at 191.



At trial, Captain Sean Patton testified that the breach of the Peace Circle on the west side of the Capitol building occurred at 12:53 p.m. *Id.* at 57-60. At about 1:54 p.m., Mr. Sheppard walked towards the Capitol building and the Peace Circle. *Id.* at 70-71. Mr. Sheppard testified that he decided to walk to the Capitol building because "President Trump said to march towards the Capitol." *See* Trial Transcript, Day 4 at 81. He also explained he had a backpack with a water bottle and some granola bars. *Id.* at 82.



Mr. Sheppard testified that when he arrived on the Capitol grounds, he did not see any bike barricades, signs indicating a restricted area, or any fencing. *Id.* at 83. Mr. Sheppard did explain that while on the grounds, he remembers it was very loud and there was a lot of people chanting, and that he observed scaffolding. *Id.* at 84-85. He then further testified that he walked up stairs from the scaffolding and admitted to entering the Capitol building. *Id.* at 86.

However, Mr. Sheppard testified that as he walked into the Capitol building, he walked through an open door, but did not notice the broken glass or anyone climbing through windows, did not hear alarms going off in the background (explaining his hearing is impaired), and did not see any police officers upon entry. *See* Trial Transcript, Day 4 at 86-89. He did hear a lot of people yelling and explained it was "very loud and very chaotic." *Id.* at 89. This could have explained why Mr. Sheppard did not recall hearing alarms going off at the time. Furthermore,

immediately when he walked in, he turned his head to the right side (not able to see people climbing through the window) and walked straight to the right not looking down and so it is entirely possible he did not see the broken glass that at this point was not visible in his flight path.



Not knowing the layout of the Capitol building, Mr. Sheppard followed the crowd and headed to the Crypt area of the Capitol building where he joined others in chanting "USA!" *Id. See also* Trial Transcript, Day 2 at 200-201. Mr. Sheppard explained that did see police forming a line in the Crypt but that he believed their presence was intended to maintain order and make sure things did not get violent. *See* Trial Transcript, Day 4 at 90-91. Mr. Sheppard never spoke to officers and they did not speak to him. *Id.* Shortly after, the crowd in front of him and behind him pushed forward and moved past police and Mr. Sheppard moved with them, however he did not make contact with any officers. *Id.* at 91-93.

Mr. Sheppard then followed the crowd throughout the Capitol building.

He explained he did not know where he was going and was going where everyone else was going *Id*. at 95-96 (*see* gov. exhibit 409A), *see also* Trial Transcript, Day 3 at 13-14. At one point, he even walked within the designated ropes in the Statuary Hall. that were not disheveled or moved at that time. *Id*. at 97 (see gov. exhibit 412), *see also* Trial Transcript, Day 3 at 27-28.



Mr. Sheppard then followed the crowd and directions of other rioters at times chanting the same phrases (such as "Stop the Steal"!). At one point, Mr. Sheppard videoed himself saying, "I am here with some god damn heroes," and "we shut down Congress," and that they were "too scared." *Id*. at 99-100. Mr. Sheppard explained that he videoed himself saying these things after hearing from the crowd around him say that they shut down Congress. *Id*. Mr. Sheppard had no independent knowledge of what was occurring and was relying on what others were telling him. He also explained that he believed the politicians were scared of the political consequences of not sending the votes back to the states but never intended

members of Congress to be physically scared for their lives. *Id*. at 100. Most importantly, Mr. Sheppard expressed remorse for saying these things and testified that it was "foolish language" and that he did not believe it was "heroic" behavior. *See* Trial Transcript, Day 4 at 207. Notably, at this point in time, Mr. Sheppard had not seen any violence and was unaware of all of the reasons that Congress was evacuated. When asked if he would have still celebrated had he been aware of the violence, Mr. Sheppard confidently said, "no." *Id*. at 243.

Mr. Sheppard lastly ended up right outside the House Chambers behind the door to the Speaker's Lobby. *See* Trial Transcript, Day 3 at 44. Mr. Sheppard followed people there who were waving him in that direction but did not know what they were doing or who they were. *See* Trial Transcript, Day 4 at 102-104. Mr. Sheppard also did not know what part of the building he was in. *Id*. at 103. Mr. Sheppard then acknowledged that while outside the Speaker's Lobby, he engaged in inappropriate rhetoric towards police officers and acted in a disorderly manner. *Id*. at 105. Mr. Sheppard then explained that as he was filming with his phone, he realized the glass of the door was being broken, but never encouraged anyone to break glass. *Id*. at 106-107. Mr. Sheppard acknowledged that he shouted things towards police like, "We supported you guys, BLM and Antifa were killing cops", and, "we are taking our country back!." *Id*. at 108-110. Mr. Sheppard, however, started to back up when he observed someone trying to kick down the door. *Id*. at 111 (*see* gov. exhibit 511). After hearing a gun shot and realizing a young lady had been shot, Mr. Sheppard became afraid and went into shock. *Id*. at 112. He

continued to back up and shortly after officers escorted him outside of the building. *Id*. Mr. Sheppard explained how everything at that door happened very fast and that watching it on video was very different from how he remembered it. *Id*. at 244.

After leaving the Capitol building, Mr. Sheppard got into his car and left D.C.. *Id*. at 113. Following January 6, 2021, Mr. Sheppard lied to his parents and a friend, telling them he did not go inside the building –realizing the extent of what he was just involved in. *Id*. at 114, 119. On January 9, 2021, before Mr. Sheppard realized the violence that occurred that on J6, he posted unfortunate comments about being fine with Mike Pence but not out of a desire that he be harmed but out of frustration that he did not send the votes back to the states. *Id*. at 116-117.

Mr. Sheppard is sorry for being involved in what was a very tragic day for this country. Even testifying in his own trial, Mr. Sheppard acknowledged his behavior. He testified multiple times that he regretted going into the Capitol building and that his actions were stupid, disruptive, foolish, and inappropriate. *See* Trial Transcript, Day 4 at 105, 117, 207, 211. When asked by counsel what he was thinking while in the building, Mr. Sheppard responded:

> At this point I think I was riled up with the crowd, which is why I was, you know, shouting inappropriately. Again, now, you know, seeing everything and looking back at it, I can tell that, you know, just my presence there did make the officers' job more difficult.

*Id*. at 108. Even on cross-examination, while Mr. Sheppard was explaining the context of some of his statements, he said, "But it was again, I did it in, you know, in an angry mob fashion, inappropriate fashion, just, you know, a disorderly fashion." *Id*. at 221.

Mr. Sheppard's family and friends all agree that this event does not represent his true character. They all paint him in a positive light and describe him as being "polite," respectful, "kind," "professional," and "courteous," and having a strong work ethic. *See* Exhibit 1, Letters of Support. His family and friends all mention how Mr. Sheppard has expressed remorse to them for his actions on J6. *Id.* For example, a family friend explains that, "I am certain that Alex regrets his actions on January 6, 2021 and would not repeat them if he could turn back time." *Id.* Letter from Patrick DeMary. Another family friend explains that, "He acknowledged remorse to us…..He deeply regrets the pain he brought to his parents." *Id.* Letter from Scott Huskey. Lisa Heaton, the mother of one of Alex's good friends, says, "He has shown remorse for going into the Capitol….it was totally shocking when I heard the news because it seemed so unlike him." *Id.* Letter from Lisa Heaton.

Mr. Sheppard's employer also took the time to write a letter to the Court where she explains that he has a positive attitude at work and goes above and beyond at work. *Id. See* Letter from Brittiney Johnson. Ms. Johnson also explains that Mr. Sheppard is compassionate and understanding towards people of all walks and beliefs. She also explains that he even expressed remorse for his actions on January 6 at work and despite his conviction, he is welcome back as an employee. *Id.*

Mr. Sheppard's young age undoubtedly led him to be vulnerable to older and more powerful people who he trusted and believed would not steer him in a bad

path. Being only 21 years old at the time, with no college education, and without much knowledge on how the Electoral Count Act worked, Mr. Sheppard fell into the manipulation strategies that Trump used to convince even older and more educated people that their democracy was being compromised. Young men like Mr. Sheppard had no chance of understanding their role as pawns in the campaign's agenda that convinced people that Trump was actually the winner of the election. For this reason, Mr. Sheppard should not be treated as harshly as someone older and with more experience.

Furthermore, the power of social media on young individuals is astonishing and is something that the older generation (including undersigned counsel) simply cannot relate to. To truly understand the addictive power of social media, scientists have studied the effects on the brains of adolescents and found devastating impacts, including significant differences in brain chemistry.[15] Mr. Sheppard has grown up in the social media world and as a result has compulsively used social media. As such, he has been more vulnerable and is part of the target population of propaganda being spread by mass amounts of social media messaging.

Lastly, Mr. Sheppard did not have any leadership role, traveled alone, had no prior intent to enter the Capitol building, did not assault anyone or destroy any property. He came to D.C. after being simply indoctrinated to believe an idea that

---

[15] CBS News, *NIH Study Tracks Effects of Social Media on Adolescent Brains*, Dec. 10, 2018, available at https://www.cbsnews.com/video/nih-study-tracks-effects-of-social-media-on-adolescent-brains/ (last viewed on April 7, 2023).

made him feel a sense of loyalty to a man he believed would help him and the future of this country. Loyalty was his agenda – not violence or assault or destruction.

Young men like Mr. Sheppard were not only pawns of the Trump campaign, but more organized groups on January 6, 2021, like the Proud Boys, also intended to rile up normal people in the crowd to serve their agenda. The New York Times investigated this dynamic and learned that there different groups who went to the Capitol building, ones that simply intended to protest peacefully and others with a plan to incite the crowd and breach the building.[16] The Proud Boys called people like Mr. Sheppard "normies" and had an intent to rile them up in order to support their agenda.[17] Mr. Sheppard went to DC naively being completely unaware of the powers at be that had paved the way for the perfect storm of January 6. He was used to serve a purpose and is now a felon because of it. While this does not excuse his actions, it does provide context. In the sentencing of Andrew Cavanaugh, the Honorable Amit P. Mehta opined that perhaps some J6 defendants are victims too and were ordinary Americans with no criminal history who were subject to the "power of being told lies over and over again by leaders who knew better." *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 26-27.

---

[16] New York Times, Proud Boys Led Major Breaches on Jan. 6 Video, July 11, 2022, available at https://www.nytimes.com/2022/07/12/us/politics/proud-boys-jan-6.html (last viewed on April 7, 2023).
[17] Reneau, Natalie, New  York Times, How the Proud Boys Breached the Capitol on Jan. 6: Rile up the Normies, June 17, 2022, available at
https://www.nytimes.com/video/us/politics/100000008392796/rile-up-the-normies-how-proud-boys-breached-the-capitol.html

Lastly, after January 6, 2021, Mr. Sheppard cooperated with the FBI's execution of a search warrant and provided access to his cellular telephone – which incriminated him at trial. He was cooperative with the investigation and has attended all of his pre-trial court hearings with courteousness. Even at trial when confronted by mocking and aggressive behavior from the government during its cross-examination, Mr. Sheppard was polite and calm.

### c.   The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities

Based on the past two years, the Court can be assured that Mr. Sheppard is unlikely to repeat the same conduct. Besides an arrest for a traffic offense that is still pending, Mr. Sheppard has been overall compliant with his conditions of release. Ever since January 6, 2021, Mr. Sheppard has been a productive member of society and has been working full-time. He has not attended Trump rallies. He also has zero criminal history and is unlikely to recidivate. Furthermore, Mr. Sheppard is now a young felon and will have to deal with the collateral consequences that stem from that for the rest of his life. This punishment is severe for a young man like Mr. Sheppard and has more than deterred him from future similar conduct.

Although there are no cases that are identical, a review of past January 6 sentences imposed for other defendants convicted of 18 U.S.C. §1512(c)(2) further demonstrates that a significant variance is warranted in the instant case.[18] The

---

[18] This case analysis is not meant to suggest that the defense believes incarceration is appropriate in these matters or that the involved allegations were in fact true as

most compelling case is *US v. Matthew Wood*, 21-cr-223 (APM). After consideration

of all of the sentencing factors, the court rejected the government's request for 57

months' incarceration and imposed a sentence of one year home confinement for a

defendant who was convicted of 18 U.S.C. §1512(c)(2). The Court determined that

the proper guideline range for Mr. Wood was 21-27 months while the government

and probation argued that his guideline range was 51-63 months based on its belief

that an 8 level adjustment for "causing or threatening to cause injury" applied. Mr.

Wood was also a young man who fell victim to the same manipulation strategies of

former President Trump. Mr. Wood was 23 years old while Mr. Sheppard was 21

years old, however both young and naïve and part of the "normies" group that

others took advantage of. Like Mr. Sheppard, Mr. Wood walked up the Upper West

Terrace side of the Capitol and entered into the Senate Wing Door at the same time

Mr. Sheppard did. Like Mr. Sheppard, he went to the Capitol with no battle gear

and no weapons and was not violent, did not destroy property, and did not steal.

However, unlike Mr. Sheppard, Mr. Wood's alleged behavior was more aggravating

in that he allegedly was aware of violence on the grounds and pushed forward,

encouraged others to press forward, was involved in scuffles in the East Rotunda

where police officers were trying to keep people out, was in the building for

approximately 90 minutes, and entered Nancy Pelosi's office and took a drink of

water from a glass that was present on the table. He also deleted text messages,

---

undersigned counsel was not counsel in all of these cases. Rather, the analysis is meant to
provide a summary of past cases that are relevant for the Court's consideration in this
matter.

including one that read: "It was total chaos. We sent Congress running into their escape tunnels." However, Mr. Wood did accept responsibility early on. The Court also considered his young age and vulnerability – which are also applicable in this case opining as to what purpose placing him a BOP facility would actually serve. *See United States v. Matthew Wood*, 21-223 (APM), Sentencing Transcript at 66-67.

Below is also a summary of other cases that also support a significant variance.

- *US v. Richard Michetti,* 21-cr-232 (CRC): Defendant sentenced to 9 months' incarceration after pleading guilty to 18 U.S.C. §1512(c)(2). Mr. Michetti's sentencing guideline range was 15-21 months. The government accused Mr. Michetti of yelling at police while they were being assaulted by others – calling them "fucking animals." The government also alleged that he briefly pinched the sleeve of another officer and continued to push against a police line in the Rotunda after being hit by chemical spray.

- *United States v. Anthony Puma,* 21-cr-454 (PLF): Defendant received 9 months' incarceration. Mr. Puma was in his 50's and also behaved immaturely on January 6 based on significant influence from former President Trump. He stayed in the Capitol and on the grounds for several hours but was never violent. Mr. Puma entered a guilty plea and cooperated with law enforcement.

- *US v. Paul Hodgkins,* 21-cr-188 (RDM): defendant sentenced to 8 months' incarceration after pleading guilty to 18 U.S.C. §1512(c)(2). Mr.

Hodgkins was accused of entering the Senate Chamber unlike Mr. Sheppard, and unlike Mr. Sheppard, he brought a backpack containing protective eye goggles, rope, and white latex gloves. However, Mr. Hodgkins accepted responsibility very early.

• *US v. John Andries,* 21-cr-93 (RC): Defendant sentenced to 12 months' and one day of incarceration after pleading guilty to 18 U.S.C. §1512(c)(2). The Court calculated his guideline range to be 21-27 months. Mr. Andries was right behind the first wave of rioters that breached the Senate Wing Door. He also made his way to the Speaker's Lobby and witnessed the shooting of Ashli Babbit. Mr. Andries also recorded himself in the building, making some unfortunate comments. After he left the building, he had to be physically removed by law enforcement after refusing to leave. Mr. Andries also had two new arrests post Jan. 6. However, Mr. Andries also had many mitigating factors, such as his outstanding service as a US Marine, and his mental and medical conditions. Mr. Andries was also cooperative with law enforcement and very remorseful for his actions.

• *US v. James Rahm,* 21-cr-150 (TFH): Defendant sentenced to 12 months' incarceration after a stipulated bench trial where he was convicted of 18 U.S.C. §1512(c)(2) as well as several other misdemeanor offenses. Mr. Rahm allegedly made comments as he was approaching the Capitol building saying "They're in there counting the electoral votes we have the building surrounded we're ready to make a breach and take our Capitol

back." After allegedly being pepper sprayed, he was involved in the
chaotic breach of the East Rotunda Doors where many officers were
assaulted in an attempt to keep rioters inside the building from letting in
rioters outside of the building. Mr. Rahm was on the outside of the
building trying to get in while all of this was occurring. When he
successfully entered, he allegedly said "Time to find some brass and kick
some friggin' ass." Post Jan. 6, Mr. Rahm allegedly posted that he walked
through Pelosi's office and should have "shit on her chair," however it was
not true that he entered her office.

• *United States v. Larry Brock*, 21-cr-140 (JDB): Mr. Brock was sentenced
to 24 months' incarceration after being convicted at trial. The Court
rejected the government's request for 60 months' incarceration based on
an estimated guideline range of 57-71 months. Mr. Brock was not a young
man like Mr. Sheppard and expressed his preference for an insurrection
and a civil war on January 6, 2021. He dressed in combat gear and
entered the Senate floor minutes after members of Congress were
evacuated. Mr. Sheppard's conduct was entirely different and he should
receive a significantly lower sentence.

Most importantly, it is worthwhile to analyze some of the past misdemeanor
sentences with aggravating conduct because it further highlights the sentencing
disparities that have resulted simply based on arbitrary lines that the government
has drawn when extending plea offers.  Had it not been for Mr. Sheppard's

comments, it is likely that he would have also been offered a misdemeanor as he did not enter the Senate Chamber and did not assault police officers. However, some of the conduct of prior misdemeanants is comparable and at times even more egregious than Mr. Sheppard's conduct. In fact, Mr. Sheppard's conduct did not appear to be more aggravating than the *David Ticas* case where this Court sentenced the defendant to 14 days' incarceration.

- *US v. David Ticas*, 21-cr-601 (JDB): The Court rejected the government's request for 3 months' incarceration and imposed a sentence of 14 days' incarceration followed by 24 months' probation for a violation of 40 U.S.C. §5104 (e)(2)(G). Mr. Ticas first attended the rally with his 16 year old daughter. They both headed to the Capitol building a little earlier than Mr. Sheppard. Mr. Ticas was filmed actively yelling at police on the Capitol grounds as loud flashbangs were occurring. Mr. Ticas first went towards the Senate Parliamentarian's Door where he was met with several police officers. Mr. Ticas asked them, "Where's Chuck Schumer?" He then ended up at the Senate Wing Door where he filmed rioters enter through the broken window just a few minutes after Mr. Sheppard entered. Like Mr. Sheppard, while inside, Mr. Ticas chanted "Stop the Steal!" Unlike Mr. Sheppard, Mr. Ticas asked an officer "Where's Nancy Pelosi?" Mr. Ticas also entered the Crypt and took several photographs. Mr. Ticas continued to negatively engage police officers while inside the building. He was not in the building as long as Mr. Sheppard – approximately 19 minutes. Following January 6, Mr. Ticas

messaged friends bragging that he stormed the Capital building – as well as some other unfortunate comments. Mr. Ticas was not a young man like Mr. Sheppard.

• *US v. John Lolos,* 21-cr-243 (APM): Mr. Lolos was sentenced to 14 days' incarceration after entering a guilty plea to 40 U.S.C. §5104 (e)(2)(G). The government accused Mr. Lolos of making troubling statements and posts while in the Capitol building where he remained for 43 minutes.  The government also alleged that after leaving the Capitol building, Mr. Lolos posted a video to twitter shouting "They left! We did it!" Unlike Mr. Sheppard, the government also accused Mr. Lolos of causing disruption on his plane ride back home –resulting in the plane having to turn around.

• *US v. Peart,* 21-cr-662 (PLF)*:* Mr. Peart was sentenced to 36 months' probation with 2 months' home detention after entering a guilty plea to 40 U.S.C. §5104 (e)(2)(G). Mr. Peart was accused of climbing on walls and scaffolding to gain entrance to the Capitol building where he observed officers using tear gas on rioters and witnessed the rioters use tear gas on officers. Mr. Peart entered the same entrance as Mr. Sheppard, only 90 seconds after rioters forced their way through officers at that entrance. Lastly, Mr. Peart allegedly had to be told twice to exit the Capitol building.

• *US v. Phillip Bromley,* 21-cr-250 (PLF): Mr. Bromley was sentenced to 90 days' incarceration followed by 12 months' supervised release after pleading guilty to 18 U.S.C. §1752(a)(1). The government accused Mr. Bromley of

posting violent rhetoric prior to January 6, 2021. He also allegedly berated U.S. Capitol police officers guarding a door to the Capitol building while his cousin assaulted one of them. He then witnessed the shooting of Ashli Babbit. After Jan. 6, the government accused Mr. Bromley of lying about his conduct.

• *US v. Jeremiah Caplinger,* 21-cr-342 (PLF): Defendants sentenced to 35 days' incarceration followed by 24 months' probation after entering a guilty plea to 40 U.S.C. §5104 (d). Mr. Caplinger allegedly brought body armor to the Capitol building, scaled a wall to reach the Upper West Terrace, and made his way to Nancy Pelosi's office after pushing past police officers in the Crypt. He allegedly gave interviews post January 6, 2021, demonstrating a lack of remorse.

• *US v. Jacob Wiedrich,* 21-cr-581 (TFH): Mr. Wiedrich was sentenced to probation with 90 days' home detention after pleading guilty to 40 U.S.C. §5104 (e)(2)(G). Mr. Wiedrich was also only 21 years old and a young man who was just following the older crowd. He also entered through the Senate Wing door, except unlike Mr. Sheppard, he was met with resistance by officers and chanted at officers while climbing through the Senate Wing Window. Mr. Wiedrich also stole a US flag from the Capitol building which was later recovered from his home. Mr. Wiedrich also had some unfortunate post January 6 statements. Mr. Wiedrich also accepted responsibility and was cooperative with law enforcement. The Court took into account his young age when imposing the sentence.

• *US v. David Mish,* 21-cr-112 (CJN): Sentenced to 30 days' incarceration with no supervision to follow after pleading guilty to 40 U.S.C. §5104 (e)(2)(G). Mr. Mish also witnessed the Ashli Babbit shooting and was close to the Speaker's lobby. Mr. Mish had a long criminal history but also turned himself in and accepted responsibility early.

• *US v. William Tryon,* 21-cr-420 (RBW): Mr. Tryon was sentenced to 50 days' incarceration after pleading guilty to 18 U.S.C. §1752(a)(1). The government alleged that Mr. Tryon was actually met with resistance from Capitol Police while attempting to gain entry into the Capitol building. The government also accused him of refusing to comply with Capitol Police commands and was pepper-sprayed and hit by a baton by them. Mr. Tryon allegedly did not give up and eventually gained entry into the building.

• *US v. Jeffrey Register, 21-cr-349 (TJK):* Mr. Register was sentenced to 75 days' incarceration after entering a guilty plea to 40 U.S.C. §5104 (e)(2)(G). The government accused Mr. Register of being on the Grounds and inside the Capitol building for 90 minutes, deliberately destroying evidence, and telling FBI that he never went inside the building. Notably, the government also accused Mr. Register of running past officers who were trying to contain a surge of rioters. The government further alleged that Mr. Register waved the crowd towards an access point to the Speaker's Lobby and eventually witnessed the killing of Ashli Babbit. This individual may have been one of the defendants who waived Mr. Sheppard towards the Speaker's Lobby.

• *US v. Brandon Nelson*, 21-cr-344 (JDB): Mr. Nelson was sentenced to 24 months' probation after entering a guilty plea to 40 U.S.C. §5104(e)(2)(G). Mr. Nelson also entered through the Senate Wing Door just a couple minutes after Mr. Sheppard and was inside the Capitol building for more than an hour. Mr. Nelson was in the same area as Mr. Sheppard in the Crypt behind the same line of officers that were eventually overrun. After January 6, 2021, Mr. Nelson said his actions were due to patriotism and that he did not back down but rather "held the line." Mr. Nelson did have mitigating circumstances just like Mr. Sheppard, including his prior service in the Air National Guard.

• *US v. Daniel Warmus*, 21-cr-417 (PLF): Defendant sentenced to 45 days' incarceration and 24 months' probation after entering a guilty plea to 40 U.S.C. §5104 (e)(2)(G). Mr. Warmus allegedly was in the first wave of rioters to breach the Capitol building on the west side, recorded his movements, evaded a Capitol Police officer's attempt to detain him, and allegedly posted videos post Jan.6 of himself harassing police officers.

• *US v. Thomas Fee*, 21-cr-133 (JDB): Mr. Fee was sentenced to 24 months' probation after entering a plea to 40 U.S.C. §5104(e)(2)(G). He entered the Senate Wing Door two minutes earlier than Mr. Sheppard. He directed other rioters to go towards the Crypt where he remained for 8 minutes. Mr. Fee spent approximately 40 minutes inside the Capitol – which was similar to how long Mr. Sheppard remained inside. What is significant about Mr. Fee's

case is that he gave people directions on where to go while he was inside. Mr.
Fee was also not a young man.

All of these cases highlight the fact that there have been inconsistencies in
how the government has charged cases and with the plea offers it extends.
Nonetheless, these past sentences further support a significant variant sentence in
the instant matter.

Lastly, it is worthwhile to also analyze the cases where defendants were
convicted of 18 U.S.C. §231(a)(3) (Civil Disorder). While Mr. Sheppard's conduct is
not similar to these defendant's conduct and less aggravating, the sentences
imposed are much lower than the government and probation's recommendation
simply because the charge guidelines for Civil Disorder are significantly less than
the guidelines in 18 U.S.C. §1512(c)(2).

- *US v. Andrew Griswold*, 21-cr-459 (CRC): Defendant sentenced to 75 days'
  incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Griswold was
  a business owner who joined the effort at the East Rotunda Door to push past
  police officers. This breach was significant in that it resulted in many
  assaults against police. He also entered the Senate Chamber and yelled "This
  is our house now!" He gave an interview after he left saying that members of
  Congress "ran" and "hid" while "we took the building," and "we will fucking
  do it again." Later, the government accused him of deleting evidence from his
  phone.

- *US v. Aaron Mostofsky,* 21-cr-138 (JEB): Defendant sentenced to 8 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3) and 18 U.S.C. §641. Mr. Mostofsky's guideline range was 12-18 months. He was accused of forcibly engaging in confrontation with police by pushing against a barrier with all of his strength to resist officer efforts to contain the riot. Mr. Mostofsky also allegedly took a bullet proof vest that a Capitol Police officer was wearing and later wore this along with a riot shield he found. Also unlike Mr. Sheppard, Mr. Mostofsky arrived at 1:30 p.m., when the crux of the first wave of violence was taking place.

- *US v. Derrick Evans*, 21-cr-337 (RCL): Defendant sentenced to 3 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Evans was a former West Virginia state legislator who joined the push at the Rotunda Doors and live streamed filmed violence against police officers. He urged others around him to "take" the Capitol and yelled that "a revolution has started!" The sentencing guidelines in this case were 0-6 months.

- *US v. Jerry Ryals*, 21-cr-244 (CKK): Defendant sentenced to 9 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). He allegedly entered the Capitol building saying "we definitely have enough people to overthrow this bitch," and tried to break down a locked office door with a sign and his shoulders. That door was eventually broken after other rioters joined his efforts. Mr. Ryals later allegedly posted that he was a patriot and that the country was headed to war.

- *US v. Daniel Johnson,* 21-cr-407 (DLF): Defendant sentenced to 4 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Johnson allegedly pushed against a line of officers who were guarding East Rotunda doors trying to prevent rioters from gaining entry to the building. The pushing of rioters caused these officers to be sandwiched against the doors and the effort of the rioters were successful as that door was breached. Mr. Johnson also allegedly said afterwards that he was trying to find a way into the Senate Chamber.

- *US v. David Blair,* 21-cr-186 (CRC): defendant sentenced to 5 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Blair was accused of bringing tactical gloves, carrying a lacrosse stick with a large Confederate flag attached to it and using that stick to push against a police officer's chest. The government also alleged he carried a backpack with a knife and roll of duct tape inside.  Mr. Blair never made it inside the Capitol building because he was detained on the spot after assaulting officers with his stick.

- *US v. Kenneth Grayson,* 21-cr-224 (TSC): This case is actually somewhat similar to Mr. Sheppard's case. Mr. Grayson was sentenced to 60 days' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). He also traveled to D.C. to protest what he believed was a stolen election. Like Mr. Sheppard, Mr. Grayson did not intend to join a crowd that eventually pushed past police inside the Rotunda. Also like Mr. Sheppard, he was inside the building for

approximately 47 minutes. Also similar to Mr. Sheppard, Mr. Grayson posted

a lot of unfortunate comments. Unlike Mr. Sheppard, however, Mr. Grayson

is 53 years old. Because Mr. Grayson was offered a plea to Civil Disorder, his

sentencing guideline range was 0-6 months.

### General Deterrence

Sentencing Mr. Sheppard to a significant period of incarceration is not the

way to ensure that the isolated events on January 6 will never occur again. An

event like January 6 is unlikely to happen again[19] Empirical evidence proves that

the certainty of prosecution, rather than the severity of the punishment is the

greater deterrent.[20] Individuals like Mr. Sheppard have already been deterred by

this threat of prosecution. Most individuals involved in January 6, 2021, were

encouraged to do what they did by the most powerful executive in our country and

yet the government has not hesitated to prosecute these individuals to the fullest

extent possible. Incarceration with most of these cases is not the answer and

perhaps to really effect general deterrence, something very different is needed so

that individuals do not fall victim to the dangerous propaganda that incited

January 6, 2021. Lastly, even if a situation like January 6 were to happen again,

the public will not be deterred by a simple young man from Ohio who is not an

extremist.

---

[19] *See* transcript of video sentencing in *United States v. Douglas Sweet*, 21CR41-3 (The
Honorable Judge Nichols states, "It is unlikely that the circumstances of led to their actions
on January 6 will occur again. It is unlikely that the sitting President will invite them, as
part of a large crow, to protest and demonstrate, even fight at the Capitol. . . ").
[20] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article
available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence

The Honorable Amit P. Mehta alluded to this dilemma in a recent sentencing hearing encouraging us all to ask ourselves why ordinary American citizens from all over the country with good backgrounds, steady jobs, and often times even Veterans, came together to commit these acts. *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 26-28. Judge Mehta opined that this was able to occur because of:

> [T]he power of propaganda; the power of being told lies over and over and over again; told by leaders who knew better, that something was taken away from people when it wasn't…the idea that people who have otherwise led modest and humble lives, who have not been political agitators, political activists, are now facing serious jail time is extraordinary. *Id.*

## III.   Sentencing Guidelines Objections

Mr. Sheppard requests that the Court reject probation's calculation of the sentencing guidelines and rather find that his guideline range is 10-16 months. Without the adjustment for Obstruction of Justice pursuant to U.S.S.G. §3C1.1 as well as the 3 level adjustment pursuant to U.S.S.G. 2J1.2(b)(2) that probation incorrectly applied, Mr. Sheppard's base offense level would be 14. Mr. Sheppard further submits that he should receive a 2 level downward adjustment pursuant to U.S.S.G. §3E1.1 for acceptance of responsibility – which would make his total offense level 12. With no criminal history, Mr. Sheppard's sentencing guideline range should be 10-16 months.

Rather than reiterate the extensive objections already filed on April 11, 2023, attached as Exhibit 2 are the objections already submitted to

probation as well as the *Seefried* Memorandum Opinion from the Honorable
Trevor N. McFadden regarding U.S.S.G. §2J1.2.(b)(2). (attached as Exhibit 3).

Probation filed its final PSR and in its response to the defense
objections, mostly reiterates its reasoning in the Draft PSR with the
exception of the adjustment pursuant to U.S.S.G. §2J1.2 (b)(2). Probation
notes that this enhancement also applies because the offense resulted in the
"unnecessary expenditure of substantial governmental or court resources."
*See* Final PSR at 25. Besides generally stating that hundreds of officers had
to be deployed and that the repair and cleanup costs were high, probation
points to nothing specifically that suggests that Mr. Sheppard himself caused
these things to happen. In fact, Mr. Sheppard was not the cause of any of
these things and these law enforcement officers would have been deployed
regardless given the substantial breaches that occurred even prior to Mr.
Sheppard's arrival.

As stated in the *Seefried* Opinion, the reliance on this clause "obscures
the rest of the definition" and ignores the proper interpretation of the entire
definition that includes "or court" suggesting that the term refers to
"*prosecutorial* resources rather than the expenditure of resources by any
public agency." *See* Exhibit 3 at 16.

Even if the Court disagrees with the *Seefried* Opinion, the analysis
must be decided on a case by case basis to determine whether or not Mr.
Sheppard's specific conduct meets that definition. In this case, it clearly does

not. Mr. Sheppard was not responsible for the deployment of more officers, he did not destroy property, knock anything down, or cause any damage that contributed to clean up costs. Therefore, this adjustment does not apply to Mr. Sheppard.

## IV.    Imminent Changes to Sentencing Guidelines

On April 5, 2023, the Sentencing Commission voted to adopt amendments to the Sentencing Guidelines that if approved by Congress, will affect the calculation of the guidelines significantly in many cases, including this one.[21] These changes will go into effect on November 1, 2023.

Applicable to Mr. Sheppard, the Commission created a new guideline at U.S.S.G. §4C1.1 which provides a two level downward reduction for certain individuals with zero criminal history points.[22] This amendment would, in part, require a reduction of two levels for defendants with zero criminal history points who essentially did not use violence, commit a sex offense and did not use a firearm.[23]

Based on this imminent and likely change, come November of this year, Mr. Sheppard's guideline range would be lower regardless of whether the Court agrees with probation's adjustments. If the Court agrees with counsel's interpretation of the guideline range and deems it to be 10-16 months, this new change would further reduce that range to 6-12 months.

---

[21] Adopted Amendments (effective November 1, 2023) | United States Sentencing Commission (ussc.gov)
[22] *Id*. at pg. 80.
[23] *Id*.

For this reason, Mr. Sheppard requests that the Court vary downward to account for this new change.[24]

Also applicable to Mr. Sheppard is an amendment under §5C1.1 application Note 4 that advices that a sentence other than imprisonment is "generally appropriate" if a person is in Zone A or B of the sentencing table and gets the §4C1.1 reduction.[25] Under counsel's interpretation of the guidelines and given the inevitable 2 level downward adjustment for having no criminal history points, Mr. Sheppard would be in Zone B and would be under this advisement.

Even if the Court disagrees with counsel's assessment and deems him to be in Zone C of the sentencing table, there are many reasons Mr. Sheppard's guidelines overstate the gravity of the offense. If probation's version of the guidelines stand, Mr. Sheppard would essentially be in the same guideline range as those who assaulted officers, stole property, and destroyed property on January 6, 2021. *See United States v. Mark Leffingwell*, 21-cr-005 (ABJ); *United States v. Kevin Creek*, 21-cr-645 (DLF); *United States v. Troy Sargent*, 21-cr-28 (TSC); *United States v. Aaron Mostofsky*, 21-cr-138 (JEB).

## V.    Downward Departures

---

[24] If the Court is not willing to consider this change yet given the new change has not gone into effect, counsel would like the opportunity to request a continuance until after November given the impact it has on his guideline range. Given the fact that this change is not simply a proposed change but rather one that has already been adopted, it is certain that come November, his guidelines would be lower.
[25] *Id*. at 81-82.

Lastly, Mr. Sheppard should receive a downward departure pursuant to U.S.S.G. §5K2.0 based on his youthful age and lack of education as these factors are present to an "exceptional degree."

One of the seminal Supreme Court cases, *Gall v. U.S.* 128 S. Ct. (2007), involves a defendant who was also only 21 years old and was invited by someone else to join in a conspiracy to distribute ecstasy. Probation determined Gall's guideline range to be 30-37 months but he ultimately received a period of probation at sentencing. The Supreme Court affirmed this sentence stating, "immaturity at the time of the offense conduct is not an inconsequential consideration." *Id.* at 601-602. The Supreme Court further reasoned that recent studies on the development of the human brain conclude that brain development may not become complete until the age of twenty-five. *Id.* The Supreme Court also discusses how youth is a time and condition in life when a person may be most susceptible to influence. *Id.* See also *Miller vs. Alabama*, 567 U.S. 460 (2012) (Breyer, J., Sotomayor, J. concurrence).

In this case, there was testimony at trial that Mr. Sheppard was not only 21 years old at the time of the offense conduct, but was also only a high school graduate. Furthermore, he was very susceptible to influence because of his age and because of his lack of higher education. Mr. Sheppard testified that he followed the former President Trump regularly and believed everything he told the American people regarding the COVID-19 Pandemic

and the 2020 Presidential Election. All of this influence contributed to his offense conduct.

Lastly, many courts have considered youthful age as well as a lack of criminal history and strong family support in imposing sentences far below the sentencing guidelines. *See United States v. Ross*, 557 F.3d 237 (5th Cir. 2009) (original sentence reasonable based on defendant's lack of criminal history, strong family support, and youth as mitigating factors); *United States v. Polito*, 215 Fed. Appx. 354, 357 (5 th Cir. 2007) (upholding sentence due to young age and immaturity at time of offense that "prohibited him from acting rationally."); *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D.Mass. 2007)( citing studies that suggest true first time offenders have a very low recidivism rate).

For these reasons, Mr. Sheppard requests that the Court consider his youthful age, lack of education, susceptibility to influence, immaturity, lack of criminal history, and strong family support to conclude that these factors are present to an exceptional degree and thus warrant a downward departure.

## VI.   Response to Government Sentencing Memorandum

### a.  Social Media

The government, in its sentencing submission, focuses its argument almost entirely on post January 6 comments on social media and fails to do a proper dive into the §18 U.S.C. 3353(a) factors. Furthermore, the

government's suggestion that Mr. Sheppard is not remorseful based on these comments is flawed. It suggests that one cannot be remorseful for their conduct while simultaneously speaking their mind regarding their political beliefs. Notably, Mr. Sheppard never denied his conduct nor bragged about his conduct on January 6.

The government first points to an interview that Mr. Sheppard gave with Dr. Alan Keyes. Notably, Mr. Sheppard *never denies his conduct* in this interview but rather provides comments that were very similar to the popular conspiracy theories regarding January 6. As already discussed above, Mr. Sheppard was extremely impressionable to influences around him and was reiterating the same propaganda.

The government also provides some of Mr. Sheppard's comments given in an interview with another young man who undersigned counsel represented last year and who was offered a plea to a petty offense. In *United States v. Micajah Jackson*, 21-cr-484 (RDM), the court sentenced the defendant to 90 days in a Reentry Center and considered his young age among many other mitigating factors when imposing the sentence. The government also aggressively argued that Jackson's post January 6 social media comments were aggravating factors. The government's simplistic and black and white perspective should be rejected as a more genuine approach would be to consider the vulnerability and age of these individuals that were influenced by very powerful and older people. The government clings to social

media to dramatize their conduct notwithstanding the fact that their actual conduct on January 6 did not reflect individuals who were leaders or instigators or activists. Rather, the truth is that these young men were "all talk" and on January 6 followed the crowd and were quite frightened by what occurred. Furthermore, the government overemphasizes social media when that is one factor among many to be considered for whether someone expresses remorse. Again, despite all of the comments stated in these interviews, Mr. Sheppard never denies his conduct.

The government then provides snippets of comments from an interview with Mr. Sheppard on "Bob & Eric Save America" after his conviction at trial. These snippets do not go towards any sentencing factors and does not contradict Mr. Sheppard's testimony. Providing this interview is rather designed to be inflammatory and continues to "mock" Mr. Sheppard just as it did at trial during his cross-examination.

The government has crossed the line in many January 6 cases by digging up every single comment said on social media in the name of "lack of remorse." While it is permissible for the government to use some of the defendant's words, the government overreaches when it uses surveillance in this manner rather than to prevent an actual crime. Mr. Sheppard does not pose a threat to the community and at some point, the government's continued surveillance of him crosses a line and becomes invasive and inappropriate when considering the actual goals of sentencing. Sentencing

should be mostly based on the actual conduct – not the viewpoints of a vulnerable population that continues to be manipulated. It is only in January 6 cases that the government has expended so many resources into diving into the personal lives of defendants even 2 years after January 6, 2021. "Just because you can doesn't mean you should." *See Alaina Jean Marie Robbins v. State of Maryland*, 07-cr-0019-000726 (App. C. of MD, April 17, 2023) (opinion by Nazarian, J.).

### b. Obstruction of Justice Enhancement

The government argues that Mr. Sheppard's testimony was false and that the enhancement under U.S.S.G. §3C1.1 applies. In support of its argument, the government tries to prove Mr. Sheppard's statements were false by citing to a post-trial social media statement he gave where he admitted he saw members of Congress evacuate while at the Speaker's lobby. Firstly, information that he learned during discovery and in trial has nothing to do with the state of mind he had on January 6 – which is what he testified to. At trial, Mr. Sheppard testified that he did not recognize the people behind the glass and he was not really sure why they were standing there. *See* Trial Transcript, Day 4 at 105-106. Throughout the trial, Mr. Sheppard learned that those people were members of Congress. The government has no indication that his words at the time were untruthful and cannot base its argument on things that Mr. Sheppard learned later on. In any event, that is

certainly not a fact that is "material," and would have not changed the outcome of guilt in this case.

### c.  Past January 6 Sentences

The government provides only two prior comparison cases that are not comparable to the instant matter. Firstly, the government tries to suggest that Mr. Sheppard's conduct is comparable to the defendant in *United States v. Bledsoe*, 21-cr-204 (BAH). This is an outrageous comparison. Firstly, as the government admits – Mr. Bledsoe's guideline range was 70-87 months because the Court found he caused or threatened to cause injury – which enhanced his sentencing guidelines by 8 levels. Secondly, Mr. Bledsoe was not a young 21 year old like Mr. Sheppard. Thirdly, his behavior was starkly different than Mr. Sheppard. Mr. Bledsoe, while on the grounds of the Capitol building, snapped a photo of people scaling the wall with a caption that read "Nothing can stop whats coming." He also climbed a statute and planted a flag in the statute's arm while in the building. Mr. Bledsoe also shouted many aggressive comments such as, "where are the pieces of shit?" Mr. Bledsoe then circled the halls of the House Chamber right at the moment that staff were trapped inside the House Gallery. While Mr. Sheppard did shout things in the Capitol building, nothing he said was an actual threat towards Congress.

The government also provided the *Brock* matter that was before this Court where the defendant was sentenced to 24 months' incarceration. For

the reasons already discussed above, this is also not an appropriate case for comparison. Notably, however, in *Bledsoe* and *Brock*, the Court chose to vary significantly below the guideline range. In *Bledsoe*, the Court varied downward from a guideline range of 70-87 months to a sentence of 48 months' incarceration. In *Brock*, the Court also varied downward from a guideline range of 57-71 months and imposed a sentence of 24 months' incarceration. In both of these cases, the Court did not accept the government's recommendations of 70 months in *Bledsoe* and 60 month recommendation in *Brock*. This shows that Courts are varying downwards given the high guideline ranges presented in these cases in addition to the many mitigating factors presented.

Moreover, the government fails to provide many other cases where Courts also varied downward substantially in cases similar to Mr. Sheppard's.

### d. Pre-trial supervision

The government overdramatizes Mr. Sheppard's performance on pre-trial release. Mr. Sheppard has been on pre-trial release conditions for 2 years and has missed some telephone check ins and did not report a traffic DUI arrest. However, Mr. Sheppard works at a Sports bar and does not leave until very early in the morning – causing him to sleep during the day and so sometimes he accidentally missed his telephone check ins. He has, however, checked in most weeks over the span of 2 years. Also, Mr. Sheppard did not

realize he had to report an arrest for a traffic matter and has since been advised of that requirement. The government mistakenly states that Mr. Sheppard "engaged in additional criminal conduct," referring to his arrest for a DUI that is still pending. He has not been found to engage in criminal conduct as this charge is still pending and there has been no determination of guilt. It is unclear why the government is characterizing this arrest as "criminal conduct" based solely on the knowledge that he has been arrested and charged with an offense.

Notably, Mr. Sheppard has been employed full-time since his arrest in this matter and has appeared for his court proceedings spanning over 2 years.

## CONCLUSION

For the reasons stated above, Mr. Sheppard respectfully requests that the Court grant his request for a non-custodial sentence.  Mr. Sheppard also requests that a fine not be imposed given his inability to afford a fine. Instead, Mr. Sheppard requests for the Court to order community service as a condition of his supervised release.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____ /s/ _____
Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Maria_jacob@fd.org